## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HADIZA I. WADA,

    Plaintiff,

    v.

KENNETH Y. TOMLINSON,

    Defendant.

Civil Action No. 03-1488 (CKK)

## MEMORANDUM OPINION
(May 9, 2007)

Pending before the Court is Defendant's Motion for Summary Judgment. Plaintiff, a former employee of the Broadcasting Board of Governors ("BBG") – specifically of the Hausa Service of the Africa Division of Voice of America ("VOA") – brings the above-captioned action against Defendant Kenneth Y. Tomlinson, in his official capacity as Chair of the BBG, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended ("Title VII"). Plaintiff's Complaint alleges that Defendant discriminated against her based on her race, sex, and religion by not selecting her for a supervisory position (Count I), refusing to reclassify Plaintiff's position from a GS-12 to a GS-13 (Count II), and subjecting her to disparate discipline (Count III). In addition, Plaintiff alleges that she was subject to retaliatory discipline as a result of her prior use of the Equal Employment Opportunity ("EEO") process (Count IV), and that she was subject to discriminatory and retaliatory harassment that amounted to a hostile work environment (Count V). Furthermore, by Order dated October 14, 2005, the Court effectively allowed Plaintiff to amend her Complaint to add allegations of discrimination and retaliation relating to

1

the termination of her employment.

Defendant has moved for summary judgment as to all Counts included in Plaintiff's Complaint as well as Plaintiff's claim that her termination constituted discrimination and retaliation.  Plaintiff opposes Defendant's motion for summary judgment, which became ripe on March 19, 2007, when Defendant filed its reply memorandum in further support of its motion for summary judgment.  Thereafter, on April 4, 2007, Plaintiff filed a motion asking that the Court disregard as untimely Defendant's motion for summary judgment and reply.  Upon a searching consideration of the filings currently before the Court, the attached exhibits, the relevant case law, and the entire record herein, the Court shall deny Plaintiff's motion asking the Court to disregard Defendant's motion for summary judgment and reply, and shall grant Defendant's motion for summary judgment in its entirety.

## I: BACKGROUND

The Court begins its discussion of the facts by noting that this Court strictly adheres to the text of Local Civil Rule 56.1 (identical to Local Civil Rule 7(h) (formerly Rule 7.1(h)).  The local rules for summary judgment "assist[] the district court to maintain docket control and to decide motions for summary judgment efficiently and effectively." *Jackson v. Finnegan, Henderson, Farabow, Garret & Dunner*, 101 F.3d 145, 150 (D.C. Cir. 1996).  "Requiring strict compliance with the local rule is justified both by the nature of summary judgment and by the rule's purposes. . . . The procedure contemplated by the rule thus isolates the facts that the parties assert are material, distinguishes disputed from undisputed facts, and identifies the pertinent parts of the record." *Id.* (quoting *Gardels v. CIA*, 637 F.2d 770, 773 (D.C. Cir. 1980)).  "[A] district court should not be obliged to sift through hundreds of pages of depositions, affidavits, and

interrogatories in order to make [its] own analysis and determination of what may, or may not, be a genuine issue of material fact." *Id.* (quoting *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988)).

The Court further notes that, in the Court's September 19, 2006 Scheduling and Procedures Order, the parties were advised that "[t]he Court strictly adheres to the dictates of Local Civil Rules 7(h) and 56.1 and may strike pleadings not in conformity with these rules." *Wada v. Tomlinson*, Civil Action No. 03-1488, Order (D.D.C. September 19, 2006 (citing *Burke v. Gould*, 286 F.3d 513, 519 (D.C. Cir. 2002)). The Court's Scheduling and Procedures Order also specifically instructed Plaintiff that she should respond to each paragraph in Defendant's statement of material facts with "a correspondingly numbered paragraph, indicating whether that paragraph is admitted or denied," including any information relevant to her response in that paragraph, and furnishing precise citations to the portions of the record on which she relied. *Id.*

In her Response to Issues of Material Facts (hereinafter "Plaintiff's Statement"), Plaintiff complies with the Court's Scheduling and Procedures Order, insofar as she responds to each paragraph of Defendant's Statement of Material Facts (hereinafter "Defendant's Statement") with a correspondingly numbered paragraph. However, many of Plaintiff's responses consist primarily of argument, rather than evidence demonstrating the existence of a genuine issue of material fact. Moreover, in her Statement, Plaintiff cites broadly to her "exhibit," which is in turn divided into sections relating to each of Defendant's numbered factual assertions. Many of these sections include upwards of fifty pages of documents, and Plaintiff does not specify the particular pages of the section on which she relies. The Court has nevertheless undertaken a review of the record evidence submitted by Plaintiff in order to determine whether genuine issues

3

of material fact exist.

As the Court's Scheduling and Procedures Order set forth, pursuant to Local Civil Rule 56.1, in resolving the present summary judgment motion, this Court "assumes that facts identified by the moving party in the statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  LCvR 56.1; 7(h).  In accordance with this Rule, the Court has treated as admitted all facts alleged by Defendant in its Statement and not specifically contradicted by Plaintiff in her Statement.  The Court has also considered the facts adduced by Plaintiff in her Statement, to the extent that they are supported by record evidence, and cites directly to the record, where appropriate, to provide additional information not covered in either of the parties' statements.

A.      The Parties

*Pro se* Plaintiff, Hadiza Wada, was born in Nigeria and became a naturalized United States citizen in 2000.  Compl. ¶ 8.[1]  Plaintiff describes herself as a female member of the Islamic

---

[1] Plaintiff is currently proceeding *pro se* in this action; however, the Court notes that she has been represented by counsel at various points throughout the history of this action.  When Plaintiff initiated this action she was represented by counsel, who subsequently withdrew after accepting employment with the federal government.  *See* Motion to Withdraw as Attorney for Plaintiff, Docket # [13], *Wada v. Tomlinson*, Civil Action No. 03-1488 (D.D.C. May 17, 2004).  Thereafter, Plaintiff retained new counsel and dismissed that counsel, choosing instead to retain a third attorney, who had previously represented her in proceedings related to her termination by the BBG.  *See Wada v. Tomlinson*, Civil Action No. 03-1488, Docket #s [22, 24, 25, 26].  Magistrate Judge Alan Kay subsequently granted Plaintiff's third attorney's motion withdraw as counsel for Plaintiff, in which the attorney asserted that Plaintiff refused to accept his legal advice, refused to disclose material necessary to respond to discovery requests, and insisted on directing all aspects of her legal representation.  *See Wada v. Tomlinson*, Civil Action No. 03-1488, Docket # [34], Motion to Withdraw as Attorney (D.D.C. Mar. 2, 2005); Minute Entry Order (D.D.C. Apr. 15, 2005).  Finally, Plaintiff retained a fourth attorney while preparing her opposition to Defendant's motion for summary judgment, whose representation she opted to terminate before her opposition was filed.  *See Wada v. Tomlinson*, Civil Action No. 03-1488, Docket #[71], Consent Motion to Extend Time (D.D.C. Nov. 9, 2006); Docket #[75] Motion for

faith. *Id.* ¶¶ 4, 8.  At the time she filed her Complaint, Plaintiff was an employee of the

Broadcasting Board of Governors ("BBG") in the Hausa Service of the Africa Division of Voice

of America ("VOA"), at its headquarters in Washington, D.C.  *Id.* ¶ 3.  BBG is an agency of the

United States federal government, and VOA is an international broadcast service, which

broadcasts on radio and television in 44 languages.  *Id.* ¶ 5; BBG Home Page,

http://www.bbg.gov/bbg_aboutus.cfm..  The Hausa Service is one of five (5) language services

and two (2) branches in the Africa Division of VOA.  9/27/02 Dillard Decl. ¶ 6.[2]

 Plaintiff was hired by VOA in 1986 as an International Radio Broadcaster (IRB) at the

GG-11 grade level, was promoted to the GG-12 grade level in 1991, and was converted to the

GS-12 grade in 2000.  Compl. ¶ 9.  Plaintiff remained a GS-12 IRB until her termination by

VOA, which was effective September 10, 2004.  Def.'s Stmt. ¶ 69.

  B. *Plaintiff's Non-Selection as Hausa Service Chief*

 In approximately June 2000, the then-Hausa Service Chief, Rashida Hasan, was

reassigned.  *Id.* ¶ 1.  The Service Chief position would remain vacant until August 2001.  *Id.*

During that time, Africa Division Director Gwendolyn Dillard assigned two VOA employees –

Diane Butts and Negussie Mengesha – to take on supervisory responsibilities for the Hausa

---

Order to Release Plaintiff's Counsel (D.D.C. Jan. 22, 2007).

 [2] The Hausa Service broadcasts exclusively in the Hausa language to approximately 180 million people in Africa, with a target audience in Nigeria, Ghana, Chad and Cameroon.  9/27/02 Dillard Decl. ¶ 7.  The Hausa language is the fastest growing trade language in most parts of West Africa; as a first language, it is spoken by close to 60 million people, and millions speak the Hausa language as a second language.  *Id.*

Service. *Id.* ¶ 2.[3]  On or about July 1, 2000, Plaintiff was officially given a new position

description of "Senior Editor" in the Hausa Service.  *Id.* ¶ 3; Def.'s Non-Select. Exs. at 1-6

(7/1/00 Request for Personnel Action).  In addition to the ordinary duties of an IRB with editorial

responsibilities, Plaintiff's duties as Senior Editor included, "[i]n absence of the Service Chief,

attends daily Division meetings, and with the assistance of other Service Chiefs and the Africa

Division Director, assumes other responsibilities representing the Service," as well as "[p]rovides

input to annual performance evaluation of staffers." *Id.* at 3.  However, as Defendant points out,

Plaintiff's new position description had no effect on her grade or pay because Plaintiff remained

an IRB GS-12, step 7.  *Id.* at 1.  Furthermore, according to the relevant Request for Personnel

Action form, the position of Senior Editor was neither supervisory nor managerial. *Id.* at 2 box

11.

   For her part, Plaintiff maintains that she performed supervisory duties on the Hausa

Service for extended periods of time, specifically between 1994 and 1998, and between 2000 and

---

[3] Plaintiff attempts to dispute Defendant's claim that Ms. Butts and Mr. Mengesha were assigned supervisory responsibilities in the absence of a Hausa Service Chief by asserting that Defendant could not produce documents officially assigning them supervisory responsibilities, and further asserting that Defendant refused to provide signed statements from Ms. Butts and Mr. Mengesha regarding the amount of time they spent on supervisory duties for the Hausa Service during the relevant period. Pl.'s Stmt. ¶ 2.  However, Plaintiff herself provides no evidence in support of her assertion that she bore the burden of supervisory duties while Ms. Butts and Mr. Mengesha spent less than an hour per day in the Hausa Service.  *Id.*  In contrast, Defendant proffers numerous affidavits, declarations, and deposition transcripts in support of its assertion that Ms. Butts and Mr. Mengesha performed supervisory duties in the absence of a Hausa Service Chief.  *See* Def.'s Non-Selection Exs. (hereinafter "Non-Select. Exs.") at 61 (11/20/01 Dillard Aff.); *id.* at 127-28 (1/25/05 Dillard Dep. at 49:1-50:3) (Plaintiff had "some kind of oversight of the service," but Ms. Butts "was asked to step in temporarily and provide some guidance and oversight . . . [and] became . . . a type of interim service chief," and Mr. Mengesha assumed those responsibilities when Ms. Butts could no longer perform them); *id.* at 83 (11/21/01 Mengesha Aff.).  This evidence is more than sufficient to support Defendant's assertion, notwithstanding Plaintiff's preference for additional alternative evidence.

2001, and that she had been a Senior Editor since 1994.  Pl.'s Stmt. ¶¶ 2-3.  In support of this

assertion, Plaintiff points to documents from the 1990s in which Plaintiff is referred to as "senior

night shift editor" and described as "one of the senior editors."  *See* Pl.'s Exs. for Issue No. 2.

Plaintiff also disputes Defendant's assertion that her Senior Editor position was not supervisory

or managerial, Def.'s Stmt. ¶ 5, noting that her 2000 position description indicates that she could

"assume other responsibilities representing the Service," Pl.'s Stmt. ¶ 5.  Nevertheless, it is

uncontroverted that Plaintiff was not officially given the position of Senior Editor until July 2000

and that the position of Senior Editor was identified as neither supervisory nor managerial in the

relevant appointment paperwork.  Def.'s Stmt. ¶ 3; Def.'s Non-Select. Exs. at 1-6 (7/1/00

Request for Personnel Action).  Moreover, in his September 26, 2002 Declaration, Mr. Mengesha

averred that Plaintiff "never had any supervisory responsibilities.  She was not authorized to rate

employees, sign time cards or authorize leave."  Def.'s Non-Select. Exs. at 87 (9/26/02

Mengesha Decl.) ¶ 6.  Indeed, during her deposition in this matter, Plaintiff testified that prior to

Ms. Hasan's appointment in 1998, Plaintiff had managerial responsibilities but did not have

supervisory responsibilities such as time attendance sheets, annual leave or performance

evaluations. 12/3/04 Wada Dep. at 33:5-11.  Plaintiff further testified that, while Ms. Butts

oversaw the Hausa Service, Plaintiff ran some division meetings and Ms. Butts handled "bigger

issues, that may be managerial or involving discipline."  *Id.* at 76:3-11.  As such, the evidence in

the record supports Defendant's assertions that Plaintiff became Senior Editor in 2000 and that,

while this position entailed additional responsibilities, Plaintiff did not perform supervisory

duties between 2000 and 2001 in the absence of a Hausa Service Chief.

On July 3, 2000, the BBG announced job vacancy No. PA-00-73 to fill the Hausa Service

Chief Position (Supervisory International Radio Broadcaster GS-13), with a closing date of July 31, 2000.  Def.'s Stmt. ¶ 7; Def.'s Non-Select. Exs. at 8 (7/3/00 Announcement).  Ms. Dillard was the selecting official for the position.  9/27/02 Dillard Decl. ¶ 14.  Plaintiff applied for the Service Chief position, Def.'s Stmt. ¶ 8; Compl. ¶ 13, but was not selected for the position, which was re-announced as vacancy No. PA-00-102 on August 21, 2000 and listed as "open until filled."  Def.'s Stmt. ¶ 14; Def.'s Non-Select. Exs. at 12 (8/21/00 Announcement).  Ms. Dillard avers that the "reason for the change was to increase the applicant base and secure the widest possible pool of outstanding candidates."  9/27/02 Dillard Decl. ¶ 16.

Both vacancy announcements included identical requirements for the position: (1) "Demonstrated potential to lead and supervise a professional staff including the ability to apply EEO principles - MANDATORY;" (2) "Ability to plan and coordinate multi-faceted programming, to implement radio programming and production innovations, and to exploit new broadcast technologies;" (3) "Professional knowledge of broadcast journalistic writing, editing principles and production techniques and skill in applying these in practice;" (4) Understanding of the foreign and domestic policies of the U.S.;" (5) "Thorough familiarity with and understanding of the political, economic, historical and cultural realities of Nigeria and other Hausa speaking areas of Africa;" and (6) "Ability to speak and read in the Hausa language - DESIRABLE."  Def.'s Non-Select. Exs. at 8 (7/3/00 Announcement); *id.* at 12 (8/21/00 Announcement).  In addition, Ms. Dillard avers that in filling the Hausa Service Chief position, she was specifically looking for a candidate who demonstrated: (1) managerial skills and the ability to work collegially with others; (2) team building skills; (3) understanding of professional journalism practices, including investigative journalism, and a sensitivity to the media climate in

8

Africa; (4) the ability to help the Hausa staff develop new broadcasting skills; (5) fluency in

English and Hausa and ability to articulately represent the Hausa Service; (6) current and

extensive understanding of Nigeria, as well as United States foreign policy; and (7) ability to

carry out Ms. Dillard's directives.  9/27/02 Dillard Decl. ¶ 17.

Ms. Dillard further avers that, as of the time of the vacancy announcements, "a history of

contention permeated the Hausa Service due in some measure to the conflicts existing within the

target regions in Africa.  This ha[d] led to a disintegration of the team effort within the Service

and many staffers ha[d] split into 'warring camps.'" *Id.* ¶ 18.  As a result, Ms. Dillard asserts, in

filling the Hausa Service Chief position, she "was looking for a person who had no involvement

in these prior conflicts so that a fresh perspective could be brought into the Service." *Id.*  Ms.

Dillard's description of the tensions within the Hausa Service at the time are supported by the

documentary evidence in this case.  On June 14, 2000, Ms. Dillard received an e-mail from a

Hausa staff member with the subject "Please intervene directly in the Hausa Service," which

stated in relevant part:

> It is with humility and respect that I write to you to ask you to please intervene
> directly in the Hausa service before things completely reach a crises [sic] level. . .
> I have the right to be listen [sic] to and as a staff of this service asking for a
> general meeting is not out of the ordinary.  For someone to use your name to
> refuse a general meeting is not fair to you or to the other staff . . . . But already
> some of us are bent on creating problems for you and for the rest of us . . . . Please
> Ms. Dillard use your good offices to bring sanity to this chaos in the Hausa
> service. . . .

Def.'s Non-Select. Exs. at 7 (6/14/00 e-mail from S. Kura to G. Dillard); Def.'s Stmt. ¶ 6.

The record evidence also demonstrates that Plaintiff was directly involved in the ongoing

disputes within the Hausa Service.  On August 5, 2000, Ms. Dillard was copied on an e-mail

9

from the same Hausa staff member, written in response to an e-mail from Plaintiff asking why a

program contained dead air, which stated:

> you did not do your technology program and [we] had to scramble to fill up the
> entire back half with something emergency . . . . You must also forget how
> sometimes you are late to the studio and another staff had to open the show for
> you . . . . You also forgot when you recently leave [sic] the office for 4-5 hours
> when you are the duty editor . . . But since we are not scheming to be the chief
> through whatever means, we never report you on that . . . . As late as last two
> weeks [we] had to complain to acting supervisor Negussie Mengesha about one
> such instance when you were the editor but was not around up to 4:00 pm . . . . If
> you would concentrate on your specified job as an editor and stop running to
> personnel and your 'friends' in the union to get help to position yourself for the
> job of chief, things would be smoother in this service.

Def.'s Non-Select. Exs. at 9-10 (8/5/00 e-mail from S. Kura); Def.'s Stmt. ¶ 10.  In addition, on

September 7, 2000, Plaintiff engaged in a e-mail exchange with another Hausa Service staff

member in which Plaintiff and the other staff member accused each other of causing mistakes in

VOA's coverage of President William J. Clinton's visit to the Hausa Service's target areas in

Africa.  *See* Def.'s Non-Select. Exs. at 13-16.  Ms. Dillard was copied on the e-mail exchange,

and responded by rebuking Plaintiff and the other staffer, stating:

> I understand the substance of your discussion but the tone of it is unacceptable.  In
> any extended live coverage of a major event it is normal the correspondent and the
> Washington office have misunderstandings about what is filed and what is used.
> That discussion should be factual, ask for clarification of what happened and be
> phrased in tones of respect between colleagues.  Your two notes moved quickly
> from raising questions into personal accusations, name calling, and impugning
> motives.  This is not how we work in this division.  It is not the sign of people
> who believe they are suited for higher grades and responsibilities.

*Id.* at 13 (9/7/00 e-mail from G. Dillard); Def.'s Stmt. ¶ 15.  Plaintiff responded to Ms. Dillard's

e-mail by stating that she was "amazed at your reference to it as something between us – how can

anyone possibly miss the importance of the visit to our target area by THE UNITED STATES

PRESIDENT HIMSELF.  Do not try to make it personal again please.  It will not work."  Def.'s

Non-Select. Exs. at 13 (9/7/00 e-mail from H. Wada); Def.'s Stmt. ¶ 16.

On September 8, 2000, Ms. Dillard forwarded the entire e-mail exchange – including her

e-mail to Plaintiff and the other staffer and Plaintiff's response – to Myrna Whitworth, VOA

Program Director, and Mike Zeitlin, VOA Chief of Staff.  Def.'s Non-Select. Exs. at 13 (9/8/00 e-

mail from G. Dillard); Def.'s Stmt. ¶ 20.  Ms. Dillard's forwarding note read:

> I'm forwarding the two notes [Plaintiff] sent (just two, although there have been
> many more) within 24 hours of her return this week to give you a sense of her
> interaction with the service and why her becoming chief or even acting chief is not
> an option.  Although the service has been doing remarkably well . . . they made
> the most progress when [Plaintiff] was gone.  She has an anger and simmering
> confrontation with members of the service that just doesn't go away.

*Id.*

Furthermore, on September 11, 2000, Ms. Dillard was copied on an e-mail string in which

a Hausa Service staff member wrote:

> EFFECTIVE IMMEDIATELY, I WILL NOT ABIDE BY ANYTHING HADIZA
> DIRECTS IN THE HAUSA SERVICE UNTIL I RECEIVE A WRITTEN
> CONFIRMATION FROM THE DIRECTOR OF THE AFRICAN SERVICE OF
> THE VOA, GWEN DILLARD, INDICATING HADIZA'S APPOINTMENT,
> AUTHORIZING HER TO DO SO. . . . A SITUATION IN WHICH SERVAL
> PEOPLE ARE DIRECTING THE AFFAIRS OF THIS SERVICE AT THE
> SAME TIME, UNDER THE GUISE OF BEING AN UNOFFICIAL "ACTING
> CHIEF" IS UNHEALTHY, CONFUSING, AND DOWNRIGHT
> UNPROFESSIONAL. . . .

Def.'s Non-Select. Exs. at 17-18 (9/11/00 e-mail exchange); Def.'s Stmt. ¶ 17.  Another staffer

responded to the first e-mail by stating:

> I write to express my agreement with [the first staffer] . . . I'm pleading with
> whoever is responsible to please intervene in good times [sic] to save not only the
> sanity and orderliness we have seen during Diane Butts [sic] tenure as the person
> "in-charge here, but also to bring the Hausa service from its wilderness.

> Whenever we work together we always reach a consensus . . . Now suddenly, since [Plaintiff's] return we started with yet another problem. . . .we need someone to work with us who will understand our problems and predicament. Someone neutral, someone who is not part to the problems of the past.  Someone who has good management experience.  Just like Ms. Butts.

Def.'s Non-Select. Exs. at 17; Def.'s Stmt. ¶ 18.

Plaintiff does not dispute that these e-mails were sent or that Ms. Dillard was copied on the various e-mails.  *See* Pl.'s Stmt. ¶¶ 6, 10, 15-18.  Instead, Plaintiff defends her participation in the various e-mail exchanges.  *Id.*  In addition, Plaintiff asserts that the e-mails sent by various Hausa Service staffers should not be relied upon because the staffers had been previously found to have "incit[ed] and stirr[ed] up problems in Hausa Service including **making false accusations without supporting facts** against" Ms. Hasan, *id.* ¶ 6 (emphasis in original), and were reprimanded for their involvement in circulating a petition advocating Ms. Hasan's removal, *id.* ¶¶ 6, 10.  Plaintiff further suggests that one of the staffer's e-mails are not credible because he was also an applicant for the Hausa Service Chief position, and because he was later found to have misused a government credit card.  *Id.* ¶ 17.  However, regardless of whether the e-mails sent by other Hausa staffers are accurate accounts of Plaintiff's behavior, they nevertheless corroborate Ms. Dillard's assertion that significant conflicts existed within the Hausa Service and that Plaintiff was directly involved in those conflicts.  Furthermore, Plaintiff's own e-mails, in and of themselves, constitute evidence of her involvement in the ongoing conflicts within the Hausa Service.

The record evidence also reveals another issue involving Plaintiff during the period when the Hausa Service Chief position was vacant.  On August 17, 2000, Plaintiff sent Ms. Dillard an e-mail regarding Plaintiff's efforts to obtain press credentials for President Clinton's visit to Nigeria

on August 25-27, 2000.  Def.'s Non-Select. Exs. at 11 (8/17/00 e-mail from H. Wada); Def.'s

Stmt. ¶ 11.  In her e-mail, Plaintiff stated, "[a]mong information they need to process the request

is, what is my designation (title).  What better opportunity can we get as a service than this to

close the chapter on the supervisory position.  The position has been closed since July 31st."  *Id.*

Ms. Dillard responded by telling Plaintiff that her "designation and title [was] Senior Editor in the

Hausa service" and that the "posting for Hausa chief did not close on July 31.  It remains open

until filled."  Def.'s Non-Select. Exs. at 11 (8/17/00 e-mail from G. Dillard); Def.'s Stmt. ¶ 12.

Ms. Dillard further stated:

> I have also noticed some inaccuracies in the Hausa webpage.  Your [sic] are
> referred to in the page as the Managing Editor/Acting chief of the service.  This is
> incorrect.  You are the Senior Editor of the service.  In your message on the
> webpage you stated that you were the Deputy Chief of the service until June.  This
> is not correct.  You were the Senior Editor of the service and continue to be.
> Please make the necessary corrections on your webpage. . .

*Id.*  Plaintiff's response to Ms. Dillard's e-mail was, "Time is on my side Ms. Dillard.  I have

never for a moment doubted by abilities.  I have never backed down from a position I take with

full knowledge of what is required of me.  I am ready.  I will take the appropriate steps, the

appropriate way."  Def.'s Non-Select. Exs. at 11 (8/17/00 e-mail from H. Wada); Def.'s Stmt. ¶

13.  Again, Plaintiff does not dispute that these e-mails were sent, but rather defends her own

conduct.  *See* Pl.'s Stmt. ¶¶ 11-13.  Furthermore, Plaintiff asserts that Ms. Dillard orally

"conferred Supervisory responsibilities [on Plaintiff] including scheduling and signing leave

statements, and familiarizing herself with writing performance appraisals."  Pl.'s Stmt. ¶ 12.

Plaintiff offers only her own deposition testimony in support of this assertion, *see* Pl.'s Exs. for

Issue No. 12, and Plaintiff's testimony as to Ms. Dillard's alleged oral representations is, of

13

course, impermissible hearsay evidence.  In any event, even if a factual question exists as to whether Ms. Dillard orally conferred supervisory responsibilities on Plaintiff at some point in time, Plaintiff cannot controvert the documentary evidence that Ms. Dillard conveyed to Plaintiff that Plaintiff had improperly designated herself as Managing Editor, Acting Chief, and/or Deputy Chief on the Hausa web page and asked Plaintiff to correct the web page descriptions.  Therefore, it is clear that as of the time of Ms. Dillard's e-mail to Plaintiff, Plaintiff was not authorized to act as Acting Hausa Service Chief.

Plaintiff was one of three employees listed on a September 13, 2000 certificate of internal status candidates eligible for promotion to the GS-13 Hausa Service Chief position; however, Ms. Dillard returned the certificate without selecting any of the internal candidates.  Def.'s Non-Select. Exs. at 19 (9/13/00 Certificate, including notation "Returned by G. Dillard, No Selection, Sep. 26, 2000); Def.'s Stmt. ¶ 19.  Ms. Dillard avers that she did not interview any of the internal candidates because she had observed them all first-hand and reviewed their applications.  9/27/02 Dillard Decl. ¶ 20.  Ms. Dillard received another certificate of internal status candidates eligible for promotion to the Hausa Service Chief position, dated February 9, 2001, which included the same three candidates; however, Ms. Dillard again did not select any of the internal candidates. Def.'s Non-Select. Exs. at 21 (2/9/01 Certificate); Def.'s Stmt. ¶ 22.

A third certificate – this one listing non-citizens eligible for the Hausa Service Chief position – was prepared on February 16, 2001, and included Sunday Dare, an applicant from outside of the BBG.  Def.'s Non-Select. Exs. at 22 (2/16/01 Certificate); Def.'s Stmt. ¶ 23.  Ms. Dillard selected Mr. Dare for the Hausa Service Chief position on March 9, 2001.  Def.'s Non-Select. Exs. at 22 (2/16/01 Certificate); Def.'s Stmt. ¶ 24; 9/27/02 Dillard Decl. ¶ 25.  In her

14

September 27, 2002 Declaration, Ms. Dillard avers that she met Mr. Dare on three separate occasions prior to his applying for the Hausa Service Chief position, 9/27/02 Dillard Decl. ¶ 25, and describes in detail her reasons for selecting Mr. Dare for the Hausa Service Chief position, *id.* ¶¶ 27-29. Because Mr. Dare was a non-citizen, on March 7, 2001, as required by BBG policy, Ms. Dillard wrote a detailed memo to the VOA Director of Personnel, requesting permission to select and hire Mr. Dare as Hausa Service Chief. 9/27/02 Dillard Decl. ¶ 26; Ex. 3 (3/7/01 Memo from G. Dillard re: Selection of Non-U.S. citizen for Hausa Chief position).

The reasons that Ms. Dillard proffers for selecting Mr. Dare in her memo are supported by Mr. Dare's application materials. According to these materials, Mr. Dare is an ethnic Yoruba (a Nigerian ethnic group), was born in Jos, Nigeria, and speaks Hausa, Yoruba, and English fluently. Def.'s Non-Select. Exs. at 23-25 (3/7/01 Memo from G. Dillard), *id.* at 34-41 (Dare Applic. Mat'ls). Mr. Dare holds a Bachelor of Science degree in International Studies from Ahmadu Bello University in Nigeria, a Masters degree in International Law and Diplomacy from the University of Jos in Nigeria and, at the time that he applied for the Hausa Service Chief position, was a Fellow in the Nieman Fellowship Program at Harvard University. *Id.* Mr. Dare's previous experience includes work as a correspondent, general editor, on-line editor, and head of the Abuja Bureau of the independent communications network in Lagos, Nigeria, where he was responsible for supervising and coordinating the work of 22 correspondents around Nigeria. *Id.* In addition, according to Ms. Dillard, Mr. Dare's co-workers indicated that he possessed effective management skills including team-building skills, and an ability to promote gender and ethnic diversity. *Id.* In her memo, Ms. Dillard specifically notes that Mr. Dare's "demonstrated skills in this critically important area, i.e., planning, directing, and managing the work of others,

15

substantially exceed those of any other candidate." *Id.* at 24.  Mr. Dare also worked with radio

and television programs in Nigeria and in the United States.  *Id.* at 25.

　　　　For her part, Plaintiff's application materials demonstrate that she holds a Bachelor of Arts

in Mass Communications from Bayero University in Nigeria, as well as a Masters of Arts in

Theater and Media Arts from the University of Kansas and, at the time she applied for the Hausa

Service Chief position, had completed 27 credit hours towards a Ph.D. in Management from

California Coast University, a correspondence school.  Def.'s Non-Select. Exs. at 26-33 (Wada

Applic. Mat'ls).   In her application materials, Plaintiff describes her employment experience with

VOA as including work as a Translator/Adaptor, an Editor/Writer, and Senior/Managing Editor.

*Id.*

　　　　Ms. Dillard's request to select and hire Mr. Dare was approved, 9/27/02 Dillard Decl. Ex.

3 (3/7/01 Memo from G. Dillard), and Mr. Dare began working as Hausa Service Chief effective

August 3, 2001, Def.'s Stmt. ¶ 29; Def.'s Non-Select. Exs. at 34.  In November, 2001, an article

appeared in The Weekly Standard (not a VOA publication) entitled "First, Do No Harm" and

subtitled "In Nigeria the Voice of America has been condemned for being pro-Muslim, anti-

Christian, and anti-American.  VOA Director Robert Reilly has his hands full reforming this

important service."  Def.'s Non-Select. Exs. at 46-48 (11/21/01 Weekly Standard Article).  In

relevant part, the article quotes VOA Director Reilly as stating "'We are aware of problems' and

are 'paying very special attention' to the Hausa-language operations."  *Id.* at 47.  The article

continues to state "[t]his past August, Sunday Dare, an impressively credentialed Nigerian

journalist and a Christian, was made chief of the Hausa-language service (before his appointment,

the bureau chief position had long sat unfilled).  Dare and Reilly are now overseeing the Hausa

broadcasts." *Id.*

Plaintiff's initial contact with the BBG's Office of Civil Rights ("OCR") was on

September 7, 2000.[4]  *Def.'s Non-Select. Exs.* at 98 (9/24/02 Johnson Decl.) ¶ 10, *id.* at 100

(9/7/00 Initial Contact Sheet); Def.'s Stmt. ¶ 21.  Plaintiff complained that she applied for, but had

not received any information regarding her eligibility for, the Hausa Service Chief position.

*Def.'s Non-Select. Exs.* at 100 (9/7/00 Initial Contact Sheet).  Plaintiff also complained about

promotions and salaries within the Hausa Service, alleging gender and equal pay as bases of

discrimination.  *Id.*  Plaintiff's informal complaint was assigned to an EEO counselor, who

interviewed Plaintiff on September 29, 2000.  *Def.'s Non-Select. Exs.* at 98 (9/24/02 Johnson

Decl.) ¶¶ 10-12 ; *id.* at 100-08 (Documents re: 9/00 OCR Contact); Def.'s Stmt. ¶ 21.  Plaintiff

received a Notice of Right to File a Discrimination Complaint on December 14, 2000; however,

Plaintiff did not file a formal Complaint of discrimination.  *Def.'s Non-Select. Exs.* at 98(9/24/02

Johnson Decl.) ¶ 12 ; *id.* at 102-03 (12/14/00 Notice of Right to File); *Def.'s Disc. Exs.* at 78

(8/14/02 Wada Dep. at 196:8-197:4).  According to Ms. Johnson, the BBG OCR Director, "the

EEO Counselor would have no basis upon which to contact [Plaintiff's] supervisor or any other

persons who may have an involvement in the matter" until after interviewing Plaintiff on

---

[4] Plaintiff asserts that her "recollection of her first contact in person with OCR was the day a second vacancy announcement for the same Hausa Supervisory Position was posted," or August 21, 2000.  Pl.'s Stmt. ¶ 21.  However, Plaintiff provides no evidence of this contact, all of the OCR records in evidence indicate that Plaintiff's initial contact with the OCR occurred on September 7, 2000, and Plaintiff admits that "[t]he day of contact . . . is usually determined by OCR."  *Id.*  Plaintiff also asserts that "[t]he whole investigative process in relation to the complaint in the year 2000 was flawed and unsatisfactory, due to the assigning of a Counselor with no prior experience (counselor in training) by the Office of Civil Rights."  *Id.*  Plaintiff's claims regarding the nature of the OCR investigation are immaterial, however, to the instant case because Plaintiff does not allege that the investigation was in any way discriminatory or retaliatory.

September 29, 2000.  Def.'s Non-Select. Exs. at 98-99 (9/24/02 Johnson Decl.) ¶ 14.

C.     *Denial of Plaintiff's Reclassification Request*

On June 18, 2001, Plaintiff sent a memo to Ms. Dillard, Mr. Mengesha, and the VOA

Personnel Management Specialist requesting that her position be reclassified and that she be

promoted to a GS-13.  Def.'s Stmt. ¶ 25; Def.'s Classification Exs. (hereinafter "Class. Exs.") at 1

(6/18/01 Memo from H. Wada).  As explained in the Declaration of Barbara Diane Sellers, a

Human Resources Specialist in the Office of Personnel, Operations and Benefits Division, of the

BBG, Plaintiff's request was one for a non-competitive promotion based on accretion of duties,

which required a classification specialist to conduct an evaluation of Plaintiff's position ("desk

audit") "to determine whether [Plaintiff's] duties ha[d] increased significantly beyond the original

classified duties of the position to such an extent that a promotion [was] warranted."  Def.'s Class.

Exs. at 31 (9/27/02 Sellers Decl.) ¶ 37.  In accordance with the standard practice for

reclassification promotions in the Hausa Service, Plaintiff's request included a memo explaining

why she believed her position was properly classified as a grade 13 position.  Def.'s Class. Exs. at

2-3; *id.* at 32 (9/27/02 Sellers Decl.) ¶ 43.  Subsequently, on June 20, 2001, Ms. Dillard was asked

to complete a reclassification questionnaire, which was formatted for Plaintiff's specific request

and asked whether Plaintiff was satisfying the key indicators for a GS-13 position.  9/27/02

Dillard Decl. ¶ 30; Def.'s Class. Exs. at 7 (7/5/01 Reclassification Form); *id.* at 32-33 (9/27/02

Sellers Decl.) ¶ 44.  However, as Ms. Dillard "had no direct knowledge of [Plaintiff's] day-to-day

activities as a senior editor in the Service," she indicated as much on the form and further

indicated that she would "support the views of [Plaintiff's] immediate supervisor, Negussie

18

Mengesha."  9/27/02 Dillard Decl. ¶ 30; Def.'s Class. Exs. at 7 (7/5/01 Reclassification Form).[5]

Mr. Mengesha completed the form and returned it to the Office of Personnel.  Def.'s

Class. Exs. at 20 ¶ 11 (9/26/02 Mengesha Decl.); 9/27/02 Dillard Decl. ¶ 30.  The form solicited

Mr. Mengesha's opinion of Plaintiff's involvement in various aspects of "Script Preparation," and

"Program Preparation," as well as three key "Indicators."  Def.'s Class. Exs. at 7-10.  Mr.

Mengesha indicated that, although Plaintiff was involved in "Script Preparation" work, others

within the Hausa Service conducted the same work, and further indicated that Plaintiff was not

involved in Program Preparation" work.  *Id.*  As to the three key Indicators, Mr. Mengesha

responded that Plaintiff "demonstrate[d] a mastery of radio broadcasting principles, practices, and

techniques," but did not have "full editorial responsibility for directing the development and

production of a substantial block of complex programming of major importance to VOA," and did

not develop new approaches to programming.  *Id.*  The form was signed by both Mr. Mengesha

and Ms. Dillard.  *Id.*

The form was then forwarded to Myrna Whitworth, VOA Acting Director, for a decision

on Plaintiff's reclassification request.  Def.'s Stmt. ¶ 26; Def.'s Class. Exs. at 5 (7/10/01 Memo

from M. Conboy).  In her Declaration, Ms. Sellers avers that she prepared the forwarding memo

submitted to Mr. Conboy for his signature, and that the "letter incorrectly stated that [Plaintiff]

met all key indicators for a promotion to the GS-13 level. . . . it is clear from [Plaintiff's]

---

[5] In her Statement, Plaintiff asserts that both "Dillard Division Director and Mengesha Program Manager filled in the questionnaire, though the process specifically called for Dillard to do it."  Pl.'s Stmt. ¶ 26.  Plaintiff does not present any evidence in support of this statement, other than the fact that both Dillard and Mengesha signed the questionnaire.  However, as discussed above, the record evidence – including Dillard and Mengesha's declarations – indicates that Dillard deferred to and supported Mengesha's completion of the questionnaire, but did not provide her own input on the questionnaire.

reclassification questionnaire that she did not meet all the key indicators for a promotion."  Def.'s

Class. Exs. at 33-34 (9/27/02 Sellers Decl.) ¶ 50.  As such, while the forwarding memo sent to

Ms. Whitworth stated that Plaintiff's supervisors' view was "that [Plaintiff] meets all the key

indicators for promotion to the GS-13 level," Def.'s Class. Exs. at 5 (7/10/01 Memo from M.

Conboy), "[t]he questionnaire attached to the [classification] appeal clearly demonstrated that

[Plaintiff] did not meet the requirements for the GS-13 level," Def.'s Class. Exs. at 13 ¶ 6

(9/17/02 Whitworth Decl.).  As a result, Ms. Whitworth disapproved Plaintiff's promotion to the

GS-13 level.  Def's Class. Exs. at 6 (7/10/01 Memo from M. Conboy indicating Whitworth

8/14/01 disapproval), *id.* at 13 (9/17/02 Whitworth Decl.) ¶ 5.[6]

In her declaration, Ms. Whitworth further avers that the Hausa Service Chief is ordinarily

the only GS-13 employee in the Hausa Service, and that "there was no justification for having two

GS-13 level employees in a service as small as the Hausa service." *Id.* ¶ 7.[7]  By memo dated

---

[6] In her Declaration, Ms. Sellers states that Plaintiff was the only employee in the Hausa Service to request a reclassification between January 2000 and September 2002.  Def.'s Class. Exs. at 34 (9/27/02 Sellers Decl.) ¶ 54.  Ms. Sellers further notes, however, that during that time period two other employees in the Africa Division – a Black female and a White female – requested and were denied promotions from a GS-12 to a GS-13 because they also failed to meet all of the key indicators for the GS-13 IRB position.  *Id.* ¶¶ 55-61.

[7] In her Statement, Plaintiff asserts that there is no rule preventing the Hausa Service from having more than one GS-13 employee, and states that "[t]here are many non-supervisory employees of Africa Division [sic] on grade level 13."  Pl.'s Stmt. ¶ 8.  As examples, Plaintiff points to individuals employed in the English to Africa service, *id.*; however, in her Declaration, Ms. Whitworth clearly explains that the services in the Africa Division that have GS-13 employees other than the Service Chief are the English to Africa Branch and the French to Africa Branch, larger services with more full-time staff members (20 and 18 full-time staff members, respectively) than the Hausa Service (11 staff members), Def.'s Class. Exs. at 14 (9/17/02 Whitworth Decl.) ¶ 7.  Plaintiff's mere speculation that the Hausa Service might have been able to support an additional GS-13, which is directly contradicted by record evidence, therefore does not demonstrate a genuine issue of material fact.

20

August 14, 2001, Plaintiff was advised that her reclassification request had been denied; Plaintiff

was further advised:

> it was determined that your position does not meet all the key indicators for work
> at the GS-13 level.  Specifically, your position does not have full editorial
> responsibility for directing the development and production of a substantial block
> of complex programming of major importance to VOA including responsibility
> for the content, style and tone of the program at least 25% of your time on a
> weekly basis.  Therefore, your position is appropriately classified at the GS-12
> level.

Def.'s Class Exs. at 11 (8/14/01 Memo from M. Conboy).[8]  Plaintiff was also advised of her right

to appeal the decision to the Office of Personnel Management.  *Id.*

In her Statement, Plaintiff argues that her position, in fact, merited classification as a GS-

13 position and that Ms. Whitworth improperly denied her reclassification request because "[t]wo

independent determinations" – one by the office of personnel and the other an independent EEOC

investigation – "determined that Plaintiff 'met all key indicators for a promotion to the GS-13

level.'" Pl.'s Stmt. ¶¶ 25-28.  Plaintiff does not, however, provide precise record citations in

support of these assertions.  *Id.*  The Court's review of Plaintiff's exhibits does not reveal any

evidence of independent determinations that Plaintiff met all key indicators for a promotion to the

GS-13 level, other than Mr. Conboy's forwarding memorandum to Ms. Whitworth which, as

discussed above, erroneously indicated such a conclusion.[9]

--------

[8] At the time that Plaintiff requested a reclassification of her position, she was one of six
IRBs with editorial responsibilities on the Hausa staff.  *See* Def.'s Disc. Exs. at 43 (9/19/02 Dare
Decl.) ¶¶ 8, 13.  As a result, each editor performed editorial duties no more than twice per week,
spending approximately 2-3 hours per week on his or her editorial duties.  *Id.* ¶ 13.

[9] The Court notes that Plaintiff's exhibits appear to skip pages (e.g., a December 17, 2001
memo from EEOC Investigator Haywood L. Perry included in Plaintiff's Exhibits for Issue No.
27 appears to include only four of fifteen pages and skips directly from page 11 to page 14);
however, as Plaintiff has not provided specific citations to the record evidence on which she

Plaintiff contacted the OCR on August 9, 2001, asserting that she received notice of Mr.

Dare's selection as Hausa Service Chief on August 6, 2001, and that she had never received a

response to her application for the position.  Def.'s Stmt. ¶ 30; 10/22/06 Johnson Decl. Attach. 1

(8/9/01 Initial Contact Sheet and 10/10/01 EEO Counselor's Report).  Plaintiff further complained

that her reclassification request had been denied, and indicated that she intended to appeal that

denial through the Office of Personnel Management.  *Id.*  Plaintiff alleged discrimination on the

bases of race and sex, as well as reprisal.  *Id.*  On September 21, 2001, Plaintiff was issued a

Notice of Right to File a Discrimination Complaint, and it appears from the record that Plaintiff

filed a formal discrimination complaint on these charges on September 26, 2001.  Pl.'s Stmt. ¶ 31;

10/22/06 Johnson Decl. ¶ 8; *id.* Attach. 1 (9/21/01 Notice of Right to File).[10]

> D.     *Events Surrounding the Hausa Service October 3, 2001 Broadcast*

>> 1.     *Mr. Dare's E-mails Prior to the Hausa Service October 3, 2001 Broadcast*

Mr. Dare assumed the position of Hausa Service Chief effective August 3, 2001.  Def.'s

Stmt. ¶ 29; Def.'s Non-Select. Exs. at 34.  On August 21, 2001, Mr. Dare sent an e-mail to the

Hausa Service staff, in which he stated:

> the editor and mc-cr for each show must collaborate towards putting together a
> professional show.  while the editor should be on top of all that is meant for the
> show, this should not prejudice the support of the mc-cr. . . . it is a joint

---

purports to rely, the Court cannot determine whether the pages were intentionally or inadvertently
omitted from Plaintiff's exhibits.

    [10] In her Statement, Plaintiff asserts – without providing factual support – that she
appealed the denial of her reclassification request to the Office of Personnel Management and
that the appeal process was suspended in light of her pending EEOC complaint (which is now her
Complaint before this Court), with the option to reopen the appeal in the event her EEOC
complaint was not resolved to her satisfaction.  Pl.'s Stmt. ¶ 28.  The status of Plaintiff's OPM
appeal, however, is of no consequence in the instant action.

> responsibility. . . . I will count largely on the news judgment of the editors to
> decide which story/report is okay to be aired. . . ."

Def.'s Discipline Exs. (hereinafter "Disc. Exs.") at 1 (8/21/01 e-mail from S. Dare).  On August

27, 2001, Mr. Dare sent another e-mail to his staff, summarizing his impressions from his first

three weeks as Hausa Service Chief.  *Id.* at 2-3 (8/27/01 e-mail from S. Dare); Def.'s Stmt. ¶ 31.

In relevant part, Mr. Dare's August 27, 2001 e-mail stated:

> With the benefit of the last three weeks, I have also noticed a few lapses and other
> areas that we must pay attention to.  The lapses I have noticed range from: -
> arriving late to the studio for our shows - non-translation of English scripts before
> the show - non-proper edit of translated scripts . . . - not making available story
> insights for the Chief before the shows. . . . here are a few reminders on newsroom
> collaboration and teamwork, copy flow, enhancement, editorial responsibilities et
> al . . . - editor and mc-cr for each show will work together to make good news
> judgement [sic] and put together the show.  The bulk [sic] stops at the editor's.
> Lapses will not be excused for failure to collaborate . . . - report usage is not
> automatic.  I will trust the judgment of the editors and mc-crs largely.  some
> reports may however need to be discussed at the editorial meeting if the need
> arises.

Def.'s Disc. Exs. at 2-3 (8/27/01 e-mail from S. Dare).

Following the September 11, 2001 attacks on the United States, Ms. Dillard instructed the

Chiefs of the services in the Africa Division to implement oversight measures for broadcasting

news and stringer reports, in order to ensure balanced news coverage.  9/27/02 Dillard Decl. ¶ 31.

Eight days later, Mr. Dare sent an e-mail to his staff advising them:

> please if you plan to or have interviewed any expert/analyst/academic/cleric on the
> US crisis, it is important that you let me know, hear it and okay it before it is used.
> this also applies to stringer reports.  this is a measure aimed at ensuring balance
> and avoiding extremist views.  this is an important notice.

Def.'s Stmt. ¶ 32; Def.'s Disc. Exs. at 4 (9/19/01 e-mail from S. Dare).  The same day, Mr. Dare

sent another e-mail to the Hausa Service staff stating, in relevant part:

> As we continue the coverage of the crisis, certain issues are pertinent and need to
> be brought to our attention - all materials generated for crisis coverage i.e. stringer
> reports, taped interviews conducted here or from stringers should be brought to
> my notice or an editor before they are aired. . . . stringer reports on the crisis will
> have to be screened objectively on the whole let us be alert.

Def.'s Stmt. ¶ 33; Def.'s Disc. Exs. at 5 (9/19/01 e-mail from S. Dare).  Finally, on October 2,

2001, Mr. Dare sent another e-mail to the Hausa Service staff asking:

> please any interviews, stringer reports or related materials relating to the attacks
> on the US will have to be brought to my notice before it is aired.  Two editors may
> also need to listen to any tape on this issue and decide. . . . we must also pay
> attention to the profile, affiliation and qualification of the person we are talking to.
> the individual must have the   credential/expertise to comment on this issue.

Def.'s Stmt. ¶ 34; Def.'s Disc. Exs. at 6 (10/2/01 e-mail from S. Dare).  Plaintiff asserts that Mr.

Dare's e-mails were "contradictory and confusing," citing a Union Grievance filed on her behalf

that argues that Mr. Dare's various e-mails did not clearly indicate who bore responsibility for

reviewing stringer reports.  Pl.'s Stmt. ¶¶ 31-34; Pl.'s Exs. for Issue No. 27 (4/30/01 Union

Grievance).[11]  However, while Mr. Dare's e-mails variously indicate that stringer reports and live

interviews should be reviewed by the editor and/or Mr. Dare himself, the e-mails make clear that

– at a minimum – someone other than the MC was required to review stringer reports and live

interviews.  Plaintiff does not deny receiving these e-mails.  Pl.'s Stmt. ¶¶ 31-34.[12]

---

[11] While Plaintiff identifies the Union Grievance and Mr. Dare's various e-mails as
related to her response to Defendant's Statement paragraph 27, the exhibits in fact appear related
to paragraphs 31 through 34 of Defendant's Statement.  See Pl.'s Exs. for Issue No. 27.
Furthermore, the Court notes that the Union Grievance that Plaintiff cites appears to be
improperly dated April 30, 2001, as it describes events occurring through the end of April 2002.

[12] Plaintiff also responds to Defendant's Statement of Material Facts regarding Mr. Dare's
e-mails by citing portions of a petition against Mr. Dare signed by members of the Hausa Service
staff (including Plaintiff).  See Pl.'s Stmt. ¶ 31; Pl.'s Exs. for Issue No. 24 (4/26/04 Petition).
Plaintiff quotes only that portion of the petition that states "Mr. Dare excells [sic] is in causing
divisions and animosity between the members of the Hausa Service.  This he achieves by sending

2.      *The Hausa Service October 3, 2001 Broadcast*

On October 3, 2001, Plaintiff was the assigned editor of the 1500 UTC Hausa Service

radio program, a daily air show broadcast from Washington D.C. (hereinafter the "October 3

Broadcast"). Def.'s Stmt. ¶ 25; Pl.'s Stmt. ¶ 25; Def.'s Disc. Exs. at 43 (9/19/02 Dare Decl.) ¶ 8.[13]

A male IRB, Aliyu Mustapha, was the MC for the program.  Def.'s Stmt. ¶ 36.[14]  During the

October 3 Broadcast, a stringer report containing an interview with an Islamic cleric in Nigeria,

Sheikh Bauchi, was broadcast.  Def.'s Stmt. ¶ 39-40; Def.'s Disc. Exs. at 47 (9/19/02 Dare Decl.)

¶ 22 .  During the interview, Sheikh Bauchi stated:

_____

conflicting emails . . . . Other times he would call staffers, especially on the night shift and give
them conflicting directives, leaving them to sort it out." Pl.'s Stmt. ¶ 31 (citing Pl.'s Exs. for
Issue No. 24 (4/26/04 Petition) at 10).  However, when read in context, the portion of the April
2004 petition that Plaintiff cites in fact alleges that Mr. Dare sent "conflicting e-mails
individually to staffers," and thus clearly does not describe the e-mails sent by Mr. Dare to the
entire Hausa Service staff in August through October 2001.  Pl.'s Exs. for Issue No. 24 at 10
(4/26/04 Petition) at 10.  In any event, the existence of the petition fails to demonstrate a genuine
question of material fact as to whether Mr. Dare sent the e-mails described above between
August and October 2001.

   [13] The Hausa Service staff is comprised mostly of IRBs and, as of October 2001, six (6)
of the IRBs were also editors.  Def.'s Disc. Exs. at 43 (9/19/02 Dare Decl.) ¶ 8 .  For each air
show, a master of ceremonies ("MC"), an editor, and a producer is assigned on a rotational basis.
*Id.* at 44 ¶ 12.  Prior to each show, the assigned editor reviews all news pieces, including stringer
reports, staff reports, and features, selects the pieces to be broadcast, and times the show to
ensure that the entire 30-minute show is filed with material.  *Id.* at 45 ¶ 14; Def.'s Disc. Exs. at
73 (8/14/02 Wada Dep. at 145:4-21).

   [14] Plaintiff does not dispute this statement, but cites to an "EEOC investigative report"
she claims is located at "item 21 page 14."  Pl.'s Stmt. ¶ 36.  Plaintiff's Exhibits for Issue No. 21
include her application materials for the Hausa Service Chief position and Mr. Dare's application
materials, but do not include an "EEOC investigative report."  Included with Plaintiff's Exhibits
for Issue No. 27 is what appears to be four pages of a 15-page investigative report completed by
EEOC investigator Haywood L. Perry; however, that document simply confirms that Mr.
Mustapha was the MC assigned to the October 3 Broadcast.  *See* Pl.'s Exs. for Issue No. 27
(12/17/01 Perry Report).

> If the U.S. thinks rationally of most of the global problems, the United States is responsible . . . . We are warning America, I swear if she decides to declare war on Afghanistan she will see will confront the unexpected.  Therefore, we are warning her if she declares war on Afghanistan then the curtain that she is using to say she is not fighting Islam and Muslims would have been torn. . . . if she decides to go to war with Afghanistan, then the curtain has been removed and she is at war with Muslims and Islam.

Def.'s Stmt. ¶ 40; Def.'s Disc. Exs. at 16-18 (Transl. of 10/3/01 Stringer Report).  The report did not include any rebuttal of Sheikh Bauchi's charges.  *Id.*

The parties dispute whether Plaintiff bore sole responsibility for reviewing the stringer report containing Sheikh Bauchi's interview before it aired; however, the record evidence is clear that Plaintiff was the assigned editor for the October 3 Broadcast, and that she did not review the tape of the stringer report before it aired.  Def.'s Stmt. ¶ 38; Pl.'s Stmt. ¶ 38; Def.'s Disc. Exs. at 12 (11/28/01 Memo from H. Wada to S. Dare) ("I did not take the report . . . I never handled it before it went on the air."); Def.'s Disc. Exs. at 9 (12/16/01 Mustapha Aff.) ("I reviewed the tape and felt that it was editorially balanced.  I did not give the tape to either Wada or Dare for their review before broadcasting it."); Pl.'s Exs. for Issue No. 27 (12/17/01 Perry Report) ¶¶ 21-22 ("the Complainant did not see or hear the tape that was broadcast on October 3, 2001 . . . Mr. Mustapha did not give it to Complainant or Mr. Dare for their review . . . ").[15]  In addition, in deposition testimony, Plaintiff acknowledged that she was aware one-half hour before air time that there were three minutes of unfilled air time in the Broadcast and that Mr. Mustapha told her

---

[15]  Plaintiff disputes Defendant's assertion that she came in late to work on October 3, 2001, asserting that she was scheduled to work from 9:00 a.m. to 5:00 p.m. and arrived to work at 9:10 a.m. Def.'s Stmt. ¶ 37 (citing Def.'s Disc. Exs. at 8 (12/5/01 e-mail from S. Aliyu)); Pl.'s Stmt. ¶ 37; Pl.'s Exs. for No. 27 (10/3/01 Timesheet).  However, this dispute is immaterial to the fact that Plaintiff did not review the stringer report containing the Sheikh Bauchi interview before it aired.

that he had three stringer reports for the Broadcast.  Def.'s Disc. Exs. at 73-74 (8/14/02 Wada Dep. at 146:9-152:24).  Plaintiff further testified that she told Mr. Mustapha to let her know if he intended to use a stringer report, *id.*, and thus appears to argue that Mr. Mustapha was responsible for making sure that Plaintiff reviewed the stringer report before it aired.  Pl.'s Stmt. ¶ 38.  To the contrary, Mr. Dare's e-mails make clear that Plaintiff, as editor, bore the ultimate responsibility for the October 3 Broadcast.  Therefore, based on the totality of the record evidence, it appears Plaintiff was aware that the Broadcast might include a stringer report, that she bore responsibility for reviewing it before it aired, and that she failed to review that report before it aired.

The October 3 Broadcast caused dissatisfaction inside and outside of VOA.  9/27/02 Dillard Decl. ¶ 34; Pl.'s Exs. for Issue No. 27 (12/17/01 Perry Report) ¶ 24 ("The broadcast was not editorially balanced and it created an embarrassment to the Agency.").  On October 25, 2001, Congressman Dave Weldon wrote a letter to VOA Director Robert Reilly, expressing that "[c]oncerns over Hausa language Voice of America (VOA) broadcasts in Nigeria were recently brought to my attention by Americans living and working in Nigeria. . . ."  Def.'s Stmt. ¶ 41; Def.'s Disc. Exs. at 19-20 (10/25/01 Letter from D. Weldon).  Congressman Weldon's letter specifically referred to the interview with Sheikh Bauchi and asked that he be provided with an English transcript of the interview.  *Id.*  On November 16, 2001, Congressman Vernon J. Ehlers wrote a similar letter to Director Reilly, "with deep concern regarding alleged pro-Muslim, Anti-American reporting by the VOA's Hausa-language programming in Nigeria."  Def.'s Disc. Exs. at 21-22 (11/16/01 Letter from V. Ehlers).

Both of the Congressmen's letters refer to statements allegedly made by Sheikh Bauchi and included in the Hausa Service's broadcast on October 15, 2001.  *See* Def.'s Disc. Exs. at 19-

27

22.   Plaintiff seizes on this date discrepancy in her Statement and asserts that the "story from the

15th referred to by congress correspondence was assigned by Sunday Dare (supervisor) and

listened to by him before it went on air," broadly citing her "exhibit" in support of this statement.

Pl.'s Stmt. ¶ 41.   However, none of the documents provided by Plaintiff in any way suggest that a

second interview with Sheikh Bauchi aired on the Hausa Service on October 15, 2001.   To the

contrary, both Mr. Dare and Ms. Dillard testified during their depositions in this matter that the

Congressmen were mistaken as to the broadcast date of the Sheikh Bauchi interview, and that the

only interview with Sheikh Bauchi that aired on the Hausa Service aired during the October 3

Broadcast.   *See* Def.'s Disc. Exs. at 87-93 (1/25/05 Dillard Dep. at 104:1-110:11); *id.* at 95-96

(11/29/04 Dare Dep. at 160:8-162:11).   As such, there is no evidence in the record that a second

interview with Sheikh Bauchi aired on October 15, for which Mr. Dare bore responsibility.

Following the October 3 Broadcast, VOA Director Reilly and Ms. Dillard were asked to

attend meetings with members of Congress, during which the members spoke of closing the

Hausa Service permanently.   Def.'s Stmt. ¶¶ 42-43; 9/27/02 Dillard Decl. ¶ 34; Def.'s Disc. Exs.

at 23 (11/29/01 e-mail from R. Reilly).   In addition, the October 3 Broadcast was mentioned in

various media outlets.   *Id.*

    3.    *Discipline Resulting from the October 3 Broadcast – Plaintiff's*
        *Reassignment, Proposed Suspension, and Letter of Reprimand*

The record is not clear as to the steps taken by Mr. Dare in the immediate wake of the

October 3 Broadcast.   Mr. Dare avers that after the Broadcast, he "immediately called a staff

meeting to discover if the editor had reviewed the clip before it was broadcast and why the

interview was broadcast."   Def.'s Disc. Exs. at 47 (9/19/02 Dare Decl.) ¶ 23.   Mr. Dare further

avers that after that meeting he called Plaintiff into his office "and verbally questioned her as to why the interview was broadcast," and that in both instances Plaintiff stated that she did not have enough time to review the tape before it aired.  *Id.* ¶ 24.  Plaintiff and Mr. Mustapha deny that Mr. Dare spoke to them individually about the incident.  Def.'s Disc. Exs. at 75 (8/14/02 Wada Dep. at 155:1-6); *id.* at 9 (12/16/01 Mustapha Aff.); Pl.'s Exs. for Issue No. 27 (12/17/01 Perry Report) ¶ 25.

In any event, in early October 2001, Mr. Dare and Ms. Dillard met with Africa Division Labor Relations Specialist, Donna Grace, to discuss appropriate discipline for Plaintiff based on the October 3 Broadcast.  *See* Def.'s Disc. Exs. at 48 (9/19/02 Dare Decl.) ¶¶ 27-28 ; *id.* at 52-53 (9/27/02 Grace Decl.) ¶¶ 5-12; 9/27/02 Dillard Decl. ¶¶ 35-36; Pl.'s Exs. for Issue No. 27 (12/17/01 Perry Report) ¶¶ 26-27.  On November 27, 2001, Plaintiff was reassigned to an IRB position without editorial responsibility.  Def.'s Stmt. ¶ 44; Def.'s Disc. Exs. at 26-32 (Reassignment Documents).  Plaintiff received a letter from Mr. Dare informing her of her reassignment, and specifically advising Plaintiff that her "grade, pay, and benefits [would] not be affected."  Def.'s Disc. Exs. at 26 (11/27/01 Reassignment Letter from S. Dare).  On the same day, Plaintiff received a second letter from Mr. Dare, which proposed a five-day suspension for "failure to follow instructions" in not reviewing the stringer report containing the Sheikh Bauchi interview or sending it to Mr. Dare to be reviewed prior to airing it.  Def.'s Stmt. ¶ 44; Def.'s Disc. Exs. at 33-37 (11/27/01 Suspension Letter from S. Dare).

A decision letter for the November proposed suspension was issued on January 30, 2002, Def.'s Stmt. ¶ 45; Def.'s Disc. Exs. at 53 (9/27/02 Grace Decl.) ¶ 12 ; however, the November proposed suspension letter erroneously stated that Plaintiff had received the tape of the stringer

report and given it to the MC without reviewing it, *see* Def.'s Disc. Exs. at 33-37 (11/27/01 Suspension Letter from S. Dare).  As a result, the November proposed suspension letter was rescinded and a new proposed suspension letter was issued on March 5, 2002, reflecting that Plaintiff never handled the tapes in question.  9/27/02 Dillard Decl. ¶ 39; Def.'s Disc. Exs. at 49 (9/19/02 Dare Decl.) ¶ 31, 53-54 (9/27/02 Grace Decl.) ¶¶ 13-14.  A decision letter for the second proposed suspension was issued on April 8, 2002.  *Id.*  Def.'s Disc. Exs. at 54 (9/27/02 Grace Decl.) ¶¶ 14-15; 9/27/02 Dillard Decl. ¶ 37.  Before Plaintiff's suspension could be implemented, the then-VOA Chief of Staff, Horace Cooper, ordered that all action on Plaintiff's suspension be held in abeyance.  Def.'s Disc. Exs. at 54 (9/27/02 Grace Decl.) ¶¶ 14-15; 9/27/02 Dillard Decl. ¶ 37.

Mr. Cooper resigned before reaching a decision on Plaintiff's proposed suspension, and a new Acting Chief of Staff, Marie Skiba, was appointed.  9/27/02 Dillard Decl. ¶ 40; Def.'s Disc. Exs. at 54 (9/27/02 Grace Decl.) ¶ 16.  On September 25, 2002, Ms. Skiba issued a letter sustaining the charge contained in Plaintiff's proposed suspension letter, and further indicating that she had decided to reduce Plaintiff's penalty to a reprimand because the offense was almost a year old and Plaintiff showed "no indication of a pattern of this type of offense."  *Id.*; Def.'s Disc. Exs. at 38 (9/25/02 Letter from M. Skiba).  The same day, Mr. Dare issued an official letter of reprimand to Plaintiff, which was placed in her official personnel file.  Def.'s Stmt. ¶ 46; Def.'s Disc. Exs. at 39-40 (9/25/02 Letter from S. Dare).  Plaintiff asserts that Ms. Skiba improperly approved the letter of reprimand because she "did not speak with Plaintiff or the former VOA chief of staff before making her decision."  Pl.'s Stmt. ¶ 46.  To that end, Plaintiff cites to a union memorandum requesting that Plaintiff's letter of reprimand be removed from her file in the event

that Ms. Skiba did not speak with Plaintiff, Mr. Mustapha, or Mr. Cooper before issuing the letter

of reprimand, Pl.'s Exs. for Issue No. 46 (10/24/03 memo from V. Wiley), as well as e-mails

indicating that Ms. Grace and Ms. Dillard discussed how to incorporate Plaintiff's oral reply to

Mr. Cooper into a revised decision letter regarding Plaintiff's proposed suspension, *id.* (7/12/02

and 7/14/02 e-mails between D. Grace and G. Dillard).  The record does not contain evidence

indicating whether or not Ms. Skiba spoke to Plaintiff, Mr. Mustapha, or Mr. Cooper before

issuing the letter of reprimand.

In addition to the discipline administered to Plaintiff, the MC for the October 3 Broadcast,

Mr. Mustapha, received a written admonishment for his actions.  Def.'s Disc. Exs. at 48 (9/19/02

Dare Decl.) ¶ 29; Pl.'s Exs. for Issue No. 17 (8/27/02 Admonishment).  In her Statement, Plaintiff

argues that this discipline is "lopsided" because "Plaintiff is held responsible for not knowing that

a tape existed that was not brought to her attention, while the Editor who made the judgment

unilaterally to put the tape on air was just admonished, and the Supervisor [Mr. Dare] who was

also not aware of the tape until after it was aired was never held responsible."  Pl.'s Stmt. ¶ 32.

Plaintiff does not provide factual support for her argument and, in any event, her argument is

unavailing because even if Mr. Mustapha was also an IRB with editorial responsibilities, the

record is clear that Plaintiff was the editor responsible for the particular October 3 Broadcast.

Furthermore, Plaintiff's proposed suspension was never carried out, and Plaintiff has provided no

evidence that Mr. Mustapha's written admonishment and Plaintiff's letter of reprimand actually

represented disparate discipline.

E.     *Other Allegedly Discriminatory and Retaliatory Events*

In addition to the events described above, which form the basis of Counts I through IV of

Plaintiff's Complaint, Plaintiff's Complaint and Opposition to Defendant's motion for summary

judgment devote attention to a number of other incidents.  As discussed in Section II.A., below,

because Plaintiff has failed to exhaust her administrative remedies as to these incidents, she

cannot claim that they constitute discrete acts of discrimination or retaliation.  Instead, Plaintiff

contends that these incidents support her claim for hostile work environment, asserted in Count V

of her Complaint, and they are therefore only relevant insofar as they relate to that claim.

Nevertheless, the Court has considered and will set forth below the various arguments that

Plaintiff raises with respect to these incidents.  Ultimately, the Court concludes that none of these

incidents is indicative of a hostile work environment based on race, sex, or religion.

### 1.    *Plaintiff's 2001-2002 Performance Evaluation*

In June 2002, Plaintiff received her performance evaluation for the period May 1, 2001 to

April 30, 2002 from Mr. Dare.  Def.'s Stmt. ¶ 47; Def.'s Evaluation & AWOL Exs. (hereinafter

"Eval. Exs.") at 1-10 (6/14/02 Wada Eval.).  Plaintiff was evaluated on six different "Performance

Requirements" on a five-level scale from Unsuccessful to Outstanding, and was rated Fully

Successful on two Requirements, Highly Successful on two Requirements, and Outstanding on

two Requirements.  *Id.*  Plaintiff received an overall summary rating of Fully Successful, and Ms.

Dillard concurred in Mr. Dare's evaluation of Plaintiff.  *Id.*  Plaintiff does not dispute these facts;

however, she argues that her 2001-2002 evaluation was retaliatory, apparently because it followed

upon Mr. Dare making changes to Plaintiff's work schedule that she was unhappy with and

because "[s]ince 1986, no supervisor of the Hausa Service rated Plaintiff below highly

successful."  *See* Pl.'s Stmt. ¶ 47.  Plaintiff fails, however, to present any evidence of a causal

connection between her 2001-2002 performance evaluation and any prior protected EEOC

activity, and the Court cannot conclude that Plaintiff's 2001-2002 performance evaluation was retaliatory simply because it was lower than her previous evaluations.

Plaintiff also argues that Mr. Dare was not authorized to complete Plaintiff's performance evaluation because he was a non-citizen.  Pl.'s Stmt. ¶ 47.  In support of this assertion, Plaintiff cites to an e-mail in which Ms. Grace informed Ms. Dillard that generally, "[b]ecause non-citizens cannot be supervisors, they cannot rate employees, neither citizens nor non-citizens."  *See* Pl.'s Exs. for Issues No. 49-55 (5/3/00 e-mail from D. Grace).  As explained by Ms. Grace in her Reply Declaration, however, her e-mail "dealt with a specific and unique situation within the French to Africa Service" where Ms. Dillard requested that a non-citizen complete performance evaluations. Grace Reply Decl. ¶ 5.  As discussed in greater detail below and as explained by Ms. Grace in her Reply Declaration, in Mr. Dare's case, Ms. Dillard had sought and obtained an exception that allowed Mr. Dare to take on a supervisory position, and therefore to rate employees.  *Id.*  Such an exception had not been obtained in the case of the French to Africa Service evaluations.  *Id.*

### 2. Office of Security Interview

On October 9, 2002, Plaintiff was interviewed by the International Broadcasting Bureau's ("IBB") Office of Security.  Def.'s Stmt. ¶ 48; Def.'s Garnish & Investigation Exs. (hereinafter "Garnish. Exs.") at 9 (11/18/02 Letter from C. Booker).  Plaintiff does not explain how this interview was in any way retaliatory or discriminatory.  Furthermore, the Court notes that the only evidence in the record regarding the interview indicates that Plaintiff "was not the subject of an investigation when she was interviewed" and that Plaintiff, "her attorney, and her AFGE union representative were all informed that [Plaintiff] was not the subject of any investigation and that the interview was completely voluntary."  *Id.*

3.    *Plaintiff's AWOL Charge*

On June 4, 2003, Plaintiff verbally requested permission to be away from the office to take care of an emergency situation. Def.'s Stmt. ¶ 49; Def.'s Eval. Exs. at 53 (3/29/05 Dare Decl.) ¶ 10, *id.* at 71 (2/10/05 Wada Dep. at 11:4-14:3).[16]  Mr. Dare granted Plaintiff verbal permission to be absent, but reminded her that she was scheduled as the first newsreader for the 4:30 p.m. live radio broadcast. Def.'s Stmt. ¶ 50; Def.'s Eval. Exs. at 53 (3/29/05 Dare Decl.) ¶ 10; *id.* at 71 (2/10/05 Wada Dep. at 11:4-12:1). Defendant maintains that Plaintiff was away from the studio from approximately 2:00 p.m. until 4:20 p.m., citing Mr. Dare's declaration to that effect, as well as e-mails that Mr. Dare sent himself at 4:02 p.m. and 4:25 p.m. on the date in question noting that Plaintiff did not return to the studio until 4:20 p.m. Def.'s Stmt. ¶ 51; Def.'s Eval. Exs. at 53 (3/29/05 Dare Decl.) ¶ 12; *id.* at 58-59 (6/4/03 e-mails from S. Dare). In her EEOC Opposition, Plaintiff asserts that she left the office at approximately 1:30 p.m. and returned at approximately 4:00 p.m.; however Plaintiff does not appear to have provided any factual support for this

---

[16] Plaintiff responds to paragraphs 49 through 55 of Defendant's Statement by referring the Court to specific pages of her opposition to Defendant's motion for summary judgment in EEOC case number 100-2004-00943X (hereinafter Plaintiff's "EEOC Opposition"), as well as her "whole motion and exhibits." Pl.'s Stmt. ¶¶ 49-55. Defendant erroneously asserts in its Reply that Plaintiff has not provided the Court with the relevant EEOC Opposition. Plaintiff has, in fact, provided her EEOC Opposition along with her Exhibits for Issues No. 49-55, and to the extent that Plaintiff has provided precise citations to that Opposition in response to Defendant's Statement, the Court has considered those materials. The Court has also reviewed the entirety of her EEOC Opposition in an attempt to discern whether genuine questions of material fact exist. However, insofar as Plaintiff generally cites the Court to her "whole motion and exhibits," she fails to carry her burden of responding to Defendant's Statement by providing precise citations to those portions of the factual record on which she relies. Indeed, while Plaintiff's EEOC Opposition appears to cite to exhibits, Plaintiff has not clearly identified those exhibits among the multiple hundreds of pages of documents she provides in connection with her opposition to the instant motion. As such, Plaintiff is left with the Court's interpretation of the factual record she provides.

assertion. Pl.'s Exs. for Issues No. 49-55 (EEOC Opp'n at 4). In any event, the parties agree that

Plaintiff was away from the studio for approximately two and one-half hours. In light of

Plaintiff's absence, Mr. Dare assigned another IRB to cover the 4:30 p.m. live radio broadcast,

and so informed Plaintiff when she returned to the studio. Def.'s Eval. Exs. at 54 (3/29/05 Dare

Decl.) ¶ 14; *id.* at 72 (2/10/05 Wada Dep. at 16:9-16).

Mr. Dare avers that Plaintiff's "absence greatly exceeded the amount of time that she had

requested . . . and could have seriously harmed the air show." Def.'s Eval. Exs. at 54 (3/29/05

Dare Decl.) ¶ 15. Mr. Dare further avers that he consulted with the BBG's Office of Labor

Relations to seek advice on how to handle the issue and, based on Plaintiff's June 4, 2003 absence

as well as other time management and tardiness problems, determined to grant Plaintiff one hour

of administrative leave and record her additional absence as AWOL. *Id.* ¶¶ 15-17. Plaintiff

asserts in her EEOC Opposition that she requested annual leave, rather than administrative leave.

Pl.'s Exs. for Issues No. 49-55 (EEOC Opp'n at 4-6); *see also* Def.'s Eval. Exs. at 71 (2/10/05

Wada Dep. at 12:12-11) ("I didn't ask for administrative leave, no."). Nevertheless, Plaintiff does

not dispute that she was ultimately charged one hour of administrative leave and one and one-half

hours of AWOL for her June 4, 2003 absence.

Plaintiff does not indicate how her being charged AWOL shows either discrimination or

retaliation. Moreover, the Court notes that Plaintiff ultimately appears not to have been harmed

financially from being charged one hour of administrative leave and one and one-half hours of

AWOL relating to her June 4, 2003 absence, rather than being charged two and one-half hours of

annual leave. *See* Def.'s Election Overtime Exs. (hereinafter "OT Exs.") at 2-3 (10/17/06 Grace

Decl.) ¶¶ 5-10. When Plaintiff was terminated by VOA in 2004, her lump sum annual leave

payment was calculated using her 2004 salary level.  Had Plaintiff been charged two and a half

hours of annual leave in 2003, those hours would have been compensated at her 2003 salary level,

*id.* ¶¶ 6-7; however, because she was charged AWOL and administrative leave, rather than annual

leave, Plaintiff ultimately received $38.07 more in compensation, *id.* ¶ 10.

> 4.    *Plaintiff's 2002-2003 Performance Evaluation*

In June 2003, Plaintiff received her performance evaluation for the period May 1, 2002 to

April 30, 2003 from Mr. Dare.  Def.'s Stmt. ¶ 53; Def.'s Eval. Exs. at 20-28 (6/11/03 Wada

Eval.).  Plaintiff was evaluated on five different "Performance Requirements" on the same five-

level scale, and was rated "Highly Successful" on two Requirements, "Fully Successful" on two

Requirements, and "Minimally Successful" on Requirement 4 - "Manages time productively and

efficiently."  Def.'s Stmt. ¶ 54; Def.'s Eval. Exs. at 20-28 (6/11/03 Wada Eval.).  Because

Requirement 4 was a "critical" Requirement, Plaintiff's overall summary rating could not exceed

"Minimally Successful," and Plaintiff in fact received that summary rating.  Def.'s Stmt. ¶ 55;

Def.'s Stmt. Eval Exs. at 28 (6/11/03 Wada Eval.).  Plaintiff does not dispute these facts; instead,

she "strongly disagrees with Mr. Dare's rating of her performance," citing the Court to her EEOC

Opposition, which discusses her 2002-2003 evaluation.  Pl.'s Stmt. ¶¶ 53-55.  In her EEOC

Opposition, Plaintiff argues that Mr. Dare was required to, but failed to, establish standards of

performance and warn Plaintiff that she was headed towards a "Minimally Successful" rating.

*See* Pl.'s Exs. for Issues No. 49-55 (EEOC Opp'n at 5-10).  Defendant does not address this

assertion, thus a factual question appears to exist as to whether Mr. Dare followed proper

procedures with respect to Plaintiff's 2002-2003 performance evaluation.  However, such a

procedural irregularity would not be evidence of discrimination or retaliation, and Plaintiff

proffers no other evidence to that effect.

On July 8, 2003, Plaintiff contacted the OCR alleging that her "Minimally Successful" performance evaluation and Mr. Dare's charging her AWOL constituted "ongoing retaliation." 10/22/06 Johnson Decl. Attach. 1 (7/8/03 Initial Contact Sheet). Plaintiff also alleged "ongoing retaliation" in the form of improper procedures resulting in a wage garnishment against her, discussed in greater detail below. *Id.* Plaintiff engaged in settlement discussions with the BBG regarding this charge; however, Plaintiff ultimately rejected the BBG's settlement offer and received a Notice of Right to File on December 22, 2003. *Id.* (Documents regarding 7/8/03 OCR contact). Plaintiff filed a formal complaint of discrimination on January 2, 2004. Def.'s Garnish. Exs. at 1-3.

> 5.    *April 19-20, 2003 Overtime and Mr. Dare's Alleged Verbal Abuse*

Nigerian presidential elections were scheduled to occur during the weekend of April 18-19, 2003, with parliamentary elections to occur the prior weekend. Def.'s OT Exs. at 2 (10/18/06 Dillard Decl.) ¶ 6; *id.* at 12-13, 36-37 (Undated Wada Dep. at 25:7-26:10, 49:3-50:21). As a result, the Hausa Service expanded its weekend radio shows to one hour in order to cover the elections. *Id.* at 36-37 (Undated Wada Dep. at 49:3-50:21). On April 15, 2003, the Tuesday prior to the presidential elections, Mr. Dare approached Plaintiff to discuss the possibility of Plaintiff working overtime during the weekend to cover the elections. *Id.* at 13 (Undated Wada Dep. at 26:11-21). Plaintiff responded, "that's interesting, but I have to check my schedule." *Id.* On the afternoon of Thursday, April 17, 2003, Mr. Dare e-mailed Plaintiff assigning her to work on Sunday, April 20, 2003. *Id.* at 15-16 (Undated Wada Dep. at 28:11-29:9). Plaintiff responded to Mr. Dare's on April 18, 2003, stating, "Due to other commitment, I would not be able to work the

weekend 1500 as scheduled." *Id.* at 16-17 (Undated Wada Dep. at 29:10-31:15).

Mr. Dare responded to Plaintiff's e-mail on the afternoon of Friday, April 18, 2003, informing Plaintiff that the Hausa Service "has an important one hour show to put on, and you will have to come to work on Sunday, April 20th, for the 1500 show as per my 17th April e-mail. You will be paid overtime for four hours.  This is not a voluntary assignment." *Id.* at 19 (Undated Wada Dep. at 32:2-20); Def.'s Stmt. ¶ 56.  Mr. Dare consulted with Ms. Dillard about the overtime schedule for the weekend, and Ms. Dillard sent an e-mail to Plaintiff on the evening of April 18, 2003, confirming that Plaintiff was scheduled to work over the weekend; however, her e-mail mistakenly directed Plaintiff to work on Saturday, April 19, rather than Sunday, April 20, 2003.  Def.'s Stmt. ¶¶ 57-58; Def.'s OT Exs. at 2 (10/18/06 Dillard Decl.) ¶¶ 7-8.  Plaintiff reported to work on the morning of Saturday, April 19, 2003.  Def.'s Stmt. ¶ 59; Def.'s OT Exs. at 22 (Undated Wada Dep. at 35:4-8).  Plaintiff asserts that she was working on the morning broadcast when Mr. Dare came up behind her and shouted "Hadiza . . . who told you you were going to be MC?  I've already chosen my MC."  12/3/04 Wada Dep. at 191:16-192:1; Def.'s Stmt. ¶ 60.  Later in the day, Mr. Dare told Plaintiff that she did not have to report to work on Sunday, April 20, 2003, and Plaintiff did not report to work that day.  Def.'s Stmt. ¶ 21; Def.'s OT Exs. at 24 (Undated Wada Dep. at 37:6-17).

Plaintiff's Union filed a grievance on her behalf, alleging that BBG "violated law or contract by failing to provide [Plaintiff] with sufficient notice" of her overtime assignment for the April 19-20, 2003 weekend.  Def.'s Stmt. ¶ 62; Def.'s OT Exs. at 60-79 (8/25/04 Opinion and Award).  In an August 25, 2004 Opinion, an impartial arbitrator found that Mr. Dare assigned Plaintiff to work overtime in compliance with the relevant union agreement, but that Ms. Dillard

38

failed to adhere to the union agreement by not providing Plaintiff with as much advance notice as possible. Def.'s Stmt. ¶ 63; Def.'s OT Exs. at 79 (8/25/04 Award). The arbitrator therefore directed BBG "to cease and desist from such conduct;" however, because the violation appeared to be an aberration and because Plaintiff had already received overtime pay for her work on April 19, 2003, the arbitrator did not require BBG to post a notice of the violation to employees or pay Plaintiff backpay. *Id.*

Plaintiff does not dispute any of the foregoing facts. Instead, Plaintiff asserts that she was forced to work over the April 19-20, 2003 weekend after Mr. Dare's "entire staff unanimously decided to stop volunteering" to work overtime. Pl.'s Stmt. ¶ 56 (citing 4/26/04 Petition at 9 ("During the Nigerian presidential elections of 2003, staff in the Hausa Service turned down opportunities to work overtime, and the Africa Division director, Gwen Dillard had to step in to force the staff to work extra hours. Ordinarily, staff jumped at any opportunity to contribute, but presently, we are reluctant to do anything more than required.")). While Defendant does not address this assertion, it is ultimately irrelevant because it does not demonstrate that Plaintiff's overtime assignment was in any way discriminatory or retaliatory. Furthermore, Plaintiff speculates that "probably to set Plaintiff up for another disciplinary action for failing to show up for an important assignment, a confusing directive was issued to Plaintiff by Dare, and another by Dillard." Pl.'s Stmt. ¶ 56. Plaintiff offers no evidentiary support for this speculation.

In addition to her allegations regarding her overtime assignment on the weekend of April 19-20, 2003, Plaintiff's Opposition contains a vague reference to Mr. Dare "forcing a weekend schedule on Plaintiff to run for weeks, and later a four months night shift schedule that keeps Plaintiff from performing her assigned official duties as Senior Editor." Pl.'s Opp'n at 16. The

documents Plaintiff proffers in her exhibits appear to suggest that, at some point in 2001, Mr.

Dare required Plaintiff to switch to a weekend schedule, followed by a night shift schedule,

notwithstanding Plaintiff's assertion that her Senior Editor duties required her to work a weekday

schedule.  *See* Pl.'s Arg. Exs. (11/10/03 Memo from H. Wada); (11/1/01 e-mail from S. Dare).  In

addition, Plaintiff's deposition testimony suggests that, at some point in 2003, Mr. Dare switched

her work schedule so that she was forced to work more than five days consecutively.  *See* 12/3/04

Wada Dep. at 194:7-198:5, 210:22-214:14; *see also* Pl.'s Arg. Exs. (2/9/03 e-mail from H. Wada).

Plaintiff does not specify how she believes these schedule changes to have been discriminatory or

retaliatory.

6.     *Garnishment Action Against Plaintiff*

As noted above, in contacting the OCR on July 8, 2003, Plaintiff asserted, *inter alia*, that

she had experienced "ongoing retaliation" "due to management following improper procedures

and resulting in a wage garnishment against her."  10/22/06 Johnson Decl. Attach. 1 (7/8/03 Initial

Contact Sheet).  In a memo dated the same day, Plaintiff explained:

> I am also asking OCR to investigate procedures in which it appears that the
> agency did not follow the proper channels to implement a wage garnishment
> against me.  The agency violated the process by handling it solely from the State
> Department's Payroll Office without informing neither the IBB Payroll Office, the
> IBB General Counsel's Office, nor the Charleston Financial Center. . . .

*Id.* (7/8/03 Memo from H. Wada).  The OCR subsequently dismissed Plaintiff's allegations

regarding the garnishment action against her in a letter dated February 4, 2004, which stated,

"[y]our statements underscore your understanding that the responsibility of implementing the

garnishment order was entirely with the Department of State, and not BBG.  Per your own

admissions, you are not an aggrieved individual as defined under the law."  Def.'s Garnish. Exs. at

3 (2/4/04 Letter from D. Johnson).  In her Statement, Plaintiff asserts that she wanted an objective

investigation into the garnishment action and states that she believes the garnishment action was

retaliatory, speculating that VOA Labor Relations Specialist Donna Grace "may be the person

who set up the garnishment."  Pl.'s Stmt. ¶ 64.  However, Plaintiff offers absolutely no evidence

that Ms. Grace was in any way involved in the garnishment action, and her mere speculation does

not controvert the record evidence indicating that BBG had no involvement in the garnishment

action.  Moreover, the garnishment action appears to be irrelevant to Plaintiff's claims in the

instant litigation, as it is not referenced in Plaintiff's Complaint or Opposition.

     *F.*     *Plaintiff's Termination*

     By e-mail dated May 11, 2004, Ms. Dillard was asked to investigate phone calls placed to

Nigeria on Sunday, May 9, 2004 from a phone located in Studio 42 of the VOA studios.  Def.'s

Termination Exs. (hereinafter "Term. Exs.") at 1 (5/11/04 e-mail from J. Brooks).

     On July 15, 2004, Ms. Dillard issued a letter to Plaintiff proposing to remove her for

improper conduct.  Def.'s Term. Exs. at 4-10 (7/15/04 Letter from G. Dillard).  Ms. Dillard

charged Plaintiff with making, or allowing others to make, unauthorized phone calls to Nigeria at

a cost to the agency of $2,695.12.  *Id.* at 7; Def.'s Stmt. ¶ 67.  In her letter, Ms. Dillard explained

that the visitors log for the VOA building for May 9, 2004 indicated that Plaintiff signed her

husband into the building at 7:30 a.m., and that security cameras recorded Plaintiff's husband

entering Studio 42 at 7:45 a.m. and exiting at 1:42 p.m.  Def.'s Term. Exs. at 4 (7/15/04 Letter

from G. Dillard).  Ms. Dillard further noted that during the time period that Plaintiff's husband

was in Studio 42, 31 unauthorized phone calls were made to a total of 14 phone numbers in

Nigeria from that Studio**,** including five calls to a phone number listed to an M. Wada.  *Id.*; *see*

*also* Def.'s Term. Exs. at 1-3 (5/11/04 e-mail from J. Brooks and pages from Nigerian telephone book).  According to Ms. Dillard, the number registered to M. Wada was also called from Studio 42 on Saturday, May 15, 2004 and Saturday, May 22, 2004, during times when the visitors log indicated that Plaintiff and her husband were present in the VOA building.  Def.'s Term. Exs. at 5 (7/15/04 Letter from G. Dillard).  Furthermore, Ms. Dillard noted, Plaintiff's son was also present in the VOA building on Saturday, May 22, 2004 when the unauthorized phone calls were made. *Id.*  In determining the appropriate penalty, Ms. Dillard specifically noted, "[t]his is not your first offense.  On September 25, 2002, you were issued a Letter of Reprimand for your failure to follow instructions." *Id.* at 8.  Ms. Dillard continued to state, however, "[e]ven if this were your first offense, the serious nature of your misconduct relating to this proposal supports your removal from the Federal Service." *Id.*

Plaintiff was placed on paid, non-duty status (administrative leave) while the termination proposal was pending.  *Id.* at 10; Def.'s Stmt. ¶ 68.  Plaintiff's pay and benefits continued, but her access to BBG buildings was restricted and she was required to turn in her security badge.  Def.'s Term. Exs. at 10 (7/15/04 Letter from G. Dillard).  Ms. Dillard's letter advised Plaintiff that she could arrange to visit the building if needed by getting a visitor's pass and being escorted at all times.  *Id.*  On August 20, 2004, Plaintiff's counsel submitted a written response to Ms. Dillard's letter.  Def.'s Term. Exs. at 11-17 (Pl.'s 8/20/04 Written Response).  In her written response, Plaintiff asserted that she did not make any of the telephone calls in question or permit another individual to make such calls, and that she was working in the building on the dates in question. *Id.*  Plaintiff also challenged the manner in which VOA proceeded in removing her from its offices as well as her opportunities to be heard on the issue of her proposed termination.

Also on August 20, 2004, Plaintiff and her counsel were scheduled to make an Oral Reply to her proposed termination at 11:00 a.m. before VOA Director David Jackson.  Def.'s Term. Exs. at 18 (Lutz Notes of 8/20/04 Oral Reply).  It appears that Plaintiff and her counsel did not arrive until 11:40 a.m., at which point Director Jackson informed them that he would be unable to extend the time for the Oral Reply because he had another meeting at noon.  *Id.*  It further appears that, during the Oral Reply, Plaintiff's counsel asserted that Plaintiff's husband made the phone calls in question, *see id.* at 20; however, when Director Jackson attempted to confirm that assertion, Plaintiff's counsel stated only that Plaintiff was "not responsible for making the calls" and "didn't tell anyone to make the calls," *id.*  Plaintiff's counsel appears to have argued that Plaintiff was improperly being held vicariously liable for the phone calls being made and asserted that if Plaintiff's husband made the phone calls, Plaintiff could not be held liable for his actions. *Id.* at 20-21.  In addition, it appears that Director Jackson asked Plaintiff's counsel whether Plaintiff had made any effort to pay BBG for the phone calls, to which Plaintiff's counsel responded that Plaintiff's Union offered to reimburse BBG after Plaintiff received Ms. Dillard's termination proposal.  *Id.* at 21-22.

In a letter dated September 9, 2004, VOA Director Jackson found that the charge of improper conduct was supported by a preponderance of the evidence and that, based on consideration of "all relevant factors relating to the penalty selection," removal was the appropriate penalty.  Def.'s Term. Exs. at 23-32 (9/9/04 Letter from D. Jackson).  Director Jackson noted that in arriving at his decision, he fully considered Plaintiff's oral and written replies, as well as Ms. Dillard's proposal letter and its supporting materials.  *Id.* at 23.  Regarding the charge, Director Jackson stated that Plaintiff did not dispute that she and her husband were

present in the VOA building when the phone calls were made (and that Plaintiff's son was also

present on May 22, 2004), and that Plaintiff could not contest this fact because a security tape

showed Plaintiff visiting her husband in Studio 42 several times between 9:58 a.m. and 1:27 p.m.

*Id.*  Director Jackson further noted that Plaintiff had not asserted that she did not know the M.

Wada to whom many of the phone calls were placed.  *Id.* at 24.

Noting that Plaintiff had offered contradictory accounts as to who made the phone calls in

question, Director Jackson stated that because no one else was present in Studio 42 at the times in

question, "[e]ven if I accept your statement that you, yourself did not make the calls, I would still

be left with the conclusion that your husband made the calls on May 9 and May 15 and either your

husband or your son made the calls on May 22."  *Id.*  Director Jackson dismissed Plaintiff's

assertion that the calls were made without her knowledge, finding that because Plaintiff had been

in Studio 42 at times when the calls were made, it appeared that she had not taken steps to prevent

the calls from being made.  *Id.* at 25-32.  Director Jackson also found to be false Plaintiff's

statement that she came to work on May 22, 2004 to work on her performance appraisal, noting

that no relevant computer activity was recorded on Plaintiff's computer on May 22, 2004 and that

the Microsoft Word documents relating to Plaintiff's performance appraisal were not created until

the following Monday.  *Id.* at 25.  Director Jackson similarly concluded that, although Plaintiff

had stated that her husband and son came to the VOA office because they had business to take

care of downtown, that explanation was inconsistent with the fact that they were in the VOA

office for a number of hours.  *Id.*

Director Jackson also considered "Other Issues" in his letter, including Plaintiff's

allegation that the charge against her constituted retaliation for the lawsuit that she had initiated

44

against the BBG, and found no evidence of this "serious claim." *Id.* at 26-29. Director Jackson

addressed and rejected Plaintiff's argument that she was being treated differently from other

employees who had been found to have improperly used BBG's telephone service. *Id.* at 30-32.

Stating that, "no other Agency employee has been found to have signed in a family member who

placed unauthorized telephone calls. There simply is no parallel case," Director Jackson

nevertheless continued to distinguish Plaintiff's alleged comparators on various grounds. *Id.*

Finally, Director Jackson noted that he might:

> have taken a different view of this matter had you readily acknowledged that your
> husband made the calls and acknowledged your own misconduct in allowing him
> to make them and had you made prompt restitution to the Agency. However, you
> have denied your culpability for the charges and, instead, blame Agency officials
> for discovering and trying to correct your misconduct. . . . You have failed to
> accept responsibility for your actions and you tried to cover them up.

*Id.* at 31. As such, Director Jackson ordered Plaintiff's removal, effective September 10, 2004.

*Id.* at 23.

In her Statement, "Plaintiff categorically denies all statements of Defendant in relation to

the termination of her employment as legally questionable by all standards of universal legal

practice including in the United States." Pl.'s Stmt. ¶ 67. Plaintiff argues that her termination

was not justified because "punishing any individual with certainty for a conduct that cannot be

pinned with certainty on the person charged, is questionable." *Id.* Plaintiff does not, however,

actually deny that she allowed her husband to make the phone calls in question, or provide factual

evidence that she did not allow the phone calls to be made. *Id.* Moreover, Director Jackson's

letter makes clear that Defendant decided to terminate Plaintiff largely because she steadfastly

refused to assume responsibility for the phone calls, despite the fact that they appeared to have

been made on multiple occasions with, at a minimum, her knowledge and acquiescence.  Def.'s

Term. Exs. at 31 (9/9/04 Letter from D. Jackson).  In addition, as Ms. Dillard expressed in her

letter, Plaintiff's "position require[d] shift work and the ability to work independently without

supervision," and Plaintiff's actions – allowing the phone calls to be made and refusing to accept

responsibility thereafter – "violated [Ms. Dillard's] trust in [Plaintiff] and [Ms. Dillard's]

confidence in [Plaintiff's] integrity.  Def.'s Term. Exs. at 8 (7/15/04 Letter from G. Dillard).

Defendant's conclusions regarding the phone calls and her subsequent refusal to accept

responsibility appear to be supported by significant circumstantial evidence, and the Court's role

is not to second-guess Defendant's employment decisions.  In addition, as discussed in greater

detail below, the ultimate issue the Court must address in resolving the instant motion is not

whether VOA was justified in terminating Plaintiff, but rather whether Plaintiff's termination

constituted discrimination or retaliation.

To that end, the Court notes that in her Statement Plaintiff asserts that, prior to her

termination, BBG had never fired an employee over unauthorized telephone calls.  *Id.*  Although

Plaintiff does not explicitly state as much in her Statement, it appears that Plaintiff is referring to

the various alleged comparators on which she relied in arguing against her termination before

Director Jackson.  As such, the Court will briefly address those comparators at this point.  In so

doing, the Court notes that Plaintiff does not indicate the race, sex, or religion of any of these

alleged comparators.

As described in Director Jackson's September 9, 2004 letter, "during FY 03 and FY 04,

nine Office of Cuba Broadcasting employees, located in Miami, Florida, and one VOA employee

in Washington reimbursed the Agency for the cost of unauthorized telephone calls that they made

46

and they were not removed or otherwise disciplined for their misconduct." Def.'s Term. Exs. at

30 (9/9/04 Letter from D. Jackson). The only additional information in the record that appears to

relate to the Office of Cuba Broadcasting employees is an October 29, 2001 letter submitted by

Plaintiff, indicating that employees who made personal phone calls from their government-issued

cellular phones were required to self-identify personal phone calls on their bills and submit a

reimbursement check to the government, along with a $10 administrative fee. Pl.'s Exs. for Issue

No. 67 (10/29/01 Letter from K. Sutton, 11/29/06 list of Unauthorized Personal Calls for BBG).

As to the VOA employee, in his letter, Director Jackson noted that "the employee called an 800-

toll free number from his/her calling card and assumed that it was free. It appears that this was an

honest mistake and the employee admitted the conduct and paid the Agency back." Def.'s Term.

Exs. at 30 (9/9/04 Letter from D. Jackson). Director Jackson further noted that the largest amount

owed to the BBG by any of these ten employees was $300, and that the total of all of the

unauthorized calls placed by these employees was $1,022.50, or $1,672.62 less than the total cost

of the phone calls Plaintiff allegedly allowed to be made to Nigeria. *Id.*

Plaintiff also points to a 1999 agreement in which the Audio Services Branch allowed an

employee to repay $2,127.18 in unauthorized phone calls via a payroll deduction. Def.'s Term.

Exs. at 33-34 (11/30/99 Agreement); Pl.'s Exs. for Issue No. 67. The employee in question

received a letter of admonishment that was not filed in her official personnel folder, *id.*; however,

Defendant notes that neither Ms. Dillard nor VOA Director Jackson were in any way involved in

administering discipline to the employee in question in 1999, Def.'s Reply at 14. The Court lacks

any additional information as to this situation. Finally, Plaintiff notes that Aliyu Mustapha, the

IRB who served as the MC for the October 3 Broadcast, misused a government-issued credit card

47

by incurring approximately $32,000 worth of charges for personal purchases and cash advances.

*See* Pl.'s Stmt. ¶ 17.  However, as Ms. Grace explains in her Declaration submitted in support of

Defendant's Reply, it appears that Mr. Mustapha was one of many BBG employees who misused

the credit cards in question and that "the agency did not have a program in place to educate

employees on their financial obligations under the Government Travel Card Program at the time

the misuse occurred."  Grace Reply Decl. ¶ 10.  As a result, "the agency decided to allow

employees to repay Citibank without pursuing formal disciplinary action."  *Id.*  Ms. Grace

distinguishes Mr. Mustapha's situation from Plaintiff's by noting that "[w]hen notified of his

misuse, Mr. Mustapha agreed immediately" to repay his debt, and further noting that the

government did not incur any debt in Mr. Mustapha's case because all monies were owed to

Citibank.  *Id.* ¶¶ 11-12.

For its part, as a comparator, Defendant points to a Hausa Service IRB who incurred

$12,476.38 in unauthorized phone calls between March 28 and June 28, 2004, and whose

employment Ms. Dillard recommended be terminated.  Def.'s Term. Exs. at 35-50 (1/31/05 Memo

from G. Dillard; 2/3/05 Letter from J. Welch).  That individual resigned by letter dated March 4,

2005, the day before his termination would have become effective.  Def.'s Term. Exs. at 51

(3/4/05 Letter to J. Welch).  In her Opposition, Plaintiff insinuates that Defendant only proposed

to terminate the individual in question in order to provide a comparator for Plaintiff.  Pl.'s Opp'n

at 19-20.  Plaintiff provides no factual support for this assertion, and the Court therefore cannot

credit Plaintiff's speculation.  In any event, however, the Court notes that Defendant's proposed

comparator does not rebut Plaintiff's assertion that the BBG had never previously fired an

employee for unauthorized phone calls, *see* Pl.'s Opp'n at 17, as Defendant proposed to terminate

the alleged comparator *after* Plaintiff was terminated.

Plaintiff initially contacted the OCR on July 26, 2004 alleging that Ms. Dillard's termination proposal constituted reprisal. 10/22/06 Johnson Decl. Attach. 1 (7/26/04 Initial Contact Sheet). It appears that Plaintiff again contacted the OCR after she was terminated by the VOA, alleging discrimination on the basis of race, sex, religion, age, and national origin, as well as reprisal, and requested that EEO counseling be waived. 10/22/06 Johnson Decl. Attach. 1 (EEO Counselor Report). Plaintiff was issued an immediate Notice of Right to File a Discrimination Complaint. *Id.*

G.    *Other Issues Raised by Plaintiff*

In her Statement, Plaintiff asserts that "[a] woman at VOA irrespective of qualification and performance is supposed to act subdued even in a position of leadership (exhib); male employees readily gain management support in doing so as clearly demonstrated by defendant's email exhibits." Pl.'s Stmt. ¶ 15. Plaintiff further asserts that "VOA management has been notorious for gender discrimination, Hartman case (exhib). with the largest award to a class action suit against any Agency of the federal Government." *Id.* These assertions bear no relation to the paragraph of Defendant's Statement to which they purport to respond. *See* Def.'s Stmt. ¶ 15. Nevertheless, the Court has reviewed the exhibits submitted by Plaintiff in support of these assertions, insofar as Plaintiff may be attempting to argue that VOA, on the agency level, discriminated against women.

Plaintiff's Exhibits for Issue No. 15 include a Memorandum for the File written by Debbie Young of the OCR regarding a March 25, 1999 meeting related to the situation, described above, where members of the Hausa Service made false accusations against the former Service Chief,

49

Ms. Hasan.  In that Memorandum, Ms. Young includes a "Personal Observation: There appears to

be much resistance to change by some of the members of the Hausa Service and a feeling that due

to their culture, things should be handled in a certain way and supervision/leadership should not

be provided by a female."  Pl.'s Exs. for Issue No. 15 (Young Memo for File).  This statement, of

course, does not demonstrate discrimination on the part of VOA management, but rather suggests

discrimination among Hausa Service staff members.

Plaintiff also proffers a memo written by English-to-Africa Branch IRB Verla Wiley to

VOA Director Robert Reilly entitled "African and African-American Women for a Just

Workplace."  Pl.'s Exs. for Issue No. 15 (2/15/02 Memo from V. Wiley).  In her memo, Ms.

Wiley asserts:

> Over the past several years, Rashidah Hasan, Kemi Southey-Cole, Hadiza Wada,
> Darlene Jones-Robinson, and I, have filed complaints/lawsuits, against the Africa
> Division.  As a result of our filings, vicious and retaliatory attacks are being
> waged by Africa Division Chief, Gwen Dillard – English to Africa Branch Chief,
> Rebecca McMenamin – and, Labor Relations Specialist, Donna Grace.  Their
> main objective: to retaliate by establishing paper trails, which make it easier to
> remove Black females from their positions.  Many Black VOA employees feel
> that Gwen Dillard, an African-American, is being used by management to carry
> out their abusive personnel practices.

*Id.*  Ms. Wiley continues to describe the allegedly discriminatory and retaliatory actions taken

against Plaintiff and other African and African-American women at VOA, all of which ultimately

amount to unproven allegations.  Moreover, Ms. Wiley's memorandum is, itself, hearsay, as it

describes the alleged discrimination and retaliation experienced by various women rather than

proffering the individuals' first-hand accounts.  In addition, Plaintiff proffers a May 2000 letter

regarding an EEOC complaint filed by Ms. Hasan; however, without further information

regarding the charges included in that complaint and the disposition of the complaint, the Court

cannot consider it as anything other than an unproven allegation.  Pl.'s Exs. for Issue No. 15

(5/10/00 Letter re: Hasan Compl.)

Finally, Plaintiff includes in her exhibits a news article and a description from a law firm's

website of the March 2000 $508 million settlement in *Hartman v. Powell*, the largest sex

discrimination in hiring case ever launched under the Civil Rights Act.  Pl.'s Exs. for Issue No. 15

(3/23/00 GovExec.com Article; Webster, Fredrickson & Brackshaw Website).  However, per

Plaintiff's own materials, that settlement affected "1,100 women who applied for jobs at the U.S.

Information Agency and the Voice of America between Oct. 8, 1974 and Nov. 16, 1984," who

"alleged discriminatory hiring practices at the now-defunct USIA," including that "qualifying

examination scores were rigged to favor male applicants," and that "hiring officials told women

that the agency was 'looking for male voices.'" *Id.*  The allegations in the *Hartman* case are thus

entirely unrelated to Plaintiff's allegations in the instant action and, moreover, "the government

admit[ted] no wrongdoing in the settlement."  *Id.*  Plaintiff's factual evidence thus fails to support

her claims that VOA management was notorious for gender discrimination and preferred male

employees over female employees at the agency level.

      H.    *Procedural History*

Plaintiff filed her original five-Count Complaint in this action on July 8, 2003.  In Count I

of Plaintiff's Complaint alleges that Plaintiff's non-selection for the Hausa Service Chief position

constituted discrimination based on Plaintiff's race, sex, and religion; Count II alleges that

Defendant's refusal to reclassify Plaintiff's position from a GS-12 to a GS-13 constituted

discrimination on the basis of Plaintiff's race, sex, and religion; Count III alleges that Plaintiff

experienced discriminatory disparate discipline on the basis of her race, sex, and religion; Count

IV alleges that Plaintiff was subjected to retaliatory discipline for her prior use of the Equal

Employment Opportunity ("EEO") process; and Count V alleges that Plaintiff was subject to

discriminatory and retaliatory harassment that amounted to a hostile work environment.  Compl.

¶¶ 29-43.  Plaintiff's employment was subsequently terminated by the VOA, effective September

10, 2004.  On October 14, 2005, the Court issued an Order allowing Plaintiff to amend her

complaint to include the allegations raised in EEOC Complaint No. 100-2004-00943 and OCR

Complaint No. OCV-04-24.  *Wada v. Tomlinson*, Civil Action No. 03-1488, Order (D.D.C. Oct.

14, 2005).  As such, Plaintiff essentially amended her Complaint to include allegations that her

termination constituted discrimination and retaliation.  *Id.*

Defendant filed its Motion for Summary Judgment in this matter on October 24, 2006,

after requesting and being granted a one-day extension of time in which to file, due to technical

difficulties Defendant experienced in filing its Motion.  *Wada v. Tomlinson*, Civil Action No. 03-

1488, Minute Entry Order (D.D.C. Oct. 24, 2006).  Plaintiff's Opposition was initially due on

November 13, 2006; however, Plaintiff retained counsel in this matter on November 9, 2006 and

the Court therefore granted Plaintiff's motion to extend her time to oppose Defendant's Motion

for Summary Judgment through and including November 30, 2006.  *Wada v. Tomlinson*, Civil

Action No. 03-1488, Minute Entry Order (D.D.C. Nov. 13, 2006).  The Court subsequently

granted Plaintiff two additional extensions of time in which to file her Opposition, such that her

Opposition was ultimately due on January 25, 2007.  *Wada v. Tomlinson*, Civil Action No. 03-

1488, Minute Entry Orders (D.D.C. Dec. 5, 2006 and Jan. 16, 2007).  On January 22, 2007,

Plaintiff filed a motion for an order to release her counsel and allow her a further extension of

time in which to file her Opposition *pro se*.  *Wada v. Tomlinson*, Civil Action No. 03-1488,

Docket #[75], Motion for Order to Release Counsel, (D.D.C. Jan. 22, 2007).  On January 25, 2007, the Court granted Plaintiff's motion to release her counsel and extended Plaintiff's time in which to file her Opposition through and including February 8, 2007.  *Wada v. Tomlinson*, Civil Action No. 03-1488, Order (D.D.C. Jan. 25, 2007).

Plaintiff filed her Opposition to Defendant's Motion for Summary Judgment on February 8, 2007, along with a Notice indicating that she had filed a supporting bulky exhibit.  On March 19, 2007, Defendant filed a motion for extension of time in which to file its Reply in further support of its motion for summary judgment, asserting that Defendant did not receive the package containing Plaintiff's bulky exhibit until February 21, 2007.  Def.'s 3/19/07 Consent Mot. for Extens. of Time.  Defendant filed its Reply the same day, and the Court granted Defendant's motion for extension of time, *nunc pro tunc*, on March 21, 2007.  *Wada v. Tomlinson*, Civil Action No. 03-1488, Minute Entry Order (D.D.C. Mar. 21, 2007).

On April 4, 2007, Plaintiff filed a motion asking the Court to declare Defendant's Motion for Summary Judgment untimely because it was filed one day after it was due, and further requesting that the Court declare Defendant's Reply "inadmissible for being grossly untimely." Pl.'s Mot. in Support of Order to Rule Def.'s Summ. J. Mots. Untimely (hereinafter "Pl.'s Timeliness Mot.").  Defendant opposed this motion on April 9, 2007.

## II: LEGAL STANDARDS

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  Under the summary judgment standard, Defendant, as the moving party, bears

53

the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Plaintiff, in response to Defendant's motion, must "go beyond the pleadings and by her own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251, 106 S. Ct. 2505 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a [fact-finder] or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50, 106 S. Ct. 2505 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there

is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587, 106 S. Ct. 1348 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

Importantly, "[w]hile summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Morgan v. Fed. Home Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001), *aff'd*, 328 F.3d 647 (D.C. Cir. 2003) (quoting *Calhoun v. Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998) (internal citation omitted), *aff'd*, No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 2000)); *see also Marshall v. James*, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special caution "does not eliminate the use of summary judgment in discrimination cases") (citing cases). "Summary judgment is not a 'disfavored procedural shortcut,' but is an integral procedural tool which promotes the speedy and inexpensive resolution of every case." *Marshall*, 276 F. Supp. 2d at 47 (quoting *Celotex Corp.*, 477 U.S. at 327). Accordingly, the Court reviews Defendant's motion for summary judgment under a "heightened standard" that reflects "special caution." *Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 879 (D.C. Cir. 1997) (internal quotations omitted), *overturned on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc). Nonetheless, while this special standard is more exacting, it is not inherently preclusive. Although more circumspect, the Court will continue to grant a motion for summary judgment in which the nonmoving party has

failed to submit evidence that creates a genuine factual dispute and the moving party is entitled to

a judgment as a matter of law.

### III: DISCUSSION

As noted above, Plaintiff alleges that Defendant discriminated against her on the basis of

race, sex, and religion by (1) not selecting her as Hausa Service Chief; (2) refusing to reclassify

her position from a GS-12 to a GS-13; (3) disparately disciplining her in connection with the

October 3 Broadcast by removing her editorial duties, proposing to suspend her, and issuing the

letter of reprimand; and (4) terminating her employment with the VOA.  Plaintiff further alleges

that Defendant retaliated against her for her protected EEOC activity by (1) disciplining her; and

(2) terminating her employment with the VOA.  Finally, Plaintiff alleges that she was subjected to

retaliatory and discriminating harassment constituting a hostile work environment.  Defendant has

moved for summary judgment as to all of Plaintiff's allegations, and the Court shall address each

set of allegations in turn.  Initially, however, the Court shall address Plaintiff's motion asking the

Court to disregard Defendant's motion for summary judgment and reply in support of that motion.

A.      *Plaintiff's Motion to Rule Defendant's Summary Judgment Motions Untimely*

In her motion filed on April 4, 2007, Plaintiff "asks the court to declare Defendant's

Summary Judgment Motion of October 24, 2006 as inadmissible for being untimely and also the

reply motion filed on March 19, 2007 as inadmissible for being grossly untimely."  Pl.'s

Timeliness Mot. at 1.  Plaintiff argues that Defendant's motion for summary judgment was

untimely because it was filed a day after the October 23, 2006 due date, along with a motion

seeking to extend Defendant's time to file that motion by one day, for which Defendant did not

seek Plaintiff's consent.  *Id.* at 2.  However, Defendant's motion for extension of time indicated

that Defendant had encountered technical difficulties in filing its motion for summary judgment

on October 23, 2006.  *See Wada v. Tomlinson*, Civil Action No. 03-1488, Docket #[69], Motion

for Extension of Time (D.D.C. Oct. 24, 2006).  The Court therefore granted Defendant's motion

for extension of time *nunc pro tunc*, such that Defendant's motion for summary judgment was

not, in fact, untimely.  *Wada v. Tomlinson*, Civil Action No. 03-1488, Minute Entry Order

(D.D.C. Oct. 24, 2006).

Plaintiff also argues that Defendant's reply memorandum in support of its motion for

summary judgment was untimely because it was not filed until March 19, 2007, despite the fact

that Plaintiff filed her Opposition on February 8, 2007.  Pl.'s Timeliness Mot. at 1-2.  However, as

Defendant points out in response to Plaintiff's argument, Plaintiff was granted a total of four

extensions of time in which to file her Opposition, which was initially due on November 13, 2006.

Def.'s Opp'n at 2.  *See also Wada v. Tomlinson*, Civil Action No. 03-1488, Minute Entry Orders

(D.D.C. Nov. 13, 2006, Dec. 5, 2006, Jan. 16, 2007, and Jan. 25, 2007).  When Plaintiff filed her

Opposition *pro se* on February 8, 2007, she attached a Notice indicating that she had filed a

supporting bulky exhibit.  As Defendant explains in its Opposition, Plaintiff's bulky exhibit was

not received by the correct attorneys until February 21, 2007.  Def.'s Opp'n at 2-3.  Furthermore,

on February 23, 2007, Plaintiff herself indicated to Defendant that she had "no objection" to

Defendant asking for an extension of time in which to file its Reply.  *See* Pl.'s Timeliness Mot. at

6 (2/23/07 e-mail from H. Wada).  Defendant reported the delay in its receipt of Plaintiff's bulky

exhibit, as well as Plaintiff's consent to an extension, to the Court in its motion for an extension

of time to file its reply memorandum, which it filed along with its reply memorandum on March

19, 2007.  On March 21, 2007, the Court granted Defendant's motion for extension of time, *nunc*

*pro tunc*, such that Defendant's reply was also not, in fact, untimely. *Wada v. Tomlinson*, Civil

Action No. 03-1488, Minute Entry Order (D.D.C. Mar. 21, 2007).

In light of the foregoing, the Court shall deny Plaintiff's motion to rule Defendant's

summary judgment motions untimely.

>    B.    *Failure to Exhaust Administrative Remedies*

As an initial matter, Defendant argues that Plaintiff has failed to exhaust the administrative

remedies available to her with respect to a number of her allegations because she did not contact

the OCR or file a formal EEO complaint regarding those allegations.  Specifically, Defendant

argues that Plaintiff did not contact the OCR or file a formal EEO complaint regarding: (1) the

Office of Security investigation; (2) the assignment of overtime on the weekend of April 19-20,

2003; (3) her 2001-2002 performance review; or (4) her assignment resulting in her working more

than five days consecutively.  Def.'s Mot. for Summ. J. at 11.  Defendant further notes that

Plaintiff first contacted the OCR regarding her AWOL charge, her "Minimally Successful"

performance rating, and the garnishment action against her on July 8, 2003 – the same day that

Plaintiff filed her Complaint in this action.  As a result, Defendant argues, Plaintiff's claims

regarding these allegations should be dismissed because she "did not, in good faith, seek to

resolve the matters at the administrative level prior to filing the above-captioned complaint."

*Id.* at 12.  Finally, Defendant argues that because Plaintiff never filed a formal complaint of

harassment or hostile work environment or even contacted the OCR regarding these charges, her

claims related to these issues must be dismissed.

"Prior to instituting a court action under Title VII, a plaintiff alleging discrimination in

federal employment must proceed before the agency charged with discrimination.  This

administrative remedies exhaustion requirement is mandatory." *Bayer v.  U.S. Dep't of Treasury*,

956 F.2d 330, 332 (D.C. Cir. 1992) (internal citations omitted).  In addition, federal employees are

required to contact an EEO counselor "within 45 days of the date of the matter alleged to be

discriminatory or, in the case of personnel action, within 45 days of the effective date of the

action."  29 C.F.R. § 1614.105.  Although this 45-day time limit is not jurisdictional, it operates as

a statute of limitations defense.  *Bayer*, 956 F.2d at 332 (referring to then-applicable thirty-day

time limit for contacting an EEO counselor).  Furthermore, as the Supreme Court's seminal

decision in *National Passenger Railroad Corporation v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061,

153 L. Ed. 2d 106 (2002) ("*Morgan*"), makes clear, a Title VII plaintiff is required to exhaust his

or her administrative remedies with respect to each discrete allegedly discriminatory or retaliatory

act.  *Id.* at 122, 122 S. Ct. 2061.

Defendant's motion for summary judgment squarely asserts that Plaintiff failed to contact

the OCR or file a formal complaint, and thus to exhaust her administrative remedies, with respect

to her allegations regarding (1) the Office of Security investigation; (2) the assignment of

overtime on the weekend of April 19-20, 2003; (3) her 2001-2002 performance review; or (4) her

assignment resulting in her working more than five days consecutively.  Def.'s Mot. for Summ. J.

at 11; *see also* 10/22/06 Johnson Decl. ¶¶ 4-7 (averring that Plaintiff did not contact the OCR or

file a formal EEO complaint regarding these claims).  Plaintiff's Opposition offers no evidence to

the contrary.  Rather, Plaintiff argues that because "her case filing in federal court included

charges of retaliation," she effectively alleged ongoing retaliation, such that requiring her to

exhaust her administrative remedies with respect to each alleged retaliatory act would "be a

cumbersome burden on the system itself and resources made available for such issues by

taxpayers." Pl.'s Opp'n at 14. However, "*Morgan* itself rejected the 'continuing violation' theory that would permit plaintiffs to recover for discrete acts of discrimination and retaliation that were not exhausted but were 'sufficiently related' to exhausted claims." *Keeley v. Small*, 391 F. Supp. 2d 30, 40 (D.D.C. 2005); (citing *Morgan*, 536 U.S. at 105, 122 S. Ct. 2061). As such, it is clear that Plaintiff failed to exhaust her administrative remedies with respect to the Office of Security investigation, the assignment of overtime on the weekend of April 19-20, 2003, her 2001-2002 performance review, and her assignment resulting in her working more than five days consecutively, and that she is therefore barred from asserting that these incidents constitute discrete acts of discrimination or retaliation.

Furthermore, in her Opposition, Plaintiff mistakenly argues that she was apprised of her AWOL charge on June 9, 2002 and of her "Minimally Successful" performance evaluation on July 8, 2002, and promptly contacted the OCR regarding these claims. *See* Pl.'s Opp'n at 14. Plaintiff's dates are off by one year – the events in question occurred in 2003, not 2002 – and the record evidence thus supports Defendant's assertion that Plaintiff first contacted the OCR regarding these claims, as well as the garnishment action against her, on July 8, 2003, the very day on which she filed her Complaint in this action. *See* 10/22/06 Johnson Decl. Attach. 1 (7/8/03 Initial Contact Sheet). As 29 C.F.R. § 1614.105(a) makes clear, federal employees are required to consult an EEO counselor prior to filing a complaint in order "to try to informally resolve the matter." *Id.* Indeed, "Title VII requires that a person complaining of a violation file an administrative charge with the EEOC and allow the agency time to act on the charge." *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995). By filing her Complaint in this action on the very day on which she contacted the OCR regarding her AWOL charge, "Minimally Successful"

performance evaluation, and garnishment action, Plaintiff foreclosed the possibility of informal resolution of those matters, and thus failed to exhaust the administrative remedies available to her. Plaintiff is therefore barred from asserting that those claims constitute discrete acts of discrimination or retaliation.

Finally, Defendant argues that Plaintiff failed to exhaust her administrative remedies with respect to her claim for harassment or hostile work environment because she never contacted the OCR or filed a formal complaint regarding such a charge. Def.'s Mot. for Summ. J. at 11-12. Defendant is correct that Plaintiff never specifically alleged harassment or hostile work environment before the OCR. However, "a Title VII lawsuit includes the claims that are 'like or reasonably related to the allegations of the administrative charge and growing out of such allegations.'" *Bell v. Gonzales*, 398 F. Supp. 2d 78, 85 (D.D.C. 2005) (quoting *Jones v. Billington*, 12 F. Supp. 2d 1, 7 (D.D.C. 1997)). In contacting the OCR on July 8, 2003, Plaintiff alleged "ongoing retaliation," 10/22/06 Johnson Decl. Attach. 1 (7/8/03 Initial Contact Sheet; 7/8/03 memo from H. Wada), and in her Opposition, Plaintiff asserts that "actions against Plaintiff occurring over an extended period of time, and usually involving the same individuals, should not be viewed as discrete events as Defendant would have the court see them, but as so related to constitute a pattern of ongoing retaliatory and discriminatory harassment," Pl.'s Opp'n at 14-15. The Court shall therefore assume, *arguendo*, that Plaintiff's July 8, 2003 contact with the OCR and her subsequent January 2, 2004 formal complaint sufficiently asserted a hostile work environment claim. The Court further notes that "a charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice" and Plaintiff has exhausted his or her administrative remedies

61

with respect to "at least one act." *Morgan*, 536 U.S. at 122, 122 S. Ct. 2061.  As such, the Court

will consider Plaintiff's allegations regarding the Office of Security investigation, the assignment

of overtime on the weekend of April 19-20, 2003, her 2001-2002 performance review, her

assignment resulting in her working more than five days consecutively, her AWOL charge, her

"Minimally Successful" performance evaluation, and the garnishment action against her in the

context of her hostile work environment claim.

    B.    *Plaintiff's Discrimination Claim*s

        1.    *Proper Standards*

    Pursuant to Title VII, all personnel actions affecting employees of the federal government

"shall be made free from any discrimination based on race, color, religion, sex, or national

origin."  42 U.S.C. § 2000e-16(a). To prove a violation of Title VII, Plaintiff must demonstrate by

a preponderance of the evidence that the actions taken by the employer were "more likely than not

based on the consideration of impermissible factors" such as race, ethnicity, or national origin.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207

(1981) (internal quotation marks and citation omitted).  Furthermore, "the plaintiff may prove his

claim with direct evidence, and absent direct evidence, he may indirectly prove discrimination"

under the burden-shifting analysis created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  *Brady v. Livingood*, 456 F. Supp. 2d 1, 6 (D.D.C. 2006).

In her Opposition, Plaintiff appears to suggest that Ms. Dillard's selection of Mr. Dare as Hausa

Service Chief constitutes "explicit religious discrimination" because Ms. Dillard "went out of her

way to select a Christian male from the Yoruba speaking group" over Plaintiff, who, like the

majority of Hausa speakers, is Muslim.  Pl.'s Opp'n at 2.  Plaintiff offers no factual support for

this assertion other than a passing reference to the letters sent by Congressmen Weldon and Ehlers in the wake of the October 3 Broadcast. *Id.* Those letters do, in fact, describe "deep concern regarding alleged pro-Muslim, Anti-American reporting by the VOA's Hausa-language programming in Nigeria." Def.'s Disc. Exs. at 21-22 (11/16/01 Letter from V. Ehlers); *see also* Disc. Exs. at 19-20 (10/25/01 Letter from D. Weldon). However, those letters – written by Congressmen unaffiliated with VOA months after Mr. Dare's selection as Hausa Service Chief – in no way constitute direct evidence of religious discrimination on the part of Ms. Dillard.[17]

Therefore, as the record in the instant case contains no direct evidence of discrimination, it is necessary to employ the *McDonnell Douglas* tripartite burden-shifting framework. *Cones v. Shalala*, 199 F.3d 512, 516 (D.C. Cir. 2000) (citing *McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). It is the district court's responsibility to closely adhere to this analysis and go no further, as it does not sit as a "super-personnel department that reexamines an entity's business decisions." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183

---

[17] In addition, in its motion for summary judgment, Defendant notes that in her answers to interrogatories, Plaintiff argued that "[a]ccording to one politically-active openly Christian-oriented publication, "The Weekly Standard," Mr. Dare was hired because he is a Christian male and to deal with allegedly religiously biased broadcasts by Muslim Voice of America staff,"and suggested that this article constituted direct evidence of religious discrimination. Def.'s Mot. for Summ. J. at 22 (citing Def.'s Non-Select. Exs. at 3 (Pl.'s Ans. to Interrog. #3)). In her Opposition, Plaintiff does not indicate that she believes The Weekly Standard article constitutes direct evidence of race, sex, or religious discrimination. Nevertheless, the Court notes that the article in question begins, "In Nigeria the Voice of America has been condemned for being pro-Muslim, anti-Christian, and anti-American. VOA Director Robert Reilly has his hands fully reforming this important service," quotes VOA Director Reilly as being "aware of problems," and continues to state that Mr. Dare, a Christian, was made chief of the Hausa Service. *See* Def.'s Non-Select. Exs. at 46-48 (11/21/01 Weekly Standard Article). However, the statement regarding Mr. Dare's religion is properly attributed to author of the article, and not to VOA Director Reilly. *Id.* As the article does not indicate that anyone at VOA believes Mr. Dare was hired because of his religious affiliation, it cannot constitute direct evidence of religious discrimination.

(D.C. Cir. 1996) (internal citation and quotation marks omitted).

Under the *McDonnell Douglas* paradigm, Plaintiff has the initial burden of proving by a preponderance of the evidence a "*prima facie*" case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. 1817.  If she succeeds, the burden shifts to Defendant to articulate some legitimate, non-discriminatory reason for Plaintiff's termination, and to produce credible evidence supporting its claim.  *Id.*  Defendant's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons."  *Burdine*, 450 U.S. at 254, 101 S. Ct. 1089; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment.").  As such, "the *McDonnell Douglas* framework shifts intermediate evidentiary burdens between the parties, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003), *cert. denied*, 540 U.S. 881, 124 S. Ct. 325, 157 L. Ed. 2d 146 (2003); *see also Burdine*, 450 U.S. at 253, 101 S. Ct. 1089.

If Defendant is successful, then "the *McDonnell Douglas* framework -- with its presumptions and burdens -- disappear[s], and the sole remaining issue [is] discrimination *vel non*."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (internal citations and quotation marks omitted).  At that point, Plaintiff has the burden of persuasion to show that Defendant's proffered reason was not the true reason for the employment decision.  *Burdine*, 450 U.S. at 256, 101 S. Ct. 1089.  Pretext may be established "directly by persuading the court that a discriminatory reason more likely motivated the employer

64

or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.*
at 256, 101 S. Ct. 1089; *see also Reeves*, 530 U.S. at 143, 120 S. Ct. 2097.  "Proof that the
defendant's explanation is unworthy of credence is simply one form of circumstantial evidence
that is probative of intentional discrimination, and it may be quite persuasive." *Reeves*, 530 U.S.
at 147, 120 S. Ct. 2097 (citing *St. Mary's Honor Ctr.*, 590 U.S. at 517, 113 S. Ct. 2742)
("[P]roving the employer's reason false becomes part of (and often considerably assists) the
greater enterprise of proving that the real reason was intentional discrimination."); *see also Aka*,
156 F.3d at 1290 ("[A] plaintiff's discrediting of an employer's stated reason for its employment
decision is entitled to considerable weight.").

Notably, the Supreme Court has taken care to instruct trial courts that "a plaintiff's prima
facie case, combined with sufficient evidence to find that the employer's justification is false, may
permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S.
at 148, 120 S. Ct. 2097.  "[T]he trier of fact may still consider the evidence establishing the
plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether
the defendant's explanation is pretextual." *Id.* at 143, 120 S. Ct. 2097 (quoting *Burdine*, 450 U.S.
at 255 n.10, 101 S. Ct. 1089).  The Court of Appeals for the District of Columbia Circuit has
distilled this analysis, noting that the fact-finder can infer discrimination from the combination of:

> (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack
> the employer's proffered explanation for its actions; and (3) any further evidence of
> discrimination that may be available to the plaintiff (such as independent evidence
> of discriminatory statements of attitudes on the part of the employer) or any
> contrary evidence that may be available to the employer (such as evidence of a
> strong record in equal opportunity employment).

*Aka*, 156 F.3d at 1289.  However, evidence in each of the three categories is not required. *Id.*

"At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination, summary judgment must be entered against [plaintiff]." *Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 27-28 (D.C. Cir. 1997).  "[T]he court must consider all the evidence in its full context in deciding whether the plaintiff has met his burden of showing that a reasonable [fact-finder] could conclude that he has suffered discrimination." *Aka*, 156 F.3d at 1290.

> 2.     *Count I – Non-Selection – Application of the* McDonnell Douglas *Analysis*
>
> a.     *Plaintiff's Prima Facie Case*

Plaintiff claims that her non-selection as Hausa Service Chief constitutes discrimination, and thus makes out a prima facie case "by showing that: (1) she is a member of a protected class; (2) she applied for and was qualified for an available position; (3) despite her qualifications, she was rejected; and (4) either someone filled the position or it remained vacant and the employer continued to seek applicants.  *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003)).[18]  Defendant does not contest that

---

[18] In its motion for summary judgment, Defendant argues that Plaintiff cannot establish a prima facie case of retaliation with respect to her non-selection as Hausa Service Chief because she cannot show a causal connection between her non-selection and protected activity. *See* Def.'s Mot. for Summ. J. at 16-18.  Defendant's argument is superfluous, because Plaintiff's Complaint only alleges that her non-selection constituted discrimination.  Nevertheless, the Court notes that Defendant's argument is supported by the record evidence, which indicates that Plaintiff complained to the OCR on September 7, 2000 that she had not received information about her eligibility for the Hausa Service Chief position, *see* Def.'s Non-Select. Exs. at 100 (9/7/00 Initial Contact Sheet), but that Ms. Dillard – the selecting official for the Hausa Service Chief position – was not aware of Plaintiff's OCR contact until after Plaintiff's September 29, 2000 interview with the EEO counselor, *see* 9/27/02 Dillard Decl. ¶ 5; Def.'s Non-Select. Exs. at 98-99 (9/24/02 Johnson Decl. ¶¶ 12, 14).  Thus, by the time Ms. Dillard learned of Plaintiff's EEO activity, she had already decided not to select Plaintiff as Hausa Service Chief.  *See* 9/27/02 Dillard Decl. ¶¶ 19-24.

Plaintiff has established a prima facie case of discrimination with respect to her non-selection as Hausa Service Chief by demonstrating that: (1) she is a Muslim woman of color; (2) she applied for the Hausa Service Chief position, and was twice certified as eligible for the position, *see* Def.'s Non-Select. Exs. at 19 (9/13/00 Certificate), 21 (2/9/01 Certificate); (3) she was not selected for the Hausa Service Chief position; and (4) Ms. Dillard continued to seek applicants after initially rejecting Plaintiff's application, *see* 9/27/02 Dillard Decl. ¶¶ 16, 19-20, and eventually selected Mr. Dare to fill the position, *id.* ¶ 25.

> b.    *Defendant's Proffered Legitimate, Non-Discriminatory Reasons*

As Plaintiff has established a prima facie case of discrimination, the burden shifts to Defendant to produce evidence that Plaintiff was not selected for a legitimate, nondiscriminatory reason. *Reeves*, 530 U.S. at 142, 120 S. Ct. 2097. Defendant has met its burden in this case. In her September 27, 2002 Declaration, Ms. Dillard describes in detail the reasons why she believed that Plaintiff "was not qualified for the Hausa Service Chief position," as well as her reasons for selecting Mr. Dare for the position. 9/27/00 Dillard Decl. ¶ 21. Specifically, Ms. Dillard avers that she "had observed, first hand, [Plaintiff's] difficulties in resolving conflicts among the staff and resolving administrative issues such as scheduling and shift rotation." *Id.* In addition, Ms. Dillard states that Plaintiff "falsely represented herself as the 'Deputy Chief' of the Hausa Service on the Service's website, although she was told that this was not her title," and avers that "[t]his misrepresentation raised serious questions in my mind about Ms. Wada's honesty and candor." *Id.* ¶ 22. Finally, Ms. Dillard avers that Plaintiff "did not consistently carry out the duties that the Program Manager and I assigned to her," including attending the Africa Division's morning editorial meeting every day, as well as meetings within the Hausa Service. *Id.* ¶ 23.

Ms. Dillard's description of her reasons for not selecting Plaintiff as Hausa Service Chief are consistent with her description of the qualities she sought in filling the position. Significantly, one of the requirements listed in the BBG's position description for the Hausa Service Chief position is "Demonstrated potential to lead and supervise a professional staff . . ." *See* Def.'s Non-Select. Exs. at 8 (7/3/00 Announcement); 12 (8/21/00 Announcement).   In addition, in her Declaration, Ms. Dillard avers that in filling the Hausa Service Chief position, she was looking for a candidate who demonstrated, among other qualities, managerial skills and the ability to work collegially with others, team building skills, and an ability to carry out Ms. Dillard's directives. 9/27/02 Dillard Decl. ¶ 17.   Finally, in her Declaration, Ms. Dillard asserts that because of the substantial tensions within the Hausa Service, in filling the Hausa Service Chief position, she "was looking for a person who had no involvement in these prior conflicts so that a fresh perspective could be brought into the Service." *Id.* ¶ 18.   Moreover, as discussed above, the numerous e-mails proffered by Defendant and referred to by Ms. Dillard in her Declaration support Ms. Dillard's assertion that Plaintiff was directly involved in the ongoing conflicts within the Hausa Service that Ms. Dillard sought to alleviate in filling the Hausa Service Chief position. *See* Def.'s Non-Select. Exs. at 7 (6/14/00 e-mail from S. Kura to G. Dillard); *id.* at 9-10 (8/5/00 e-mail from S. Kura); *id.* at 13-16 (9/7/00 e-mail exchange); *id.* at 17-18 (9/11/00 e-mail exchange).

Furthermore, in her Declaration, Ms. Dillard describes her reasons for selecting Mr. Dare as Hausa Service Chief.  Ms. Dillard believed that Mr. Dare "possessed the management and journalism background and experience necessary for the position" because he had an extensive educational background in journalism and African and U.S. foreign policy and had served as an online editor for two Nigerian magazines with worldwide readership, including supervising "22

68

male and female employees from varying racial and ethnic backgrounds." 9/27/02 Dillard Decl. ¶

27.  In addition, Mr. Dare "had an extensive knowledge of Nigeria, its peoples, politics and

issues," and was fluent in English, Hausa, and Yoruba. *Id.* ¶ 28.  Finally, Ms. Dillard avers that,

"as an applicant from outside the Agency, [Mr. Dare] had no involvement in the prior conflicts

and would be able to provide a fresh perspective to the Hausa Service." *Id.* ¶ 29.  Ms. Dillard's

detailed justification of her selection of Mr. Dare over Plaintiff as Hausa Service Chief constitutes

a legitimate, nondiscriminatory reason for Defendant's allegedly discriminatory action, which

suffices to meet Defendant's burden of production under the second prong of the *McDonnell*

*Douglas* paradigm.  *See Holcomb*, 433 F.3d at 896.

*c.*      *Evidence of Pretext or Discrimination* Vel Non

Given this legitimate nondiscriminatory reason identified by Defendant, Plaintiff now

must seize the "opportunity to discredit the employer's explanation," *Aka*, 156 F.3d at 1288, by

demonstrating that the proffered reason is mere pretext for discrimination, *see Paquin*, 119 F.3d at

26-27.  As always, Plaintiff retains the "ultimate burden of persuading the court that she has been

the victim of intentional discrimination." *Burdine*, 450 U.S. at 256, 101 S. Ct. 1089.  However,

"one way for a plaintiff to show that an adverse employment decision was made for a

discriminatory reason is to show that the nondiscriminatory explanation the defendant proffered

for its decision was false." *Czekalski v. Peters*, 475 F.3d 360, 366 (D.C. Cir. 2007) (citations

omitted).  The Court therefore turns to considering the "ultimate question of discrimination *vel*

*non*." *Reeves*, 530 U.S. at 142-43, 120 S. Ct. 2097.  As always, Plaintiff retains the "ultimate

burden of persuading the court that she has been the victim of intentional discrimination."

*Burdine*, 450 U.S. at 256, 101 S. Ct. 1089.  At this point,

> a court reviewing summary judgment looks to whether a reasonable [fact-finder] could infer intentional discrimination or retaliation from all the evidence, including (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its action; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer).

*Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004) (internal citations and quotation marks omitted).

Plaintiff responds to Defendant's proffered legitimate, non-discriminatory reason for her non-selection with a number of arguments – some of which appear to be an attempt to demonstrate pretext, others of which might be considered "further evidence of discrimination." First, Plaintiff attempts to demonstrate that Defendant's reasons for her non-selection are mere pretext for discrimination by arguing that Defendant hired Mr. Dare for the position, despite Plaintiff's qualifications, and despite the fact that hiring Mr. Dare – a non-citizen – allegedly violated 22 U.S.C. § 1474.

As to Plaintiff's argument that she was qualified for the Hausa Service Chief position, courts have consistently declined to serve as a "super-personnel department that reexamines an entity's business decisions." *Fischbach*, 86 F.3d at 1183. However, the D.C. Circuit has concluded that "a factfinder could infer discrimination if the evidence showed a reasonable employer would have found the plaintiff *significantly* better qualified for the job but nevertheless failed to offer the position to her." *Holcomb*, 433 F.3d at 897 (citing *Aka*, 156 F.3d at 1295).

Such a finding is not supported by a comparison of Plaintiff's application materials and Mr. Dare's application materials. As discussed above, Mr. Dare was born in Nigeria and speaks Hausa, Yoruba, and English fluently. Def.'s Non-Select. Exs. at 23-25 (3/7/01 Memo from G.

70

Dillard), 34-41 (Dare Applic. Mat'ls).  Mr. Dare holds a Bachelor of Science degree in

International Studies and a Masters degree in International Law and Diplomacy from universities

in Nigeria and, at the time that he applied for the Hausa Service Chief position, was a Fellow in

the Nieman Fellowship Program at Harvard University.  *Id.*  Mr. Dare's previous experience

includes work as a correspondent, general editor, on-line editor, and head of the Abuja Bureau of

the independent communications network in Lagos, Nigeria, where he was responsible for

supervising and coordinating the work of 22 correspondents around Nigeria, as well as work on

radio and television programs in Nigeria and in the United States.  *Id.*  In addition, Mr. Dare's co-

workers indicated that he possessed effective management skills including team-building skills,

and an ability to promote gender and ethnic diversity.  *Id.*  Finally, as an applicant from outside of

VOA, Mr. Dare was not embroiled in the ongoing tensions within the Hausa Service.  For her

part, Plaintiff's application materials demonstrate that she holds a Bachelor of Arts in Mass

Communications from Bayero University in Nigeria, as well as a Masters of Arts in Theater and

Media Arts from the University of Kansas and, at the time she applied for the Hausa Service Chief

position, had completed 27 credit hours towards a Ph.D. in Management from California Coast

University, a correspondence school.  Def.'s Non-Select. Exs. at 26-33 (Wada Applic. Mat'ls).

Plaintiff's previous work experience was with VOA, in positions she describes as

Translator/Adaptor, an Editor/Writer, and Senior/Managing Editor.  *Id.*

In her Opposition, Plaintiff also focuses on her positive performance record – asserting

that Ms. Dillard endorsed her 1999 performance rating of Highly Successful and her 2000

performance rating of Outstanding.  Pl.'s Opp'n at 6.  This argument is inapposite, however,

because Plaintiff's success as an IRB with editorial duties does not necessarily make her well-

qualified to assume the Hausa Service Chief position, a position which entailed significant

managerial and supervisory duties.  *See* 9/27/02 Dillard Decl. ¶¶ 15, 17.  Moreover, as discussed

above, the record does not indicate that Plaintiff performed managerial and supervisory duties as

Senior Editor, in the absence of a Hausa Service Chief.  The record evidence thus fails to

demonstrate that Plaintiff was significantly better qualified for the Hausa Service Chief position

than was Mr. Dare.

However, Plaintiff is not required to establish such a disparity in order to survive a motion

for summary judgment; instead, Plaintiff may seek to expose other flaws in Defendant's

explanation.  *Holcomb*, 433 F.3d at 897.  Here, Plaintiff attempts to do so by arguing that

Defendant violated 22 U.S.C. § 1474 by employing Mr. Dare, a non-citizen, rather than Plaintiff,

a qualified citizen.  Pursuant to 22 U.S.C. § 1474:

> [T]he Secretary, or any Government agency . . . may (1) employ, without regard to
> the civil service and classification laws, aliens within the United States and abroad
> for service in the Untied States relating to the translation or narration of colloquial
> speech in foreign languages or the preparation and production of foreign language
> programs *when suitably qualified United States citizens are not available* when
> job vacancies occur. . .

22 U.S.C. § 1474 (emphasis added).  Furthermore, section 822.1 of the BBG's Manual of

Operations and Administration (MOA) provides:

> a. A non-U.S. citizen may be appointed only after reasonable efforts to recruit
> equally or better qualified U.S. citizens has been made and have been
> unsuccessful.  A non-U.S. citizen may be employed or promoted only if no
> equally or better qualified U.S. citizen is available to perform the duties of the
> position. . . .
> c. As a matter of Broadcasting policy, non-U.S. citizens will not be employed in
> or promoted to supervisory positions or positions which involve policy or program
> decision-making.

Pl.'s Exs. for Issue No. 19 (MOA § 822.1).  Plaintiff thus asserts that Mr. Dare's selection as

Hausa Service Chief violated 22 U.S.C. § 1474, as well as the BBG's own policies.

As Defendant emphasizes, however, Section 822.1c of the MOA also states:

(1) Exceptions will be allowed only on an individual basis when the appropriate Office, or Service Head determines, with the concurrence of the Director of Personnel that the unavailability of an equally or better qualified U.S. citizen to perform such supervisory or managerial functions is not only significantly handicapping the ability of the Office, or Service to operate, but is also having an adverse impact on Broadcasting's mission.
(2) It is anticipated that positions for which an exception to the U.S. citizenship requirement would be considered will be graded no higher than the GS-13 grade level.

*Id.* Defendant correctly argues that, in the instant case, Ms. Dillard made the determination required by MOA section 822.1c.(1), supported her determination in her detailed memo to the VOA Director of Personnel requesting permission to select and hire Mr. Dare as Hausa Service Chief, and obtained the appropriate approval. *See* 9/27/02 Dillard Decl. Ex. 3 (3/7/01 Memo from G. Dillard, indicating approval by B. Coniff). As such, it appears that Ms. Dillard properly selected Mr. Dare as Hausa Service Chief, notwithstanding the fact that he was not a United States citizen and Plaintiff was a United States citizen.

Plaintiff nevertheless argues that Ms. Dillard's selection of Mr. Dare was improper because Mr. Dare "does not fit the description of prospective employees for which such exceptions were made" because he was Yoruba and not a native Hausa speaker. Pl.'s Opp'n at 2. However, as Plaintiff herself goes on to acknowledge, section 822.1 of the MOA applies to positions which require "(1) services related to the translation or narration of colloquial speech in foreign languages; (2) the preparation and production of foreign language programs; or (3) the selection, evaluation, editing, writing and adaptation of source material for use in foreign language programming." *Id.* (citing MOA § 821.1). This description discusses only "foreign

language programing," and thus clearly encompasses the Hausa Service, without in any way

distinguishing between native and non-native speakers of a foreign language.[19]  Plaintiff's

argument that Mr. Dare's selection as Hausa Service Chief violated 22 U.S.C. § 1474 or the

BBG's internal policy thus fails to demonstrate that Defendant's proffered legitimate, non-

discriminatory reason is mere pretext.

 Plaintiff also attempts to suggest that Ms. Dillard lacked sufficient knowledge of

Plaintiff's work experiences, and therefore inappropriately relied on the e-mails she received from

other Hausa staff members in determining not to select Plaintiff for the Hausa Service Chief

position.  Pl.'s Opp'n at 4.  In support of this argument, Plaintiff notes that when Ms. Dillard was

asked to complete the questionnaire in connection with Plaintiff's reclassification request in June

2001, she indicated that she had "no direct knowledge on these questions" and would therefore

"support the views of [Plaintiff's] immediate supervisor, Negussie Mengesha." *Id.*; *see also* Def.'s

---

[19] In addition, although she does not specifically mention it in her Opposition, Plaintiff's
exhibits include an Institutional Grievance filed by her Union, alleging that the BBG "have been
violating on a routine and continuing basis" 22 U.S.C. § 1474 by "hiring non-U.S. citizens in
spite of the existence of suitably qualified U.S. citizens."  Pl.'s Exs. for Issue No. 19 (6/7/06
Institutional Grievance).  The Court notes, without so finding, that this Institutional Grievance
may demonstrate that the BBG's exception policy described in section 822.1c.1 of the MOA fails
to comply with 22 U.S.C. § 1474 because it "places a higher standard on U.S. citizens beyond the
suitably qualified standard contained in the law."  *Id.*  However, even if the BBG's policy
violated 22 U.S.C. § 1474, it would not suggest that an inference of discrimination was
appropriate based on Ms. Dillard's selection of Mr. Dare over Plaintiff.  At most, it would show
that the BBG's erroneous policy had become the norm, such that Plaintiff's non-selection was
consistent with BBG policy.  *Cf. Fischbach*, 86 F.3d at 1183 ("the Department's having followed
a procedure other than that prescribed by its regulations lends no support at all to the plaintiff's
inference that its stated reason for choosing [someone else over him] is a pretext.  In fact, the
procedure that the Department followed was reasonable and was, according to undisputed
testimony, its usual procedure.  That is, departure from the prescribed procedure had become the
norm.  In these circumstances, we see no basis for concluding that the procedure the Department
followed was implausible or that the Department did not, in fact, rely upon it.").

Class. Exs. at 7 (7/5/01 Reclassification Form).  However, in her Declaration, Ms. Dillard

specifically states, "[a]lthough I had an overall awareness of [Plaintiff's] interactions with the

Hausa staff, I had no direct knowledge of her day-to-day activities as a senior editor in the

service."  9/27/02 Dillard Decl. ¶ 30.  This statement is consistent with Ms. Dillard's statement

regarding her basis for not selecting Plaintiff for the Hausa Service Chief position: "I had

observed, first hand, [Plaintiff's] difficulties in team-building and in maintaining a disciplined

workforce.  I had observed her difficulties in resolving conflicts among the staff and resolving

administrative issues such as scheduling and shift rotation."  *Id.* ¶ 21.  The fact that Ms. Dillard

believed Mr. Mengesha more qualified to complete the reclassification questionnaire thus does

not demonstrate that her reasons for not selecting Plaintiff as Hausa Service Chief are mere

pretext.[20]

---

[20] In her Opposition, Plaintiff generally asserts – without reference to any particular claim of discrimination or retaliation – that "Ms. Dillard's affidavits alone create [] doubt about the trust and legitimacy of the agency's stated reasons to infer to her improper motives," and thus raise an inference of discrimination.  Pl.'s Opp'n at 20.  While Plaintiff does not support these aspersions with allegations, elsewhere in her Opposition, Plaintiff states that "Dillard's credibility has been questioned many times in Plaintiff's case," alleging that Ms. Dillard "has made misrepresentations to a federal court by claiming not to have interviewed Mr. Sunday Dare; a claim Mr. Dare disputes."  *Id.* at 11-12; *see also* Def.'s Term. Exs. at 13 (8/20/04 Letter from C. Zampogna).  The Court is, of course, precluded from making assessments of Ms. Dillard's credibility in considering Defendant's motion for summary judgment.  However, the Court notes that Plaintiff has not provided any factual support for her allegations regarding Ms. Dillard.  To the contrary, the record evidence before the Court does not demonstrate any inconsistency between Ms. Dillard's testimony and Mr. Dare's testimony.  In her Declaration, Ms. Dillard avers that she did not interview any of the internal candidates for the Hausa Service Chief position because she had observed them all first-hand and reviewed their applications.  9/27/02 Dillard Decl. ¶ 20.  However, Ms. Dillard also admits that met Mr. Dare on three separate occasions prior to his applying for the Hausa Service Chief position, *id.* ¶ 25, a statement which is consistent with Mr. Dare's Declaration, in which he states "I met with Ms. Dillard on three separate occasions before being offered the [Hausa Service Chief] position," Def.'s Disc. Exs. at 41-42 (9/19/02 Dare Decl.) ¶ 3.

Plaintiff also suggests \ that Ms. Dillard inappropriately relied on the e-mails that she received from other Hausa staffers because she "based her reasons for not Selecting [sic] Plaintiff mainly on comments from employees who perform lower level [sic] of duties than Plaintiff" and whose credibility was questionable.  Pl.'s Opp'n at  4-6.  As an initial matter, it is entirely irrelevant that the Hausa staffers who sent the various e-mails had less responsibility than Plaintiff, as the e-mails stand on their own as evidence that Plaintiff was embroiled in the conflicts within the Hausa Service.  *See* Def.'s Non-Select. Exs. at 7 (6/14/00 e-mail from S. Kura to G. Dillard); *id.* at 9-10 (8/5/00 e-mail from S. Kura); *id.* at 13-16 (9/7/00 e-mail exchange); *id.* at 17-18 (9/11/00 e-mail exchange).  Moreover, in assessing whether Plaintiff can show pretext, "[w]hether Plaintiff believes [her co-workers'] complaints were justified is irrelevant, as the issue is whether [Ms. Dillard] received the complaints and believed that plaintiff's performance was deficient."  *Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1, 10 (D.D.C. 2000), *aff'd*, 298 F.3d 989 (D.C. Cir. 2002) (citing *Vasilevsky v. Reno*, 31 F. Supp. 2d 143, 151 (D.D.C. 1998) ("An employer is entitled to rely on his own perception of an employee's work performance.")).  Plaintiff's attempts to impugn of the credibility of the Hausa staffers who sent the various e-mails therefore fail to demonstrate that Defendant's proffered reasons for Plaintiff's non-selection as Hausa Service Chief are mere pretext for discrimination.

The Court next moves to considering "any further evidence of discrimination that may be available to the plaintiff[,] such as independent evidence of discriminatory statements or attitudes on the part of the employer[]."  *Carter*, 387 F.3d at 878 (D.C. Cir. 2004) (internal citations and quotation marks omitted).  In her Opposition, Plaintiff asserts that, "the stark discrimination against Plaintiff leaning towards Mr. Mustapha the second certified candidate from Hausa Service

has been demonstrated.  Management demonstrated amply they prefer Mustapha by many of its actions, but could not justify not selecting Plaintiff officially"  Pl.'s Opp'n at 3.  As evidence of "management's" alleged preference for Mr. Mustapha, Plaintiff points to the fact that Mr. Mustapha received only an admonishment for his role in the October 3 Broadcast, as well as the fact that he was not terminated for his unauthorized use of a government credit card.  Pl.'s Opp'n at 3.  As discussed above, Plaintiff has not demonstrated that her letter of reprimand constituted more severe discipline than Mr. Mustapha's written admonishment, *contra* Def.'s Mot. for Summ. J. at 36 ("the actions against both resulted in no effect on their pay or grade."), and Mr. Mustapha's misuse of a government credit card is easily distinguished from the offense for which Plaintiff was terminated, *see* Grace Reply Decl. ¶¶ 8-12.  Furthermore, even if Mr. Mustapha received preferential discipline in the wake of the October 3 Broadcast and his alleged misuse of a government credit card, Plaintiff has adduced no evidence that Mr. Mustapha was treated differently with respect to the Hausa Service Chief position.  Most significantly, Plaintiff altogether fails to show that Ms. Dillard ever even contemplated selecting Mr. Mustapha for the position.

In addition, Plaintiff suggests that evidence of discrimination on the part of Defendant may be inferred because, during the period that the Hausa Service Chief position was open, Ms. Dillard, as Africa Division Director, selected three white supervisors for positions in other services.  Pl.'s Opp'n at 3.  Plaintiff argues that these three individuals may be used as comparators because there is only one supervisory position for each language unit within the Africa Division.  *Id.* at 4.  Plaintiff thus asserts that Ms. Dillard "established a pattern of Supervisory selection within the division not favorable to Plaintiff's protected status."  *Id.*

However, Defendant is correct that Plaintiff is not, strictly speaking, similarly situated to these three individuals because they were selected for positions outside of the Hausa Service, for which Plaintiff did not apply.  Def.'s Mot. for Summ. J. at 23.  Even more significantly, Plaintiff provides absolutely no evidence of the races or relative qualifications of individuals allegedly not selected for the other three supervisory positions.  As such, the Court has no basis whatsoever from which to infer discrimination on the part of Ms. Dillard from the fact that she allegedly selected three white supervisors.

Finally, Plaintiff appears to suggest that evidence of a history of discrimination by Defendant can be found in the "complaints and grievances filed charging a pattern of the use by Higher Management of African American Managers willing to tow the line, to discriminate against other Black employees, in an effort to make it hard to prove discrimination."  Pl.'s Opp'n at 3-4.  Plaintiff is correct that in her Memorandum "African and African-American Women for a Just Workplace," Ms. Wiley states "[m]any Black VOA employees feel that Gwen Dillard, an African-American, is being used by management to carry out their abusive personnel practices. It's a known fact that when Blacks are used to discriminate against each other, discrimination is harder to prove."  Pl.'s Exs. for Issue No. 15 (2/15/02 Memo from V. Wiley).  However, as discussed above, Ms. Wiley's memo consists of hearsay and unsupported allegations, which do not in and of themselves demonstrate a history of discrimination on Defendant's part.  Moreover, the Court is "not persuaded that the mere filing of [] informal discrimination complaints against [a supervisor], where nothing more is known about the nature, merit, or outcome of those complaints, can be used as a proxy to establish [the supervisor's] discriminatory animus in the present case."  *Holcomb*, 433 F.3d at 900-01 (citations omitted).

Plaintiff has thus failed to demonstrate that Defendant's proffered legitimate, non-discriminatory reasons for her non-selection as Hausa Service Chief are mere pretext for illegal discrimination on the basis of race, sex, or religion.  Nor has Plaintiff presented the Court with any further evidence of discrimination by Defendant from which the Court could infer that Plaintiff's non-selection was discriminatory in nature.  As Plaintiff has not carried her "ultimate burden of persuading the trier of fact that [Defendant] intentionally discriminated against" her by not selecting her for the Hausa Service Chief position, the Court shall grant Defendant's motion for summary judgment as to Count I of Plaintiff's Complaint.  *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d at 651 (D.C. Cir. 2003).

> 3.      *Count II – Reclassification – Application of the* McDonnell Douglas *Analysis*

In Count II of her Complaint, Plaintiff alleges that Defendant discriminated against her on the basis of race, sex and religion by refusing her request to reclassify her position from a GS-12 to a GS-13.[21]   At the outset, the Court notes that Defendant has already articulated a legitimate non-discriminatory reason for the denial of Plaintiff's reclassification request, in the form of the August 14, 2001 Memo that Plaintiff received informing her of that denial.  *See* Def.'s Class Exs. at 11 (8/14/01 Memo from M. Conboy).  As the D.C. Circuit recently reiterated in *Czekalski*, "once a defendant has proffered such a nondiscriminatory explanation, it has 'done everything that

---

[21] As with Count I, despite the fact that Plaintiff only alleges discrimination in her Complaint, Defendant asserts that Plaintiff cannot prove that the denial of her reclassification request was retaliatory because she cannot show a causal connection between that denial and her protected activity.  Def.'s Mot. for Summ. J. at 24.  Although this argument is again superfluous, the Court notes that Ms. Whitworth avers that she was unaware of Plaintiff's EEOC activity at the time that she denied Plaintiff's reclassification request.  Def.'s Class. Exs. at 13, 15 (9/17/02 Whitworth Decl.) ¶¶ 5, 10.

would be required of [it] if the plaintiff had properly made out a *prima facie* case.'" 475 F.3d at

364 (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S. Ct. 1479, 75

L. Ed. 2d 403 (1983)).  Thus, whether Plaintiff actually made out a prima facie case "'is no longer

relevant,' and the only question is 'whether the defendant intentionally discriminated against the

plaintiff.'" *Id.*  Nevertheless, the Court evaluates Plaintiff's prima facie case because, as noted

above, it "'is part of the evidence [the Court] must consider in addressing the question' of whether

[Plaintiff] has created a genuine issue of [] discrimination." *Id.* (quoting *George v. Leavitt*, 407

F.3d 405, 413 (D.C. Cir. 2005)).

The traditional *McDonnell Douglas* test is adjusted slightly for cases of failure to promote

based on a denial of increased pay or grade, such that to make out a *prima facie* case, Plaintiff

must prove (1) that she belongs to a protected group; (2) that she was qualified for and applied for

a promotion; (3) that she was considered and denied the promotion; and (4) "that other employees

of similar qualifications who were not members of the protected group were indeed promoted at

the time the plaintiff's request for promotion was denied." *Glenn v. Williams*, Civ. A. No. 98-

1278 (CKK), 2006 WL 401816, *20 (D.D.C. Feb. 21, 2006) (quoting *Bundy v. Jackson*, 641 F.2d

934, 951 (D.C. Cir. 1981)).  The D.C. Circuit reiterated this formulation of the prima facie case

for failure to promote based on denial of increased pay or grade in *Taylor v. Small*, 350 F.3d 1286,

1294 (D.C. Cir. 2003).  However, other recent D.C. Circuit opinions have emphasized that "a

plaintiff in a discrimination case need not demonstrate that she was replaced by a person outside

her protected class in order to carry her burden of establishing a prima facie case," and further that

a plaintiff may "be able to demonstrate that she received unfavorable treatment in the promotion

process because she is a woman," notwithstanding the fact that both men and women were

promoted to the position for which the plaintiff applied.  *Stella v. Mineta*, 284 F.3d 135, 145-46

(D.C. Cir. 2002); *see also Czekalski* 475 F.3d at 365-66; *George*, 407 F.3d at 412.  It is therefore

unclear whether Plaintiff would, in fact, be required to show that individuals outside of her

protected class were promoted in the event that she was required to establish a prima facie case.

Defendant does not contest that Plaintiff is a member of numerous protected classes based

on her race, sex, and religion, that she requested a reclassification of her position, and that her

request was considered and denied.  Instead, Defendant argues that Plaintiff cannot make out a

prima facie case of discrimination based on the denial of her reclassification request because she

cannot show that she was eligible for reclassification from a GS-12 to a GS-13.  In support of this

argument, Defendant relies on the Declarations of Ms. Sellers and Ms. Whitworth.  Def.'s Mot.

for Summ. J. at 25-26.  As discussed above, those Declarations establish that Plaintiff's

reclassification request was handled according to the standard procedure followed for such

requests – Defendant's supervisor, Mr. Mengesha, completed a reclassification questionnaire that

asked whether Plaintiff was satisfying the key indicators for a GS-13 position.  9/27/02 Dillard

Decl. ¶ 30; Def.'s Class. Exs. at 7 (7/5/01 Reclass. Form); Def.'s Class. Exs. at 32-33 (9/27/02

Sellers Decl.) ¶ 44.  With respect to the three key Indicators listed on the questionnaire, Mr.

Mengesha responded that Plaintiff did not have "full editorial responsibility for directing the

development and production of a substantial block of complex programming of major importance

to VOA" because editorial duties rotated between the six editors in the Hausa Service.  Def.'s

Class. Exs. at 7-10 (7/5/01 Reclass. Form).  Based on this questionnaire, Ms. Whitworth

disapproved Plaintiff's promotion to the GS-13 level because she "did not have full editorial

responsibility for directing the development and production of a substantial block of complex

programming of major importance to VOA including responsibility for the content, style and tone of the program at least 25 percent of her time on a weekly basis," and thus did not meet one of the key indicators for a GS-13 IRB.  Def's Class. Exs. at 13 ¶ 6 (9/17/02 Whitworth Decl.); *id.* at 35 (9/27/02 Sellers Decl.) ¶¶ 59-61.[22]

In her Opposition, Plaintiff fails to respond to Defendant's argument that she was not qualified for the promotion she sought.  The Court therefore notes that, although Plaintiff is not actually required to establish a prima facie case, it appears that she would be unable to do so because she cannot demonstrate that she was qualified for the reclassification that she requested. Furthermore, as a legitimate, non-discriminatory reason for the denial of Plaintiff's reclassification request, Defendant proffers Plaintiff's failure to meet one of the key indicators for a GS-13 IRB position.  Plaintiff again fails to respond to this argument in her Opposition, and thus presents no evidence whatsoever that it constitutes pretext for discrimination.  Instead, Plaintiff offers only her speculation that Plaintiff's reclassification request prompted Defendant to post the vacancy announcement for the Hausa Service Chief position, asking "[w]ould Management have announced the position in July had she not requested, just a month prior in June a fair and equitable compensation for work done?"  Pl.'s Opp'n at 6.  Plaintiff's assertion is entirely devoid of merit, however, because the BBG initially announced the job vacancy for the Hausa Service Chief position on July 3, 2000, Def.'s Non-Select. Exs. at 8 (7/3/00 Announcement), almost a

_____

[22] Although Plaintiff was only advised that her reclassification request was denied because she did not meet the key indicators for a GS-13, *see* Def.'s Class. Exs. at 11 (8/14/01 Memo from M. Conboy), Ms. Whitworth also avers in her Declaration that the Hausa Service Chief is ordinarily the only GS-13 employee in the Hausa Service, and that "there was no justification for having two GS-13 level employees in a service as small as the Hausa service." Def.'s Class. Exs. at 14 (9/17/02 Whitworth Decl) ¶ 7.

year before Plaintiff's June 18, 2001 reclassification request, Def.'s Class. Exs. at 1 (6/18/00

Memo from H. Wada).

Plaintiff has thus failed to demonstrate that Defendant's legitimate, non-discriminatory

reason for the denial of her reclassification request is pretext for a discriminatory animus, and has

presented no further evidence of discrimination in this respect.  Furthermore, it appears that

Plaintiff would have been unable to establish a prima facie case of discrimination on the basis of

race, sex, or religion because she cannot demonstrate that she was qualified for the reclassification

that she sought.  As a result, based on the totality of the evidence before the Court, a reasonable

jury could not conclude that the denial of Plaintiff's reclassification request constituted

discrimination on the basis of race, sex, or religion.   The Court shall therefore grant Defendant's

motion for summary judgment as to Count II of Plaintiff's Complaint.

   4. *Count III - Disparate Discipline – Application of the* McDonnell Douglas
    *Analysis*

    a. *Plaintiff's Prima Facie Case*

In Count III of her Complaint, Plaintiff alleges that Defendant discriminated against her on

the basis of her race, sex, and religion by imposing "disparate discipline" upon her after the

October 3 Broadcast because Plaintiff was reassigned to a position without editorial duties, given

two proposed suspensions, and eventually given a letter of reprimand, while Mr. Mustapha

received only a written admonishment.  Again, Defendant has already articulated a non-

discriminatory reason for Plaintiff's proposed suspension and letter of reprimand in the form of

the letters Plaintiff received informing her of that discipline.  *See* Def.'s Disc. Exs. at 33-37

(11/27/01 Letter from G. Dillard); 38 (9/25/02 Letter from M. Skiba).  Nevertheless, the Court

evaluates Plaintiff's prima facie case because it is "part of the evidence [the Court] must consider in addressing the question of whether she created a genuine issue of [] discrimination." *Czekalski*, 475 F.3d at 364 (internal quotation and citation omitted). Plaintiff asserts a claim of disparate treatment discrimination, and thus makes out a prima facie case "by establishing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *George*, 407 F.3d at 412; *see also Stella*, 284 F.3d at 145.

Defendant argues that none of Plaintiff's allegedly disparate discipline constitutes an adverse employment action. The Court agrees with Defendant with respect to Plaintiff's proposed suspensions because Plaintiff was never actually suspended, and thus experienced no adverse consequence from the proposed suspension. *See Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002) ("an employee suffers an adverse employment action if he experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm.") (citing *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999)). However, with respect to Plaintiff's other alleged forms of disparate discipline – her reassignment to an IRB position without editorial duties and her letter of reprimand – the Court will assume that Plaintiff has suffered an adverse employment action.

Defendant argues that Plaintiff's reassignment does not constitute an adverse employment action because her pay and benefits remained the same, her promotion potential was unaffected, and because the reassignment did not significantly diminish her responsibilities. Def.'s Mot. for Summ. J. at 31-33. Defendant is correct that Plaintiff's reassignment had no effect on her grade

or pay.  *See*  Def.'s Disc. Exs. at 26 (11/27/01 Reassignment Letter from S. Dare advising Plaintiff

that her "grade, pay, and benefits [would] not be affected").  With respect to Plaintiff's promotion

potential, however, Plaintiff asserts in her Statement that her reassignment "curtail[ed] [her]

competitive ability for promotional positions within the agency and any career with any other

Agency of the federal government."  Pl.'s Stmt. ¶ 44; *see contra* Def.'s Class. Exs. at 29 (9/27/02

Sellers Decl.) ¶ 30 (Plaintiff "is at the 'full performance level' of her position).  Plaintiff offers no

factual support for this assertion; nevertheless, the Court notes that the extent of Plaintiff's

editorial responsibilities was relevant to Plaintiff's request to be reclassified as a GS-13 and, in

fact, that her reclassification request was denied in part because significant editorial duties did not

comprise 25 percent of her time on a weekly basis.  Class. Exs. at 13 ¶ 6 (9/17/02 Whitworth

Decl.); *id.* at 35 (9/27/02 Sellers Decl.) ¶¶ 59-61.  Although Plaintiff's editorial duties appear to

have been effectively capped at approximately 2-3 hours per week at the time of her

reclassification request (because she was one of six IRBs who divided editorial responsibilities on

the Hausa staff), *see* Def.'s Disc. Exs. at 43 (9/19/02 Dare Decl.) ¶¶ 8, 13, her reassignment to a

position without editorial duties foreclosed the possibility that she could ever be reclassified to a

GS-13.

        Furthermore, the D.C. Circuit has clearly held that "there are lateral transfers that could be

considered adverse employment actions," including "reassignment with significantly different

responsibilities."  *Czekalski*, 475 F.3d at 364 (quoting *Stewart v. Ashcroft*, 352 F.3d 422, 426

(D.C. Cir. 2003)).  Defendant asserts that Plaintiff's reassignment did not significantly diminish

Plaintiff's responsibilities because her editorial duties "only constituted a small fraction of [her]

overall work, at most 2-3 hours per 40-hour week."  Def.'s Mot. for Summ. J. at 32.  While

Plaintiff does not attempt to rebut this assertion, it is at least possible that Plaintiff's editorial duties represented a significant responsibility, even if they did not represent a significant portion of Plaintiff's work week.  Indeed, the D.C. Circuit has recently reiterated that "[w]hether a particular reassignment of duties constitutes an adverse action for purposes of Title VII is generally a jury question."  *Czekalski*, 475 F.3d at 365 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, --- U.S. ---, ---, 126 S. Ct. 2405, 2417, 165 L. Ed. 2d 345 (2006)).  The Court shall therefore assume, without so finding, that Plaintiff's reassignment constituted an adverse employment action.

Finally, Defendant argues that Plaintiff's letter of reprimand did not constitute an adverse employment action because it did not affect Plaintiff's title, pay, or benefits, and thus imposed no objective harm.  Def.'s Mot. for Summ. J. at 35.  Defendant is correct that a letter of reprimand, in and of itself, does not ordinarily constitute an adverse employment action.  *Brown v. Brody*, 199 F.3d at 458.  However, as Plaintiff notes in her Opposition, in her letter proposing to terminate Plaintiff, Ms. Dillard cited Plaintiff's letter of reprimand as evidence of a prior offense.  Def.'s Term. Exs. at 8 (7/15/04 Letter from G. Dillard).  Thus, to the extent that Plaintiff's letter of reprimand may have factored into Ms. Dillard's decision to seek Plaintiff's termination, the Court will assume, without deciding, that it constituted an adverse employment action.

Plaintiff is also required to meet the third element of her prima facie case, by showing that "the unfavorable action gives rise to an inference of discrimination."  *Czekalski*, 475 F.3d at 364; *George*, 407 F.3d at 412; *Stella*, 284 F.3d at 145.  Traditionally, to meet the third prong of a prima facie case of disparate treatment discrimination, a plaintiff was required to demonstrate "that she was treated differently from similarly situated employees who are not part of the protected class."

86

*Czekalski*, Slip Op. at 9.  While Plaintiff asserts that she was disciplined more harshly than Mr. Mustapha, Defendant correctly argues that Mr. Mustapha was not similarly situated to Plaintiff in this instance because he was only the MC for the October 3 Broadcast while Plaintiff was the responsible editor.  *See Childs-Pierce v. Util. Workers Union of Am.*, 383 F. Supp. 2d 60, 73 (D.D.C. 2005) (to be similarly situated, individuals "must have dealt with the same supervisor, have been subject to the same standards and *have engaged in the same conduct . . . .*") (emphasis added).

However, the Court notes that recently in the contexts of discharges, reassignments, and failures to promote, the D.C. Circuit has emphasized that a plaintiff may also meet the third prong of a prima facie case of disparate treatment discrimination through alternative means. *See Czekalski*, Slip Op. at 9; *George*, 407 F.3d at 412; *Stella*, 284 F.3d 145-146.  Plaintiff, who bears the burden of establishing a prima facie case of disparate treatment discrimination, makes no argument as to how this alternative method would apply to her claims of disparate discipline. Nevertheless, "[t]he burden of establishing a prima facie case of disparate treatment is not onerous," *Burdine*, 450 U.S. at 253, 101 S. Ct. 1089, and the *McDonnell Douglas* model of the *prima facie* case is not "rigid, mechanized, or ritualistic," its requirements can vary depending on the factual context.  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002).  As a result, and in light of the approach taken in the D.C. Circuit's recent disparate treatment discrimination decisions, the Court shall assume, *arguendo*, that Plaintiff can establish a prima facie case of disparate discipline with respect to her reassignment without editorial duties and her letter of reprimand.

   b.  *Defendant's Legitimate, Non-Discriminatory Reason*

87

Defendant proffers the same reason for Plaintiff's reassignment to an IRB position without editorial duties and her letter of reprimand – her failure to review the stringer report including the interview with Sheikh Bauchi prior to the October 3 Broadcast.  Def.'s Mot. for Summ. J. at 33-35, 37.  Defendant asserts that Plaintiff was the assigned editor for the October 3 Broadcast, was aware of her responsibility to review all tapes before they aired, and failed to review the tape or send it to Mr. Dare for review.  *Id.*  As discussed above, it is clear from Mr. Dare's e-mails prior to the October 3 Broadcast that someone other than the MC was to review stringer reports and live interviews before they were aired.  *See* Def.'s Disc. Exs. at 1 (8/21/01 e-mail from S. Dare), *id.* at 2-3 (8/27/01 e-mail from S. Dare), *id.* at 4 (9/19/01 e-mail from S. Dare), *id.* at 5 (9/19/01 e-mail from S. Dare), *id.* at 6 (10/2/01 e-mail from S. Dare).  As also discussed above, the record evidence is clear that Plaintiff was the assigned editor for the October 3 Broadcast, that she was aware that Mr. Mustapha might use a stringer report during the October 3 Broadcast, and that she did not review the tape of the stringer report before it aired.  Def.'s Stmt. ¶ 38; Pl.'s Stmt. ¶ 38; Def.'s Disc. Exs. at 73-74 (8/14/02 Wada Dep. at 146:9-152:24); *id.* at 12 (11/28/01 Memo from H. Wada to S. Dare); *id.* at 9 (12/16/01 Mustapha Aff.); Pl.'s Exs. for Issue No. 27 (12/17/01 Perry Report) ¶¶ 21-22.  Defendant has thus proffered sufficient evidence in support of its assertion that Plaintiff was disciplined because she "was derelict in her editorial duties during the October 3 broadcast."  Def.'s Mot. for Summ. J. at 37.

c.      <i>Evidence of Discrimination</i> Vel Non

Plaintiff makes a number of arguments in response to Defendant's proffered legitimate, non-discriminatory reason, some of which apply equally to each form of allegedly disparate discipline, and others of which are particular to her reassignment or letter of reprimand.  As an

initial matter, Plaintiff asserts – without providing any factual support – that her two proposed

"suspensions were rescinded because they were not supported by facts."  Pl.'s Opp'n at 7-8.  The

Court notes that Plaintiff's first proposed suspension was, in fact, rescinded because it erroneously

stated that Plaintiff had received the tape of the stringer report and given it to the MC without

reviewing it.  *See* Def.'s Disc. Exs. at 33-37 (11/27/01 Suspension Letter from S. Dare).

Furthermore, a second proposed suspension letter was issued, along with a second decision letter,

but Plaintiff's suspension was ordered held in abeyance by the then-VOA Chief of Staff, Horace

Cooper.  9/27/02 Dillard Decl. ¶¶ 37, 39; Def.'s Disc. Exs. at 49 (9/19/02 Dare Decl.) ¶ 31; *id.* at

53-54 (9/27/02 Grace Decl.) ¶¶ 13-15.  Plaintiff offers no support, however, for her assertion that

this occurred because the proposed suspension was not supported by facts.  Instead, the only

evidence in the record on this issue is Ms. Dillard's deposition testimony that "Mr. Cooper said

that he was going to hold up the suspension because he had other issues pending with the union

and they were strongly opposed to this issue, the suspension issue, and he did not want to go

forward with that because he wanted to negotiate the other issues."  Def.'s Disc. Exs. at 85

(1/25/05 Dillard Dep. at 99:5-20).  Ms. Dillard's testimony constitutes inadmissible hearsay

evidence, but nevertheless underscores Plaintiff's inability to demonstrate pretext by arguing that

her proposed suspension was unsupported by facts.[23]

_____

[23] With respect to her allegedly disparate discipline, Plaintiff's Opposition includes passing references to an alleged "attempt to falsify documents by a Management official from the office of Labor Relations, with the sole purpose of making the charges stick," Pl.'s Opp'n at 8, and an attempt "to produce a false testimony by a White Labor Relations Official forcing Plaintiff's coworker to sign.  The testimony is in direct contrast to an earlier testimony provided for the first investigation.  Plaintiff's coworker refused to sign," *id.* at 9 n.1.  In support of these assertions, Plaintiff cites only to her "exhibit" without specifying which documents she refers to. Plaintiff's Opposition does not even identify the individual who allegedly attempted to falsify documents; however, in her Statement, Plaintiff identifies the individual as Labor Relations

As to her reassignment, although Plaintiff does not label it as such, she appears to attempt to demonstrate that Defendant's proffered reason is mere pretext by arguing that "her editorial duties were never restored" despite her exoneration by an independent EEOC investigation. Pl.'s Opp'n at 8. Although Plaintiff does not specify the "EEOC investigation" to which she refers, the Court assumes that she means Mr. Perry's December 17, 2001 report, of which Plaintiff has provided only 4 of 15 pages, and which does not "exonerate" Plaintiff with regards to the October 3 Broadcast. Pl.'s Exs. for Issue No. 27 (12/17/01 Perry Report). Mr. Perry's report does state that Plaintiff did not "see or hear the tape that was broadcast on October 3, 2001," that the tape was given directly to Mr. Mustapha by the producer, and that "Mr. Mustapha did not give it to Complainant or Mr. Dare for their review as requested by Mr. Dare in his directives." *Id.* ¶¶ 21-22. However, Mr. Perry's report also notes that Plaintiff was the editor for the October 3 Broadcast and that the "Editor is responsible for ensuring the broadcast is conducted properly." *Id.* ¶ 20. As such, the portions of Mr. Perry's report that Plaintiff has provided are entirely devoid of any conclusion as to whether Plaintiff was properly disciplined, and certainly do not demonstrate that Defendant's proffered legitimate, non-discriminatory reason for Plaintiff's reassignment is merely pretext.

---

Specialist Donna Grace. *See* Pl.'s Stmt. ¶ 64. Plaintiff's exhibits include an undated note from "Tim" to "Denise" stating that Ms. Grace wrote a statement for Mr. Mustapha to sign regarding the October 3 Broadcast, which Mr. Mustapha refused to sign because he believed it to be incorrect. Pl.s' Arg. Exs. Similarly, Plaintiff's Exhibits for Issue No. 27 include an April 30, 2001 Grievance filed by Plaintiff's Union, which alleges that Ms. Grace presented Mr. Mustapha with a written statement for his signature, which contradicted an earlier affidavit executed by Mr. Mustapha regarding the October 3 Broadcast, and which Mr. Mustapha refused to sign because he believed it to be inaccurate. Pl.'s Exs. for Issue No. 27 (4/30/01 Grievance at 5). These documents are, of course, hearsay evidence, which cannot sustain Plaintiff's claim that a "Labor Relations Official" attempted to falsify documents in support of Plaintiff's discipline.

Plaintiff offers no "further evidence" of discrimination on the part of Defendant, and thus would have the Court conclude that Plaintiff's reassignment to an IRB position without editorial duties constitutes discrimination based solely on: (1) her unsupported assertion that her reassignment affected her promotion potential; (2) the fact that Mr. Mustapha – who was the MC on the October 3 Broadcast while Plaintiff was the editor – received a written admonishment for his role in the October 3 Broadcast; (3) her unproven statement that her proposed suspensions were rescinded because they were not supported by facts; and (4) the findings in Mr. Perry's report that Plaintiff did not hear or see the tape containing the Sheikh Bauchi interview before it was broadcast.  However, Defendant's proffered legitimate, non-discriminatory for Plaintiff's discipline is supported by record evidence, and it is not the Court's role to second-guess Defendant's employment decisions.  *Fischbach*, 86 F.3d at 1183 (The Court does not sit as a "super-personnel department that reexamines an entity's business decisions.") (internal citation and quotation marks omitted); *see also Forman v. Small*, 271 F.3d 285, 291 (D.C. Cir. 2001) ("consistent with the courts' reluctance to became involved in micromanagement of everyday employment decisions, the question before the court is limited to whether [the plaintiff] produced sufficient evidence of . . . discrimination, not whether [s]he was treated fairly.").  More significantly, Plaintiff presents no evidence whatsoever that her reassignment was in any way connected to her race, sex, or religion.  Therefore, based on the totality of the admissible evidence before the Court, a jury could not reasonably conclude that Plaintiff's reassignment constituted discriminatory disparate discipline.

With respect to her letter of reprimand, although she does not state as much, Plaintiff appears to attempt to show pretext by asserting, "[t]he whole issue is questionable, when the same

proposing and deciding officials, Dare and Dillard, were also part of the team that are supposed to weigh and make a determination of guilt or innocence." Pl.'s Opp'n at 9. Plaintiff is correct that Mr. Dare and Ms. Dillard were involved in the initial decision to propose Plaintiff's suspension, however, that involvement is irrelevant because the proposed suspensions were never issued, and Ms. Skiba – rather than Mr. Dare or Ms. Dillard – was the deciding official for Plaintiff's letter of reprimand. Plaintiff further asserts that the "legal status" of her letter of reprimand "has been challenged, because it was reached without the review and inclusion of Plaintiff's defense to the charges for which she was to be reprimanded . . . . Ms. Skiba a new appointee who signed the letter ignored Plaintiff's input and did not consider it in making her decision." *Id.* at 10. Again, Plaintiff cites only to her "exhibit" in support of this argument, which contains e-mails between Ms. Grace and Ms. Dillard noting that Plaintiff's oral reply to Mr. Cooper was to be considered in revising the decision letter regarding Plaintiff's proposed suspension, Pl.'s Exs. for Issue No. 46 (7/12/02 and 7/14/02 e-mails between D. Grace and G. Dillard). Although the record does not contain evidence of the extent to which Ms. Skiba considered Plaintiff's oral reply or spoke to Plaintiff, Mr. Mustapha, or Mr. Cooper before issuing the letter of reprimand, the Court notes that – even if Ms. Skiba was required to and failed to consider these matters before issuing the letter of reprimand – "[a]n employer's failure to 'follow its own regulations and procedures, alone, may not be sufficient to support' the conclusion that its explanation for the challenged employment action is pretextual." *Fischbach*, 86 F.3d at 1183 (citing *Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982)).

Plaintiff similarly presents no "further evidence" of discrimination with respect to her letter of reprimand, and thus would have the Court conclude that it constitutes discrimination

based solely on: (1) the fact that it was mentioned as a prior offense in the letter proposing her termination; (2) the fact that Mr. Mustapha received a written admonishment; and (3) the question as to whether or not Ms. Skiba considered Plaintiff's oral reply or spoke with Plaintiff, Mr. Mustapha or Mr. Cooper before issuing the letter of reprimand.  Plaintiff presents no evidence, however, that her letter of reprimand was in any way connected to her race, sex, or religion, or even that her letter of reprimand actually constituted disparate discipline from Mr. Mustapha's written admonishment.  *Contra* Def.'s Mot. for Summ. J. at 36 ("the actions against both resulted in no effect on their pay or grade.").  As such, the record is entirely devoid of evidence from which a jury could reasonably conclude that Plaintiff's letter of reprimand constituted discriminatory disparate discipline.  The Court shall therefore grant Defendant's motion for summary judgment as to Count III of Plaintiff's Complaint.

> 5.      *Plaintiff's Termination – Application of the* McDonnell Douglas *Analysis*
>
> a.      *Plaintiff's Prima Facie Case*

At the outset, the Court notes that Defendant has again articulated legitimate, non-discriminatory reasons for Plaintiff's termination in the form of the proposal and decision letters Plaintiff received from Ms. Dillard and VOA Director Jackson with respect to her termination. *See* Def.'s Term. Exs. at 4-10 (7/15/04 Letter from G. Dillard); 23-32 (9/9/04 Letter from D. Jackson).  In addition, the Court notes that Defendant does not assert that Plaintiff has failed to establish a prima facie case of discrimination with respect to her termination.  The Court nevertheless assesses Plaintiff's prima facie case to the extent that it is part of the evidence to be considered in determining whether she has created a genuine issue of discrimination. *Czekalski*, 475 F.3d at 364.  As noted above, Plaintiff makes out a prima facie case of discrimination "'by

establishing that: (1) she is a member of a protected class; (2) she suffered an adverse employment

action; and (3) the unfavorable action gives rise to an inference of discrimination.'" *George*, 407

F.3d at 412; *Stella*, 284 F.3d at 145.  Plaintiff is a member of numerous protected classes, and her

termination is clearly an adverse employment action, *see Burlington Indus., Inc. v. Ellerth*, 524

U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).

Plaintiff may satisfy the third prong of her prima facie case "by demonstrating that she was

treated differently from similarly situated employees who are not part of the protected class,

[however] this is not the only way." *George*, 407 F.3d at 412.  Another way is to show that "the

discharge was not attributable to the two [most] common legitimate reasons for discharge:

performance below the employer's legitimate expectations or the elimination of the plaintiff's

position altogether." *Id.*  With respect to the first method, although Plaintiff points to a number

of alleged comparators who were not terminated for making unauthorized phone calls, Plaintiff

fails to demonstrate that any of those individuals were similarly situated.  To do so, Plaintiff must

"demonstrate that all of the relevant aspects of their employment situation are nearly identical."

*Childs-Pierce*, 383 F. Supp. 2d at  73 (citing *Phillips v. Holladay Prop. Servs.*, 937 F. Supp. 32,

37 (D.D.C. 1996), *aff'd Phillips v. Holladay Corp.*, No. 96-7202, 1997 WL 411695 (D.C. Cir.

Jun. 19, 1997); *see also Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1513-14

(D.C. Cir. 1995)), *aff'd* No. 05-7121, 2006 WL 1878891 (D.C. Cir. Jun. 27, 2006)).  Thus, the

individuals "must have dealt with the same supervisor, have been subject to the same standards

and have engaged in the same conduct . . . ." *Id.*  As discussed above, each of Plaintiff's alleged

comparators either dealt with different supervisors or engaged in different conduct, and therefore

none is similarly situated to Plaintiff for purposes of her discrimination claim.  Still more

significantly, as Plaintiff does not present evidence of the race, sex, or religion of her alleged comparators, the Court is unable to determine whether any of Plaintiff's alleged comparators are even outside of her protected class.

As to the alternative means of demonstrating an inference of discrimination, there is no evidence in the record to indicate that Plaintiff's position was eliminated altogether.  Furthermore, strong evidence exists that Plaintiff did not meet Defendant's legitimate expectations, in the form of Ms. Dillard and VOA Director Jackson's letters regarding Plaintiff's termination, which explain how Plaintiff's actions failed to comply with VOA's expectations.  It therefore appears that Plaintiff might have difficulty establishing a prima facie case of discrimination with respect to her termination, in the event that she was actually required to do so.

> b.   *Defendant's Legitimate, Non-Discriminatory Reasons*

In response to Plaintiff's claim that her termination constituted discrimination on the basis of race, sex, and religion, Defendant adduces a legitimate, non-discriminatory reason – the same reason proffered by Ms. Dillard and VOA Director Jackson in terminating Plaintiff.  Specifically, Defendant asserts that Plaintiff was terminated because VOA determined that she had either made, or allowed her husband or son to make, 47 unauthorized telephone calls to Nigeria at a cost to the agency of $2,695.12.  Def.'s Mot. for Summ. J. at 27.  In support of this conclusion, Defendant reiterates that security cameras show Plaintiff's husband being present in the studio from which the phone calls were made, during the times that the phone calls were made, and also that numerous phone calls were made to a phone number listed to an M. Wada, whom Plaintiff did not deny knowing.  *Id.*; Def.'s Term. Exs. at 4-10 (7/15/04 Letter from G. Dillard), *id.* at 23-32 (9/9/04 Letter from D. Jackson).  Defendant also highlights Ms. Dillard's statement that

Plaintiff's "position require[d] shift work and the ability to work independently without supervision," and that Plaintiff's actions – allowing the phone calls to be made and refusing to accept responsibility thereafter – "violated [Ms. Dillard's] trust in [Plaintiff] and [Ms. Dillard's] confidence in [Plaintiff's] integrity.  Def.'s Mot. for Summ. J. at 28; Def.'s Term. Exs. at 8 (7/15/04 Letter from G. Dillard).   Finally, Defendant notes that Director Jackson found Plaintiff's statement that she came into work on one occasion to work on her performance appraisal to be contradicted by the record of activity on her computer, and further found Defendant's assertion that her husband and son came to the VOA office because they had business to take care of downtown to be inconsistent with the number of hours that they spent in the office.  Def.'s Mot. for Summ. J. at 29; Def.'s Term. Exs. at 25 (9/9/04 Letter from D. Jackson).

> c.    *Evidence of Discrimination* Vel Non

Although Plaintiff does not label them as such, she advances two arguments that appear to suggest that Defendant's proffered legitimate, non-discriminatory reason for her termination is mere pretext for discrimination.  First, Plaintiff asserts that the BBG "admitted that it had never terminated any employee based on charges of unauthorized phone calls before Plaintiff's employment was terminated for those charges."  Pl.'s Opp'n at 17.  However, Plaintiff's argument fails for the reason noted above in connection with Plaintiff's prima facie case – Plaintiff cannot show that she was similarly situated to any of the individuals that she posits as comparators.  Although Plaintiff asserts that "similarly situated employees do not have to be completely identical in all aspects to be comparators,"she cites no authority for this proposition.  In fact, Plaintiff's assertion contradicts the relevant authority, which holds that "[t]o show that another individual is similarly situated, Plaintiff must "demonstrate that all of the relevant aspects of their

employment situation are nearly identical." *Childs-Pierce*, 383 F. Supp. 2d at 73.

The nine Office of Cuba Broadcasting employees are not similarly situated to Plaintiff because they appear to have self-reported their personal use of government-issued celluar phones, *see* Pl.'s Exs. for Issue No. 67 (10/29/01 Letter from K. Sutton, 11/29/06 list of Unauthorized Personal Calls for BBG), whereas Plaintiff did not self-report the unauthorized phone calls to Nigeria, or even acknowledge responsibility for those phone calls.  Moreover, as Director Jackson noted in his September 9, 2004 letter, the Office of Cuba Broadcasting employees were not supervised by Ms. Dillard or Director Jackson.  *See* Def.'s Term. Exs. at 30 (9/9/04 Letter from D. Jackson).  Similarly, Director Jackson's letter explains that while a VOA "employee called an 800-toll free number from his/her calling card and assumed that it was free.  It appears that this was an honest mistake and the employee admitted the conduct and paid the Agency back." *Id.* This situation is again factually dissimilar from Plaintiffs, both because the individual admitted his conduct, and because of the amount of money involved.  *Id.*

The Court lacks detailed information as to the case of the Audio Services Branch employee who was allowed to repay $2,127.18 in unauthorized phone calls via a payroll deduction; however, at a minimum that individual was not similarly situated to Plaintiff because she was not supervised by Ms. Dillard or Director Jackson.  *See* Def.'s Term. Exs. at 33-34 (11/30/99 Agreement); Pl.'s Exs. for Issue No. 67; Def.'s Reply at 14.  Finally, although Plaintiff alleges that Aliyu Mustapha misused a government-issued credit card by incurring approximately $32,000 worth of charges for personal purchases and cash advances, that situation is clearly not factually similar to Plaintiff's because it involves an entirely different offense.  Moreover, Ms. Grace avers that, "[w]hen notified of his misuse, Mr. Mustapha agreed immediately" to repay his

97

debt, and the government did not incur any debt in Mr. Mustapha's case.  Grace Reply Decl. ¶¶

11-12.  Plaintiff therefore has not identified a comparator to whom she is actually similarly

situated for purposes of her termination.  As a result, she fails to demonstrate pretext by asserting

that Defendant had never fired another employee for unauthorized telephone calls because, as

Director Jackson stated in his letter terminating Plaintiff, "[t]here simply is no parallel case."

Def.'s Disc. Exs. at 30 (9/9/04 Letter from D. Jackson).

Second, Plaintiff challenges Ms. Dillard's "claim that an investigation was conducted," as

well as Director Jackson's investigation of Plaintiff's computer activities for May 22, 2004.  Pl.'s

Opp'n at 18.  Defendant does not respond to these challenges in its Reply, however, the Court has

reviewed the factual record for evidence supporting Plaintiff's challenges.  In her letter proposing

to terminate Plaintiff, Ms. Dillard refers to her "investigation, conducted with assistance from

Facilities and Office of Security and Personnel."  Pl.'s Opp'n at 18; Def.'s Disc. Exs. at 4 (7/15/04

Letter from G. Dillard).  In her Opposition, Plaintiff asserts that "[w]hen the EEOC investigator

however asked for a copy of such report, none was found to have been prepared."  Pl.'s Opp'n at

18.  Plaintiff cites broadly to her exhibit, which includes a memo written by a Sam Langerman to

Melissa Clark of the OCR, in which Mr. Clark requests a copy of the investigation referred to in

Ms. Dillard's letter, Pl.'s Exs. for Issue No. 67 (3/4/05 memo from S. Langerman), as well as a

responsive memo in which Ms. Clark states that "no written investigation, other than a delineation

of the date(s), time(s), and length of the unauthorized calls, as referenced in the notice dated July

15, 2004, has ever been prepared in this case," Pl.'s Exs. for Issue No. 67 (3/7/05 Memo from M.

Clark).  Although the Court lacks additional information as to the nature of Ms. Dillard's

investigation, it is unclear that any factual dispute exists, because Ms. Dillard's letter states only

that she conducted an investigation, without indicating that any written report of that investigation was prepared.

Plaintiff also asserts that, when questioned during his deposition in this matter, "Director Jackson could not provide any detail of his investigation of [Plaintiff's] Computer activities for [May 22, 2004], claimed in his decision letter of September, 2004." Pl.'s Opp'n at 18. For once, Plaintiff provides a precise record citation in support of this assertion, identifying page 74, line 14 through page 76, line 10 of Director Jackson's deposition. *Id.* Plaintiff fails, however, to actually provide the Court with those pages of Director Jackson's deposition. As such, the Court is unable to verify Plaintiff's assertion that Director Jackson "does not know whether he directly asked the computer specialist, who that computer person was, and whether he reported to him the findings verbally or issued a report," and "does not recall also whether there exists any report of the computer analysis for activities by Plaintiff on that day May 22, 2004." *Id.* Instead, the only record evidence regarding Director Jackson's investigation is his letter regarding Plaintiff's termination, which sets out the details of his investigation into Plaintiff's computer activities, even if his memory may have later proven faulty. Thus, while Plaintiff offers two arguments that might demonstrate pretext as to Defendant's proffered reason for Plaintiff's termination, the Court is unable to credit either argument because they are unsupported by factual evidence.

In addition to her arguments that appear aimed at demonstrating pretext, Plaintiff offers arguments that, if proven, might provide "further evidence" of discrimination on the part of Defendant. Specifically, Plaintiff argues that "the harsh treatment meted [sic] Plaintiff which include security escort out of the building and the deliberate barring of Plaintiff from persons and offices duly qualified to assist Plaintiff in (exhib) defending herself from the charges were all

indicative of Defendant's discrimination, disparate treatment, discriminatory harassment and

retaliation." Pl.'s Opp'n at 18.  However, Plaintiff does not identify which pages of her multiple-

hundred-page "exhibit" purportedly support this argument, and the Court's own review of

Plaintiff's exhibit does not reveal any likely candidates.[24]  As such, the Court has no basis for

concluding that Plaintiff's treatment subsequent to her termination was in any way discriminatory

in nature.

Nor does the Court have any basis for crediting Plaintiff's assertion that Defendant

proposed to terminate a Hausa Service staff member after Plaintiff was terminated in order to

create a comparator for Plaintiff.  *See* Pl.'s Opp'n at 19-20.  As discussed above, Defendant posits

that a comparator for Plaintiff may be found in a Hausa Service IRB who incurred $12,476.38 in

unauthorized phone calls between March 28 and June 28, 2004, and whose employment Ms.

Dillard recommended be terminated.  Def.'s Term. Exs. at 35-50 (1/31/05 Memo from G. Dillard;

2/3/05 Letter from J. Welch).  Although Plaintiff bemoans Defendant's allegedly "crafty

introduction of a comparator to Plaintiff after the fact," Pl.'s Opp'n at 19, she does not provide

---

[24] The only evidence in the record that appears related to the issue of Plaintiff's exclusion from BBG buildings following her termination is Ms. Dillard's termination proposal letter, which informed Plaintiff of the procedures she was required to follow in the event that she needed "to enter any BBG/IBB building for the purpose of preparing and/or making [her] reply,"  Def.'s Term. Exs. at 10 (7/15/04 Letter from G. Dillard), and an August 6, 2004 letter from the BBG Director of Security reminding Plaintiff of those security procedures, 10/22/06 Johnson Decl. Attach. 1 (8/6/04 Letter from L. Smith).  The Director of Security's letter stated that within the previous week, Plaintiff had "twice gained access to Agency buildings without following the required security procedures set out in Ms. Dillard's July 15th letter," and warned Plaintiff, "[d]o not attempt to enter the [BBG/IBB buildings] unless you have complied with the security procedures . . . [u]nauthorized access to Agency-occupied buildings may place you in violation of Agency security procedures and further action may be taken."  *Id.*  These documents provide no evidence that Plaintiff's exclusion from the BBG buildings following her termination was in any way discriminatory in nature.

any evidence that the individual in question's termination was actually proposed in order to provide a comparator for Plaintiff.  As such, Plaintiff's speculation does not constitute "further evidence" of discrimination on the part of Defendant.

In sum, Plaintiff would have this Court conclude that her termination was discriminatory based on (1) her denial of responsibility for the unauthorized phone calls; (2) the fact that the BBG did not terminate other individuals – who were not similarly situated to Plaintiff – for unauthorized phone calls; and (3) the fact that Ms. Dillard did not create a written report of her investigation.  While it is clear that Plaintiff believes Defendant improperly terminated her, the Court notes that significant circumstantial evidence appears to support Defendant's conclusion that Plaintiff made or allowed to be made unauthorized phone calls to Nigeria at a cost to the BBG of over $2000 and that, in any event, the Court's role is not to second-guess the BBG's employment decisions.  *Holcomb*, 433 F.3d at 897.  Based on the totality of the admissible evidence before the Court, a jury could not reasonably conclude that Plaintiff's termination constituted impermissible discrimination.  As such, the Court shall grant Defendants' Motion for Summary Judgment with respect to Plaintiff's claim that her termination constituted discrimination on the basis of race, sex, or religion.

C.      *Plaintiff's Retaliation Claims*

"Like claims of discrimination, claims of retaliation are also governed by the *McDonnell Douglas* burden-shifting scheme."  *Carney v. Am. Univ.*, 151 F.3d 1090, 1094 (D.C. Cir. 1998) (citing *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984)).  To establish a prima facie case of retaliation, Plaintiff must show that (1) she engaged in statutorily protected activity; (2) a reasonable employee would have found the challenged action so materially adverse that he would

have been dissuaded from making or supporting a charge of discrimination; and (3) a causal

connection exists between the protected activity and the challenged retaliatory act. *Rochon v.*

*Gonzalez*, 438 F.3d 1211, 1219-20 (D.C. Cir. 2006). "An activity is 'protected' for the purposes

of a retaliation claim 'if it involves opposing alleged discriminatory treatment by the employer or

participating in legal efforts against the alleged treatment.'" *Lemmons v. Georgetown Univ. Hosp.*,

431 F. Supp. 2d 76, 91 (D.D.C. 2006) (quoting *Coleman v. Potomac Elec. Power Co.*, 422 F.

Supp. 2d 209, 212-13 (D.D.C. 2006)). Furthermore, the Supreme Court recently clarified in

*Burlington Northern & Santa Fe Railway Co. v. White*, --- U.S. ---, 126 S. Ct. 2405, 165 L. Ed. 2d

345, that, because Title VII's retaliation and discrimination provisions are not "coterminous," *id.*

at 2414, the anti-retaliation provision of Title VII is "not limited to discriminatory actions that

affect the terms and conditions of employment," *id.* at 2412-13. In so doing, however, the

Supreme Court emphasized that the "anti-retaliation provision protects an individual not from all

retaliation, but from retaliation that produces an injury or harm." *Id.* at 2414. Moreover, "[a]n

employee's decision to report discriminatory behavior cannot immunize that employee from those

petty slights or minor annoyances that often take place at work and that all employees

experience." *Id.* at 2415. It is therefore " important to separate significant from trivial harms,"

*id.*, and to recognize that "the significance of any given act of retaliation will often depend upon

the particular circumstances," *id.* at 2415-16.

       1.    *Count IV - Retaliatory Discipline – Application of the* McDonnell Douglas
             *Analysis*

      Count IV of Plaintiff's Complaint alleges that she was disciplined in retaliation for her

protected activity, specifically her August 2001 contact with the OCR and her subsequent formal

EEO Complaint in September 2001.  Compl. ¶¶ 6, 38-40.  In its motion for summary judgment,

Defendant asserts that Plaintiff's claim of retaliatory discipline fails for a number of reasons.

Plaintiff's Opposition contains a heading entitled "Retaliation," however, that section relates to

Plaintiff's non-selection as Hausa Service Chief and does not even discuss allegedly retaliatory

activities.  Pl.'s Opp'n at 11-13.  Instead, Plaintiff's sole reference to allegedly retaliatory

discipline is an assertion that statements relied upon by Defendant in connection with the October

3 Broadcast "were apparently made only to forcefully implicate Plaintiff and provide reasons for

retaliations against her for engaging in protected activity and such actions as seeking honest pay

for honest work; reclassification, and seeking to assert her rights to selection for the Supervisory

Hausa position by filing an EEOC Complaint."  *Id.* at 8.  It is therefore unclear whether Plaintiff

has conceded her claim of retaliatory discipline; however, the Court will nevertheless briefly

address the merits of that claim.

In its motion for summary judgment, Defendant first argues that Plaintiff cannot make out

a prima facie case of retaliation because her reassignment, proposed suspensions, and letter of

reprimand do not constitute materially adverse actions under the standard set forth in *Burlington

Northern*.  Def.'s Mot. for Summ. J. at 33, 35.   The Court agrees with Defendant as to Plaintiff's

proposed suspension, which was never issued; however, for the reasons discussed above in

connection with her discrimination claims, the Court will assume that Plaintiff's reassignment and

letter of reprimand may constitute materially adverse actions for purposes of her retaliation claim.

Plaintiff nevertheless cannot make out a prima facie case of retaliation as to her letter of

reprimand because, as Defendant correctly argues, she cannot demonstrate a causal connection

between her statutorily protected conduct and her letter of reprimand.  Def.'s Mot. for Summ. J. at

35-36.  Plaintiff's letter of reprimand was issued on September 25, 2002 – more than a year after

she engaged in statutorily protected conduct – and those cases that accept mere temporal

proximity between an employer's knowledge of a protected activity and an adverse employment

action as sufficient evidence of causality to establish a prima facie case uniformly hold that the

temporal proximity must be 'very close.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-

74, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205,

209 (10th Cir. 1997) (3-month period insufficient) and *Hughes v. Derwinski*, 967 F.2d 1168,

1174-75 (7th Cir. 1992) (4-month period insufficient)).   Moreover, the deciding official for

Plaintiff's letter of reprimand was Ms. Skiba, who was in no way involved in the events

underlying Plaintiff's September 2001 EEOC complaint – the Hausa Service Chief selection and

the denial of Plaintiff's reclassification request.  *Cf. Bieber v. Runyon*, Civ. A. No. 93-1391

(JHG), 1996 WL 525372, * 11 (D.D.C. Sept. 9, 1996) (plaintiff failed to establish prima facie

case of retaliation where allegedly retaliatory action was taken by individual not implicated in

Plaintiff's earlier EEOC complaint).  Nor has Plaintiff presented evidence that Ms. Skiba was

aware of Plaintiff's EEOC activity when she decided that Plaintiff should receive a letter of

reprimand.  As such, Plaintiff has failed to demonstrate a causal connection between her EEOC

activity and her letter of reprimand, and thus to establish a prima facie case of retaliation.

Plaintiff's claim for retaliatory discipline is therefore limited to her reassignment;

however, Plaintiff cannot survive summary judgment on this count for the same reasons that are

fatal to her discrimination claim of disparate discipline.  Defendant has proffered a legitimate,

non-discriminatory reason for Plaintiff's reassignment – Plaintiff's failure to review the stringer

report containing the interview with Sheikh Bauchi before the October 3 Broadcast – and, for the

reasons discussed above in connection with Plaintiff's disparate discipline claim, Plaintiff cannot

demonstrate that this reason is mere pretext for retaliation.  Nor does Plaintiff offer any "further

evidence" from which a reasonable jury could conclude that Plaintiff's reassignment constituted

retaliation for her earlier protected activity.  The Court shall therefore grant Defendant's motion

for summary judgment as to Count IV of Plaintiff's Complaint.

> 2. *Plaintiff's Termination – Application of the* McDonnell Douglas *Analysis*

By Order dated October 14, 2005, the Court allowed Plaintiff to amend her complaint to

include the allegations raised in EEOC Complaint No. 100-2004-00943 and OCR Complaint No.

OCV-04-24, which the Court described as a claim "that Plaintiff was terminated by Defendant as

part of the pattern of retaliation alleged in her Complaint in this case."  *Wada v. Tomlinson*, Civil

Action No. 03-1488, Order (D.D.C. Oct. 14, 2005).  Neither Defendant's motion for summary

judgment nor Plaintiff's Opposition to that motion specifically addresses a claim that Plaintiff's

termination constituted retaliation for protected EEOC activity.  Nevertheless, the Court notes that

Plaintiff's retaliation claim suffers from the same weaknesses that ultimately prove fatal to

Plaintiff's claim that her termination constituted impermissible discrimination on the basis of

race, sex, or religion.

As an initial matter, the Court notes that Plaintiff would likely have difficulty

demonstrating the requisite causal connection between her EEOC activity and her termination.

Based on the Court's review, it appears that Plaintiff's last EEOC activity prior to her termination

was the formal complaint she filed on January 2, 2004 regarding her "Minimally Successful"

performance review, her AWOL charge, and the garnishment action against her.  *See* Def.'s

Garnish. Exs. at 1-3.  Ms. Dillard did not propose to terminate Plaintiff until July 15, 2004, and

that termination was not effective until September 10, 2004.  However, as noted above, those cases that accept mere temporal proximity between an employer's knowledge of a protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark County Sch. Dist.*, 532 U.S. at 273-74, 121 S. Ct. 1508 (citing *Richmond*, 120 F.3d at 209 (3-month period insufficient) and *Hughes*, 967 F.2d at 1174-75 (4-month period insufficient)).

Furthermore, even if Plaintiff could establish a prima facie case of retaliation based on her termination, she could not avoid summary judgment on that claim.  As discussed in detail above, Defendant has adduced a legitimate, non-discriminatory reason for Plaintiff's termination – her making or allowing to be made the unauthorized phone calls to Nigeria and her subsequent refusal to take responsibility for the phone calls – and Plaintiff has not shown that reason to be pretextual. Nor has Plaintiff proffered any "further evidence" of retaliation on the part of Defendant.  In sum, as with her discrimination claim, Plaintiff cannot bear her "ultimate burden of persuading the court that [he] has been the victim of intentional [retaliation]." *Burdine*, 450 U.S. at 256, 101 S. Ct. 1089.  As no reasonable jury could conclude that Defendant retaliated against Plaintiff for her EEOC activity, Plaintiff's claim that her termination was retaliatory in nature cannot survive Defendant's motion for summary judgment.

D.     *Count V – Hostile Work Environment*

Count V of Plaintiff's Complaint is titled "Employment Discrimination – Retaliatory and Discriminatory Harassment," and alleges that Defendant created, engaged in, tolerated, and encouraged a "harassing and hostile environment in retaliation against Plaintiff for her protected activity and because of her race, sex, and/or religion."  Compl. ¶ 42.  Plaintiff's Complaint further

alleges that through their conduct "including but not limited to depressed performance ratings, security office interrogation, improper assignment of hours, and improper leave administration, the Agency, Ms. Dillard and Mr. Dare encouraged, created, engaged in, and tolerated a pattern and practice of continuing retaliatory harassment against Plaintiff." *Id.* ¶ 26. Count V thus amounts, in essence, to a claim of hostile work environment.

To establish a claim of a hostile work environment, a plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment occurred because of the plaintiff's protected status; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question but nonetheless failed to either take steps to prevent it or afford the plaintiff prompt remedial action. *See Baloch v. Norton*, 355 F. Supp. 2d 246, 259 (D.D.C. 2005) (citing cases); *Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 120 (D.D.C. 2004). In determining whether a hostile work environment exists, the Supreme Court has directed the courts to look at the totality of the circumstances, including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct.367, 126 L. Ed. 2d 295 (1993)). While the plaintiff is not required to plead a *prima facie* case of hostile work environment in the complaint, the alleged facts must be able to support such a claim. *See Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1114 (D.C. Cir. 2000).

The Supreme Court has held that a hostile work environment exists only "[w]hen the

workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 22 (quotation omitted).  In addition, the Supreme Court has circumscribed the definition of a hostile work environment so that "[t]hese standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher*, 524 U.S. at 788, 118 S. Ct. 2275 (citations omitted).  Indeed, these standards are intended to "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Id.* (citations omitted).  "Even a few isolated incidents of offensive conduct do not amount to actionable harassment." *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002) (citing *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996) ("holding that the fact that alleged incidents were spread over a seven-year period suggested that the harassment was not sufficiently pervasive to establish [] Title VII liability"); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) ("holding that nine incidents spread over seven months did not constitute sexual harassment because the supervisor never touched the employee and incidents were not sufficiently severe or pervasive")).

In her Opposition, Plaintiff asserts that she "was indeed subjected to a hostile work environment." Pl.'s Opp'n at 16.  In support of this assertion Plaintiff claims that Mr. Dare's "past writings and also ethnic background . . . was clearly marked by history as antagonistic to the Hausa Speaking Group." *Id.*  Plaintiff further claims that "[t]he moment [Mr. Dare] arrived in August, a succession of harassments surfaced," which included "forcing a weekend schedule on Plaintiff to run for weeks, and later a four months night shift schedule . . . humiliating discussions

of Plaintiff's official duties in general meetings and subjecting them to a vote, and . . . the removal

of Plaintiff's editorial responsibility and a proposal to suspend Plaintiff." *Id.*  In addition, Plaintiff

asserts that she suffered "intimidatory verbal abuse and harassments" and constant monitoring,

and that she was "overworked and not allowed leave taking as other employees." *Id.* at 16-17.

 As an initial matter, the Court notes that Plaintiff cannot simply regurgitate her disparate

discipline and retaliatory discipline claims in an effort to flesh out her hostile work environment

claim. *See Keeley*, 391 F. Supp. 2d at 51 ("The remainder of plaintiff's alleged 'hostile' events

are the very employment actions he claims are retaliatory; he cannot so easily bootstrap alleged

retaliatory incidents into a broader hostile work environment claim.").  Moreover, Plaintiff's

hostile work environment claim consists of an amalgam of claims – her 2001-2002 and 2002-

2003 performance evaluations, her AWOL charge, the Office of Security investigation, and her

overtime and work assignments – for which Plaintiff failed to exhaust her administrative

remedies. *See supra* Section A.  However, "[P]lainitff cannot cure [her] failure to exhaust [her]

complaints about these incidents by sweeping them under the rubric of a hostile work

environment claim." *Patterson v. Johnson*, 391 F. Supp. 2d 140, 146 (D.D.C. 2005).

Furthermore, to the extent that Plaintiff's hostile work environment claim is comprised of a series

of discrete acts, it suffers from an additional infirmity because "[d]iscrete acts constituting

discrimination or retaliation claims . . . are different in kind from a hostile work environment

claim that must be based on severe and pervasive discriminatory intimidation or insult." *Lester v.

Natsios*, 290 F. Supp. 2d 11, 33 (D.D.C. 2003).

 Even more fundamentally, Plaintiff's hostile work environment claim lacks merit because

many of the allegations she levels are entirely unsupported by documentary evidence.  First,

Plaintiff has proffered no evidence whatsoever that Mr. Dare's "previous writing" demonstrated a hostility to members of the Hausa ethnic group or, as Plaintiff also claims, that "African sources and Nigerian Scholars, professionals and general public in the United States clearly warned about Mr. Dare's background and his being hostile to Hausa speaking group." Pl.'s Opp'n at 16.[25]  Nor has Plaintiff offered evidence to substantiate her claim regarding "humiliating discussions of Plaintiff's official duties in general meetings and subjecting them to a vote," or being "confined to her desk by constant monitoring." *Id.* at 16-17.

Moreover, Plaintiff alleges that she was subjected to "intimidatory verbal abuse and harassments," and "a tirade by Mr. Dare which occurred several times (exhib) and had always been directed at Plaintiff and no one else in the Service." Pl.'s Opp'n at 16-17.  However, when asked about her allegation of "verbal abuse" during her deposition, the only incident that Plaintiff reported was Mr. Dare shouting at her when she came to work on the morning of April 19, 2002, "Hadiza . . . who told you you were going to be MC?  I've already chosen my MC." *See* 12/3/04 Wada Dep. at 191:16-192:1.  This lone incident, in and of itself, simply does not rise to the level of a hostile work environment. *See Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 56 (D.D.C. 2004) ("Criticisms of a subordinate's work and expressions of disapproval (even loud expressions of disapproval) are the kinds of normal strains that can occur in any office setting.")).

---

[25] In her "Argument Exhibits" Plaintiff includes two e-mails written in November 2001 by Americans living in Nigeria, neither of which discusses Mr. Dare in any way, and both of which were clearly written after Mr. Dare was hired as Hausa Service Chief. *See* Pl.'s Arg. Exs. (11/11/01 e-mail from C. McCain; 11/11/01 e-mail from R. Rice).  In addition, Plaintiff proffers an article from an unidentified online publication entitled "Obasanjo's Tentacles in Washington," which describes Plaintiff's termination; however as that article is dated September 15, 2004 it also post-dates Mr. Dare's selection as Hausa Service Chief. *See* Pl.'s Arg. Exs. (9/15/04 Article).

The remaining allegations comprising Plaintiff's hostile work environment claim include "depressed performance ratings, improper assignment of hours and overtime, and improper leave administration," Compl. ¶ 26, by which the Court assumes Plaintiff to be referring to her 2001-2002 "Fully Successful" performance rating, her 2002-2003 "Minimally Successful" performance rating, her AWOL charge, her overtime assignment on the weekend of April 19-20, 2003, and the changes that Mr. Dare made to her work schedule.  As discussed above, however, with respect to each of these incidents, Plaintiff fails to allege that Mr. Dare and Ms. Dillard's actions were in any way the result of Plaintiff's race, sex, or religion or to identify the specific protected activity for which she was allegedly retaliated against.  *See supra* Section I.E.  Nor does Plaintiff allege that Mr. Dare or Ms. Dillard ever made any reference, joking or otherwise, to Plaintiff's race, sex, or religion.  *See* 12/3/04 Wada Dep. at 104:8-105:17, 135:1-10; 287:3-288:8.  While Plaintiff's arguments regarding these issues clearly evidence her dissatisfaction with Mr. Dare and Ms. Dillard's management, they altogether fail to demonstrate a "workplace . . . permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris*, 510 U.S. at 22 (quotation omitted).  Plaintiff has thus failed to adduce evidence of a hostile work environment, let alone a hostile work environment on the basis of race, sex, or religion.  "[I]t must be clear that the hostile work environment was the result of discrimination based on a protected status otherwise the federal courts will become a court of personnel appeals."  *Singh*, 300 F. Supp. 2d at 48 (internal citation and quotation marks omitted); *Lester v. Natsios*, 290 F. Supp. 2d 11, 18 (D.D.C. 2003).  Accordingly, the Court will grant Defendant's Motion for Summary Judgment as to Count V of Plaintiff's Complaint.

**IV: CONCLUSION**

For the reasons set forth above, the Court shall grant Defendant's Motion for Summary

Judgment in its entirety.  An appropriate Order accompanies this Memorandum Opinion.


Date:   May 9, 2007

                                    _____/s/_____
                                    COLLEEN KOLLAR-KOTELLY
                                    United States District Judge